**Fill in this information to identify your case:**

United States Bankruptcy Court for the:

DISTRICT OF DELAWARE

Case number *(if known)* _____     Chapter   **11**

☐ Check if this an amended filing

Official Form 201

# Voluntary Petition for Non-Individuals Filing for Bankruptcy

06/24

If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and the case number (if known). For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals,* is available.

| | | | |
|---|---|---|---|
| 1. | **Debtor's name** | **Rainbow Digital Services, LLC** | |
| 2. | **All other names debtor used in the last 8 years** Include any assumed names, trade names and *doing business as* names | | |
| 3. | **Debtor's federal Employer Identification Number** (EIN) | **95-4859827** | |

4. **Debtor's address**

| Principal place of business | Mailing address, if different from principal place of business |
|---|---|
| **2901 W Alameda Blvd.** **4th Floor** **Burbank, CA 91505** Number, Street, City, State & ZIP Code | P.O. Box, Number, Street, City, State & ZIP Code |
| **Los Angeles** County | **Location of principal assets, if different from principal place of business** Number, Street, City, State & ZIP Code |

5. **Debtor's website** (URL) _____

6. **Type of debtor**

☑ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))

☐ Partnership (excluding LLP)

☐ Other. Specify: _____

Debtor    **Rainbow Digital Services, LLC**    Case number (if known) _____
_____
         Name

**7.** **Describe debtor's business**    A. *Check one:*

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))

☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

☐ Railroad (as defined in 11 U.S.C. § 101(44))

☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))

☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))

☐ Clearing Bank (as defined in 11 U.S.C. § 781(3))

☑ None of the above

B. *Check all that apply*

☐ Tax-exempt entity (as described in 26 U.S.C. §501)

☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. §80a-3)

☐ Investment advisor (as defined in 15 U.S.C. §80b-2(a)(11))

C. NAICS (North American Industry Classification System) 4-digit code that best describes debtor. See http://www.uscourts.gov/four-digit-national-association-naics-codes.

**5121**

**8.** **Under which chapter of the Bankruptcy Code is the debtor filing?**    *Check one:*

☐ Chapter 7

☐ Chapter 9

☑ Chapter 11. *Check **all** that apply:*

☐ Debtor's aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $3,024,725 (amount subject to adjustment on 4/01/25 and every 3 years after that).

☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D). If the debtor is a small business debtor, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if all of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D), and it chooses to proceed under Subchapter V of Chapter 11.

☐ A plan is being filed with this petition.

☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).

☐ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934. File the *Attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11* (Official Form 201A) with this form.

☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.

☐ Chapter 12

**9.** **Were prior bankruptcy cases filed by or against the debtor within the last 8 years?**
If more than 2 cases, attach a separate list.

☑ No.
☐ Yes.

District _____ When _____ Case number _____
District _____ When _____ Case number _____

**10.** **Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?**

☐ No
☑ Yes.

List all cases. If more than 1, attach a separate list

Debtor    **See Attachment**    Relationship _____
District _____ When _____ Case number, if known _____

| Debtor | **Rainbow Digital Services, LLC** | Case number (*if known*) | |
|---|---|---|---|
| | Name | | |

---

**11. Why is the case filed in *this district*?**   *Check all that apply:*

☐ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.

☑ A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district.

---

**12. Does the debtor own or have possession of any real property or personal property that needs immediate attention?**

☑ No

☐ Yes. Answer below for each property that needs immediate attention. Attach additional sheets if needed.

**Why does the property need immediate attention?** (*Check all that apply.*)

☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.
 What is the hazard? _____

☐ It needs to be physically secured or protected from the weather.

☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).

☐ Other _____

**Where is the property?** _____
 Number, Street, City, State & ZIP Code

**Is the property insured?**

☐ No

☐ Yes.   Insurance agency _____

 Contact name _____

 Phone _____

---

■ **Statistical and administrative information**

---

**13. Debtor's estimation of available funds**   .   *Check one:*

☑ Funds will be available for distribution to unsecured creditors.

☐ After any administrative expenses are paid, no funds will be available to unsecured creditors.

---

**14. Estimated number of creditors**

| | | |
|---|---|---|
| ☑ 1-49 | ☐ 1,000-5,000 | ☐ 25,001-50,000 |
| ☐ 50-99 | ☐ 5001-10,000 | ☐ 50,001-100,000 |
| ☐ 100-199 | ☐ 10,001-25,000 | ☐ More than 100,000 |
| ☐ 200-999 | | |

---

**15. Estimated Assets**

| | | |
|---|---|---|
| ☐ $0 - $50,000 | ☐ $1,000,001 - $10 million | ☐ $500,000,001 - $1 billion |
| ☐ $50,001 - $100,000 | ☑ $10,000,001 - $50 million | ☐ $1,000,000,001 - $10 billion |
| ☐ $100,001 - $500,000 | ☐ $50,000,001 - $100 million | ☐ $10,000,000,001 - $50 billion |
| ☐ $500,001 - $1 million | ☐ $100,000,001 - $500 million | ☐ More than $50 billion |

---

**16. Estimated liabilities**

| | | |
|---|---|---|
| ☐ $0 - $50,000 | ☐ $1,000,001 - $10 million | ☐ $500,000,001 - $1 billion |
| ☐ $50,001 - $100,000 | ☑ $10,000,001 - $50 million | ☐ $1,000,000,001 - $10 billion |
| ☐ $100,001 - $500,000 | ☐ $50,000,001 - $100 million | ☐ $10,000,000,001 - $50 billion |
| ☐ $500,001 - $1 million | ☐ $100,000,001 - $500 million | ☐ More than $50 billion |

---

Debtor   **Rainbow Digital Services, LLC**                                    Case number (*if known*) _____
         Name

| | **Request for Relief, Declaration, and Signatures** |

**WARNING --** Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

**17. Declaration and signature of authorized representative of debtor**

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

I have been authorized to file this petition on behalf of the debtor.

I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on   11/04/2024
              MM / DD / YYYY

Signed by:

X  *Peter Coleman*
   8F4148C615FF49C...
   Signature of authorized representative of debtor          **Peter Coleman**
                                                             Printed name

Title   **Manager**

**18. Signature of attorney**

X  */s/ Ericka F. Johnson*                          Date  11/04/2024
   Signature of attorney for debtor                       MM / DD / YYYY

   **Ericka Johnson**
   Printed name

   **Bayard P.A.**
   Firm name

   **600 North King Street, Suite 400**
   **Wilmington, DE 19801**
   Number, Street, City, State & ZIP Code

   Contact phone  **(302) 655-5000**   Email address  **ejohnson@bayardlaw.com**

   **5024 DE**
   Bar number and State

Debtor    **Rainbow Digital Services, LLC**                              Case number (*if known*) _____
          Name

| Fill in this information to identify your case: |
| --- |

United States Bankruptcy Court for the:

DISTRICT OF DELAWARE

Case number (*if known*) _____    Chapter    **11**

☐ Check if this an
   amended filing

## FORM 201. VOLUNTARY PETITION

## Pending Bankruptcy Cases Attachment

| Debtor | **EPS-Cineworks, Inc.** | | | Relationship to you | **Affiliate** |
| --- | --- | --- | --- | --- | --- |
| District | **Delaware** | When | 11/04/2024 | Case number, if known | |
| Debtor | **Film Finances, Inc.** | | | Relationship to you | **Affiliate** |
| District | **Delaware** | When | 11/04/2024 | Case number, if known | |
| Debtor | **Rainbow Production Services, LLC** | | | Relationship to you | **Affiliate** |
| District | **Delaware** | When | 11/04/2024 | Case number, if known | |

# United States Bankruptcy Court
## District of Delaware

In re   **Rainbow Digital Services, LLC**

Debtor(s)

Case No.

Chapter   **11**

## CORPORATE OWNERSHIP STATEMENT (RULE 7007.1)

Pursuant to Federal Rule of Bankruptcy Procedure 7007.1 and to enable the Judges to evaluate possible disqualification or recusal, the undersigned counsel for   **Rainbow Digital Services, LLC**   in the above captioned action, certifies that the following is a (are) corporation(s), other than the debtor or a governmental unit, that directly or indirectly own(s) 10% or more of any class of the corporation's(s') equity interests, or states that there are no entities to report under FRBP 7007.1:

**Rainbow Production Services, LLC**
**110 Leroy Street**
**New York, NY 10013**

☐ None [*Check if applicable*]

11/04/2024

Date

Signed by:

*Peter Coleman*

6E4148C815FE49C...

**Peter Coleman**

Manager

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 11 |
| RAINBOW DIGITAL SERVICES, LLC, *et al.*,[1] | Case No. 24___ ([___]) |
| Debtors. | (Joint Administration Requested) |

## List of Equity Security Holders

The following is a list of debtor Rainbow Digital Services, LLC's significant equity holders. This list has been prepared in accordance with Federal Rules of Bankruptcy Procedure 1007(a)(3) for filing in this chapter 11 case.

| Equity Holder | Address of Equity Holder | Percentage of Equity Held |
|---|---|---|
| **Rainbow Production Services, LLC** | **110 Leroy Street New York, NY 10013** | **100%** |

---

[1]   The address of the Debtors is 9000 Sunset Blvd., Ste. 1400, Los Angeles, CA 90069.  The last four digits of the Debtors' federal tax identification numbers are: (i) Rainbow Production Services, LLC (4758); (ii) Rainbow Digital Services, LLC (9827); (iii) Film Finances, Inc. (7130) and (iv) EPS-Cineworks, Inc.  (3355).

**Fill in this information to identify the case and this filing:**

Debtor Name  Rainbow Digital Services, LLC

United States Bankruptcy Court for the: _____ District of  Delaware
                                                                    (State)

Case number (*If known*):  _____24-_____

Official Form 202

# Declaration Under Penalty of Perjury for Non-Individual Debtors                12/15

**An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date.  Bankruptcy Rules 1008 and 9011.**

**WARNING -- Bankruptcy fraud is a serious crime.  Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both.  18 U.S.C. §§ 152, 1341, 1519, and 3571.**

## Declaration and signature

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

☐  *Schedule A/B: Assets–Real and Personal Property* (Official Form 206A/B)

☐  *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 206D)

☐  *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 206E/F)

☐  *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G)

☐  *Schedule H: Codebtors* (Official Form 206H)

☐  *Summary of Assets and Liabilities for Non-Individuals* (Official Form 206Sum)

☐  Amended *Schedule _____*

☒  *Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 30 Largest Unsecured Claims and Are Not Insiders* (Official Form 204)

☒  Other document that requires a declaration___List of Equity Security Holders_____

I declare under penalty of perjury that the foregoing is true and correct.

Executed on    11/04/2024        ✗   *Peter Coleman*
               MM / DD / YYYY              └─6E4148C815FE49C...─┘
                                         Signature of individual signing on behalf of debtor

                                         Peter Coleman
                                         Printed name

                                         Manager
                                         Position or relationship to debtor

Official Form 202                 **Declaration Under Penalty of Perjury for Non-Individual Debtors**

**Fill in this information to identify the case:**

**Debtor name:** Rainbow Production Services, LLC, et al.

**United States Bankruptcy Court for the:** District of Delaware

**Case number (if known):** 24-_____

☐ Check if this is an amended filing

Official Form 204

## Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 30 Largest Unsecured Claims and Are Not Insiders, on a Consolidated Basis 12/15

A list of creditors holding the 30 Largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. **Do not include claims by any person or entity who is an insider, as defined in 11 U.S.C. § 101(31). Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 30 Largest unsecured claims.**

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent unliqui-dated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 1 | Internal Revenue Service Internal Revenue Service Ogden UT 84201-0039 | Fax: 267-941-1015 | Taxes | ☐ C ☐ U ☐ D | | | $14,875,010.00 |
| 2 | Franchise Tax Board PO Box 942857 Sacramento CA 94257-0511 | | Taxes | ☐ C ☐ U ☐ D | | | $2,130,255.00 |
| 3 | Quinn Emanuel Urquhart & Sullivan, LLP 865 S. Figueroa St., 10th Floor Los Angeles CA 90017 | Gary E. Gans Tel: 213-443-3210 garygans@quinnemanuel.com | Service | ☐ C ☐ U ☐ D | | | $512,906.62 |
| 4 | 7080 Hollywood, LLC 135 N. Los Robles Ave #600 Pasadena CA 91101 | Michael Park Tel: 310-997-1897 michaelpark@jamisonservices.com | Trade Payable | ☐ C ☐ U ☐ D | | | $450,000.00 |
| 5 | Atlas V Leroy 40 W 57Th St. 29th Floor New York CA 10019 | cmok@atlas-cap.com | Trade Payable | ☐ C ☐ U ☐ D | | | $410,000.00 |
| 6 | Cahuenga Tower 9631 De Soto Chatsworth CA 91311 | Bahar Minoo Tel: 213-624-4040 x 102 bahar@4minvestment.com | Trade Payable | ☐ C ☐ U ☐ D | | | $170,000.00 |

Debtor    **Rainbow Production Services, LLC, et al.**    Case number *(if known)* **24-_____**

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 7 | The Link Property Owner LLC Dept La Pasadena CA 91185 | Brittney Hwang Tel: 310-997-1897 bhwang@pendulumpp.com | Trade Payable | ☐ C ☐ U ☐ D | | | $163,000.00 |
| 8 | DE 12121 Wilshire 12121 Wilshire Blvd Suite 730 Los Angeles CA 90025 | Greg Owens Tel: 310-820-1287 greg.owens@douglasemmett.com | Trade Payable | ☐ C ☐ U ☐ D | | | $128,500.00 |
| 9 | KPMG LLP 3 Chestnut Ridge Rd. Montvale NJ 07645 | Vilma Stephenson Tel: 858-750-7219 Fax: 858-430-2563 vstephenson@kpmg.com | Service | ☐ C ☐ U ☐ D | | | $120,000.00 |
| 10 | Soundtrack NY 162 Columbus Ave Boston MA 02116 | Donna Raymond Tel: 212-420-6010 donnaraymond@soundtrackgroup.com | Trade Payable | ☐ C ☐ U ☐ D | | | $76,000.00 |
| 11 | Tower Burbank Owner LLC 3900 W Alameda Ave Suite 100 Burbank CA 91505 | Angela Lucatorto Tel: 818-955-7200 AngelaL@worthe.com | Trade Payable | ☐ C ☐ U ☐ D | | | $60,000.00 |
| 12 | Mani Brothers Nine Thousand (DE), LLC 9200 W. Sunset Blvd Suite 555 West Hollywood CA 90069 | Isabel Bustamante Tel: 310-777-5000 isabel@manibrothers.com | Trade Payable | ☐ C ☐ U ☐ D | | | $53,550.00 |
| 13 | Balboa Capital P.O. Box 844803 Los Angeles CA 90084 | Catherine Mok customerservice@balboacapital.com | Trade Payable | ☐ C ☐ U ☐ D | | | $48,500.00 |
| 14 | AFCO 150 N. Field Drive Suite 190 Lake Forest IL 60045 | Tel: 877-701-1212 | Trade Payable | ☐ C ☐ U ☐ D | | | $42,000.00 |
| 15 | Baby Broom General Cleaning 75 Riverdale Rd Valley Stream NY 11581 | Alex Orellana babybroomgralcleanservice@gmail.com | Trade Payable | ☐ C ☐ U ☐ D | | | $20,000.00 |
| 16 | ABM Parking Services 710 S. Glenwood Place Burbank CA 91506 | invoices@abmparkingservices.com | Trade Payable | ☐ C ☐ U ☐ D | | | $15,000.00 |

Debtor    **Rainbow Production Services, LLC, et al.**                                        Case number *(if known)* **24-_____**

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent unliqui-dated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 17 | Cordova West Properties 101 South First Street Suite 400 Burbank CA 91502 | Charles Cusumano Tel: 818.841-5800 | Trade Payable | ☐ C ☐ U ☐ D | | | $13,979.00 |
| 18 | Megan Properties 18035 Boris Dr. Encino CA 91316 | Nina Coffey Tel: 818-929-8088 | Trade Payable | ☐ C ☐ U ☐ D | | | $13,322.00 |
| 19 | Melrose Mac 6614 Melrose Ave Los Angeles CA 90038 | Monica Cabrera | Trade Payable | ☐ C ☐ U ☐ D | | | $10,000.00 |
| 20 | Ipower Resale 6383 Rose Lane Suite A Carpinteria CA 93013 | Tobias Prins | Trade Payable | ☐ C ☐ U ☐ D | | | $10,000.00 |
| 21 | Cashet 4325 Girard St. Metairie LA 70001 | billing@cashetservices.com | Trade Payable | ☐ C ☐ U ☐ D | | | $10,000.00 |
| 22 | Boris Fx 198 Dean Rd. Brookline MA 02445 | Mike Maguire Tel: 617-451-9900 sales@borisfx.com | Trade Payable | ☐ C ☐ U ☐ D | | | $10,000.00 |
| 23 | RSM US LLP 4650 East 53rd St Davenport IA 52807 | Aryan Azarani Tel: 213-330-4586 aryan.azarani@rsmus.com | Service | ☐ C ☐ U ☐ D | | | $8,400.00 |
| 24 | Zayo PO Box 952136 Dallas TX 75395 | | Trade Payable | ☐ C ☐ U ☐ D | | | $7,000.00 |
| 25 | SP+ 8037 Collection Center Dr Chicago IL 60693 | Rick Ortiz Tel: 323-464-0240 rortiz@spplus.com | Trade Payable | ☐ C ☐ U ☐ D | | | $7,000.00 |
| 26 | Metropolis PO Box 6870 Carol Stream IL 60197 | Baptiste Dradin Tel: 424-438-9645 baptiste@metropolis.io | Trade Payable | ☐ C ☐ U ☐ D | | | $7,000.00 |
| 27 | Film Logic 15100 S. Broadway Gardena CA 90248 | Tel: 310-352-1122 www.filmlogicchb.com | Trade Payable | ☐ C ☐ U ☐ D | | | $7,000.00 |

Debtor    **Rainbow Production Services, LLC, et al.**                     Case number *(if known)* **24-_____**

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent unliqui-dated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 28 | Rediger Investment Corporation 4400 Riverside Dr #110-2700 Burbank CA 91505 | Daren Rediger Tel: 818-842-2312 fourredsdr@gmail.com | Trade Payable | ☐ C ☐ U ☐ D | | | $5,000.00 |
| 29 | Annex Solar Electric 1036 North Lake St Burbank CA 91502 | Henrik Arklian Tel: 818-237-8644 henrik@annexsolar.us | Trade Payable | ☐ C ☐ U ☐ D | | | $4,000.00 |
| 30 | Dial Industries Inc. DBA Filmtek Cloud 812 W Layton Ave Ste B Salt Lake City UT 84104 | Allen Dial allen.dial@filmtekcloud.com | Trade Payable | ☐ C ☐ U ☐ D | | | $3,000.00 |

**JOINT ACTION BY UNANIMOUS WRITTEN CONSENT**
**OF**
**THE MEMBER AND THE MANAGER**
**OF**
**RAINBOW DIGITAL SERVICES, LLC**

October 31, 2024

The undersigned, being the sole member (the "**Member**") of Rainbow Digital Services, LLC, a California limited liability company (the "**Company**"), and the sole manager of the Company (the "**Manager**"), in accordance with the Limited Liability Company Operating Agreement of the Company and applicable California law, hereby adopt the following resolutions by unanimous written consent:

**FILING OF CHAPTER 11 BANKRUPTCY CASES**

**WHEREAS**, the Company has determined that it is desirable and in the best interests of the Company and its creditors, employees, and other interested parties that a petition be filed by the Company, seeking relief under the provisions of Chapter 11 of 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**").

**NOW, THEREFORE, BE IT RESOLVED**, that the Manger and Member have determined that it is advisable and in the best interests of the Company to file a voluntary petition for relief in the Bankruptcy Court; and

**RESOLVED FURTHER**, that Peter Coleman (the "**Responsible Officer**"), and anyone designated by the Responsible Officer, is hereby authorized, in the name and on behalf of the Company, and in such capacity, acting alone or together, with power of delegation, be, and they hereby are, authorized and empowered to commence a Chapter 11 bankruptcy case under the Bankruptcy Code and to execute and file on behalf of the Company, including in the Company's capacity as shareholder or member of its subsidiaries, all petitions, schedules, lists, applications, pleadings and other motions, papers, agreements, consents or documents, and to take any and all action that they deem necessary or proper to obtain such relief, including, without limitation, any action necessary to maintain the ordinary course operation of the Company's businesses (collectively, the "**Bankruptcy Case**").

**RETENTION OF PROFESSIONALS**

**RESOLVED**, that the Responsible Officer be, and hereby is, authorized and directed to employ the law firm of Levene, Neale, Bender, Yoo & Golubchik L.L.P. ("**LNBYG**") as general bankruptcy counsel to represent and assist the Company in carrying out its duties under the Bankruptcy Code, file the Chapter 11 bankruptcy petition and represent the Company in the Bankruptcy Case; and in connection therewith, the Responsible Officer, with power of delegation, is hereby authorized and directed to execute appropriate retention agreements, pay appropriate retainers, and to cause to be filed an appropriate application for authority to retain the services of LNBYG;

**RESOLVED FURTHER**, that the Responsible Officer be, and hereby is authorized and directed to employ, the law firm of Bayard P.A. ("**Bayard**") as general bankruptcy counsel to represent and assist the Company in carrying out its duties under the Bankruptcy Code, file the Chapter 11 bankruptcy petition and represent the Company in the Bankruptcy Case; and in connection therewith, the Responsible Officer,

with power of delegation, is hereby authorized and directed to execute appropriate retention agreements, pay appropriate retainers, and to cause to be filed an appropriate application for authority to retain the services of Bayard;

**RESOLVED FURTHER**, that the Responsible Officer be, and hereby is authorized, in the name of the Company, to employ the law firm of Sullivan & Triggs, LLP ("**S&T**") as corporate counsel to the Company during the Bankruptcy Case; and in connection therewith, the Responsible Officer, with power of delegation, is hereby authorized and directed to execute appropriate retention agreements, pay appropriate retainers, and to cause to be filed an appropriate application for authority to retain the services of S&T;

**RESOLVED FURTHER**, that the Responsible Officer be, and hereby is, authorized and directed to employ the firm of Donlin Recano ("**Donlin**") as notice and claims agent to assist the Company in carrying out its duties under the Bankruptcy Code, and to take any and all actions to advance the Company's rights and obligations; and in connection therewith, the Responsible Party, with power of delegation, is hereby authorized and directed to execute appropriate retention agreements, pay appropriate retainers, and to cause to be filed appropriate applications for authority to retain the services of Donlin;

**RESOLVED FURTHER**, that the Responsible Officer be, and hereby is, authorized and directed to employe the firm of Roth Capital Partners, LLC (the "**Investment Banker**") as its financial advisor to provide financial advisory and investment banking services during the Bankruptcy Case; and in connection therewith, the Responsible Officer, with power of delegation, is hereby authorized and directed to execute appropriate retention agreements, pay appropriate retainers, and to cause to be filed an appropriate application for authority to retain the services of Roth;

**RESOLVED FURTHER,** that the Responsible Officer be, and hereby is, authorized and directed to employ any other professionals to assist the Company in carrying out its duties under the Bankruptcy Code, assist the Company in connection with the Bankruptcy Case and to take any and all actions to advance the Company's rights and obligations; and in connection therewith, the Responsible Officer, with power of delegation, is hereby authorized and directed to execute appropriate retention agreements, pay appropriate retainers, and to cause to be filed appropriate applications for authority to retain the services of any other professionals as necessary;

**RESOLVED FURTHER**, that the Responsible Officer be, and hereby is, with power of delegation, authorized, empowered and directed to execute and file all petitions, schedules, motions, lists, applications, pleadings, and other papers and, in connection therewith, to employ and retain all assistance by legal counsel, accountants, financial advisors, and other professionals and to take and perform any and all further acts and deeds that the Responsible Officer deem necessary, proper or desirable in connection with the Bankruptcy Case, with a view to the successful prosecution of such case; and

**RESOLVED FURTHER**, that the authority granted to the Responsible Officer pursuant to the foregoing resolutions to cause the Company to take further actions in connection with the Bankruptcy Case shall include, but not be limited to, seeking Bankruptcy Court approval for the Company to use cash collateral and/or to obtain post-bankruptcy financing and executing any agreements related to any of the foregoing; compensating employees; hiring and terminating employees; entering into or continuing with agreements; terminating, altering or amending agreements; collecting accounts receivable; negotiating with creditors, lenders, vendors, contract counterparties and landlords; assuming, assigning, or rejecting

executory contracts and unexpired leases; renegotiating the terms of executory contracts and unexpired leases; signing new or amended contracts and leases; commencing, defending and settling litigation involving the Company; marketing the Company's assets for sale and consummating the sale of all or substantially all of the Company's assets for the most money possible; and formulating, filing and seeking to confirm a plan of reorganization to maximize the recovery for creditors and other interest holders.

## APPROVAL OF BANKRUPTCY BUDGET, DEBTOR-IN-POSSESSION CREDIT AGREEMENT, AND AGREEMENT FOR THE USE OF CASH COLLATERAL

**WHEREAS**, it has been proposed that the Company (i) enter into that certain Debtor-in-Possession Credit Agreement providing for the Company to borrow up to $[5] million of additional money in the form attached hereto as Exhibit A (the "**Financing Agreement**") and agreement for the use of cash collateral with SILAC Insurance Company, in its capacity as Agent, and SILAC Insurance Company, and Haymarket Insurance Company (the "**DIP Lenders**", and together with the Agent, the "**DIP Lender Parties**") in the form attached hereto as Exhibit B (the "**DIP Credit Agreement**"), subject to any further modifications negotiated between the Company and the DIP Lender Parties and approved by the Responsible Officer in the exercise of his reasonable discretion to be in the best interests of the Company, and (ii) adopt that certain budget (the "**Budget**") presented to the Manager and Member subject to any further modifications negotiated between the Company and the DIP Lender Parties and approved by the Responsible Officer in the exercise of his reasonable discretion; and

**WHEREAS**, after due consideration, the Manager and Member deem it advisable and in the best interests of the Company, its creditors and other interest holders (i) to approve the Financing and DIP Credit Agreements and adopt the Budget and, subject to the approval of the Bankruptcy Court, (ii) to enter into and perform under the Financing and DIP Credit Agreements and (iii) to act in accordance with any related orders of the Bankruptcy Court.

**NOW, THEREFORE, BE IT RESOLVED**, that the Financing and DIP Credit Agreements and the Budget, subject to any further modifications negotiated between the Company and the DIP Lender Parties and approved by the Responsible Officer in the exercise of his reasonable discretion are adopted, approved and ratified in all respects; and

**RESOLVED FURTHER**, that the Responsible Officer is authorized, in the name of the Company, to sign the Financing and DIP Credit Agreements, as applicable, for and on behalf of the Company, to do or cause to be done all such acts and things, and to take all actions deemed necessary or appropriate, to cause the Company to obtain the Bankruptcy Court's approval of the Financing and DIP Credit Agreements and the Budget.

## ASSET PURCHASE AGREEMENT

**WHEREAS**, the Manager and Member deem it to be advisable and in the best interests of the Company, its creditors and other stakeholders to enter into that certain Asset Purchase Agreement in the form attached hereto as Exhibit C (the "**Purchase Agreement**") by and between Film Services International, LLC, a Delaware limited liability company (the "**Buyer**") and the Company, pursuant to which the Sellers have agreed, subject to the terms and conditions thereof, to sell, assign and transfer to Buyer certain Acquired Assets and Assumed Liabilities, as defined in the Purchase Agreement, subject to overbid at an auction to be conducted by the Investment Banker and final approval of the Bankruptcy Court (the "**Transaction**"); and

**WHEREAS**, after due consideration, the Manager and Member deem it advisable and in the best interests of the Company, its creditors, and other stakeholders to approve and adopt the Transaction and the Transaction Documents and, subject to the approval of the Bankruptcy Court, to enter into and perform under the Transaction and the Transaction Documents and to act in accordance with any related orders of the Bankruptcy Court.

**NOW, THEREFORE, BE IT RESOLVED**, that the form, terms, and provisions of the Transaction Documents, including any and all other agreements, certificates or documents required or contemplated by any of the Transaction Documents or deemed necessary or appropriate in connection therewith including all exhibits and schedules attached thereto, be, and hereby are, determined to be fair, advisable, and in the best interest of the Company, its , creditors and other stakeholders; and that the Transaction Documents, be and hereby are, adopted and approved;

**RESOLVED FURTHER**, subject to the approval of the Bankruptcy Court, the Responsible Officer be, and hereby is authorized and directed, for and on behalf of the Company, to execute and deliver the Transaction Documents and any and all other agreements, certificates or documents required or contemplated by any of the Transaction Documents or deemed necessary or appropriate in connection therewith, and to take all actions deemed necessary or appropriate to cause the Company's obligations thereunder to be performed;

**RESOLVED FURTHER**, that the Responsible Officer be, and hereby is authorized, for and on behalf of the Company, to modify, amend or revise the forms, terms and provisions of the Transaction and the Transaction Documents, to execute, deliver and/or file any and all documents, certificates, instruments, agreements and notices, and to perform or cause to be performed any and all acts as may, in his judgment, be necessary or desirable to accomplish the purposes of the foregoing resolutions and the transactions contemplated thereby and by the Transaction and the Transaction Documents, and the making of any such modifications, amendments or revision, the taking of any such actions and/or the execution, delivery or filing of any such documents or instruments shall be conclusive evidence that the individual making such modification, amendment or revision, taking such action and/or executing, delivering or filing such document or instrument has deemed the same to be necessary or advisable;

**RESOLVED FURTHER**, that the Responsible Officer be, and hereby is, authorized and empowered to prepare, execute, and file such governmental filings as may be necessary or required by law in connection with the Transaction;

**RESOLVED FURTHER**, that the Responsible Officer be, and hereby is authorized to take all action to notify, or to obtain any authorizations, consents, licenses, waivers, findings of suitability or approvals of any third Officer that the Responsible Officer deems necessary, appropriate or advisable to carry out the terms and provisions of the Transaction and the Transaction Documents and the transactions contemplated thereby or the intent and purposes of these resolutions; and

**RESOLVED FURTHER**, that the Company be, and hereby is, authorized and empowered to perform all of its obligations under the Transaction Documents, including but not limited to, the Transaction.

**GENERAL AUTHORIZATION**

**RESOLVED**, that the Responsible Officer be, and hereby is, authorized and empowered to take all such further action and to execute and deliver all such further agreements, certificates, instruments, and documents, in the name and on behalf of the Company, and if requested or required, under its corporate seal duly attested by the Secretary or Assistant Secretary; to pay or cause to be paid all expenses; to take

Docusign Envelope ID: 25CEF4BC-1816-4D54-92DF-646EA7096670

all such other actions as he shall deem necessary, desirable, advisable, or appropriate to consummate, effectuate, carry out, or further the transactions contemplated by and the intent and purposes of the foregoing resolutions; and

**RESOLVED FURTHER**, that the omission from these resolutions of any agreement or other arrangement contemplated by any of the agreements or instruments described in the foregoing resolutions or any action to be taken in accordance with any requirements of any of the agreements or instruments described in the foregoing resolutions shall in no manner derogate from the authority of Responsible Officer to take all actions necessary, desirable, advisable, or appropriate to consummate, effectuate, carry out, or further the transactions contemplated by and the intent and purposes of the foregoing resolutions.

*[Signature page follows.]*

**IN WITNESS WHEREOF**, the undersigned has executed these resolutions and unanimous written consent as of the date first set forth above.

MEMBER:

**RAINBOW PRODUCTION SERVICES, LLC,**
a Delaware limited liability company

By: _Peter Coleman_
Name: Peter Coleman
Title: Manager

**MANAGER:**

_Peter Coleman_
Peter Coleman

**<u>Exhibit A</u>**

**Financing Agreement**

[attached]

*Privileged and Confidential*

PRIMING SUPERPRIORITY

DEBTOR-IN-POSSESSION CREDIT AGREEMENT

BY AND AMONG

FILM FINANCES, INC., RAINBOW PRODUCTION SERVICES, LLC,

RAINBOW DIGITAL SERVICES, LLC, AND EPS-CINEWORKS, INC.,

AS DEBTORS,

SILAC INSURANCE COMPANY,

AS AGENT,

AND

SILAC INSURANCE COMPANY AND HAYMARKET INSURANCE COMPANY,

AS DIP LENDERS

DATED AS OF OCTOBER [___], 2024

## TABLE OF CONTENTS

Page

ARTICLE I        DEFINED TERMS ...................................................................2
    Section 1.1        Definitions.............................................................2
ARTICLE II       LOANS ...........................................................................14
    Section 2.1        DIP Loans .............................................................14
    Section 2.2        Borrowing Mechanics ..........................................14
    Section 2.3        Use of Proceeds....................................................15
    Section 2.4        Evidence of Debt...................................................15
    Section 2.5        Interest and Fees on Loans ...................................15
    Section 2.6        Repayment.............................................................15
    Section 2.7        Prepayments..........................................................15
    Section 2.8        Application of Payments and Proceeds .................16
    Section 2.9        General Provisions Regarding Payments ...............16
    Section 2.10       Termination of DIP Loan Commitments ................17
ARTICLE III      CONDITIONS PRECEDENT; CONDITIONS SUBSEQUENT....................17
    Section 3.1        Conditions Precedent; Closing Date .....................17
    Section 3.2        Conditions to Each Borrowing..............................20
    Section 3.3        Conditions Subsequent..........................................21
ARTICLE IV       REPRESENTATIONS AND WARRANTIES........................21
    Section 4.1        Representations and Warranties.............................21
ARTICLE V        AFFIRMATIVE COVENANTS .......................................24
    Section 5.1        Affirmative Covenants..........................................24
ARTICLE VI       NEGATIVE COVENANTS/BUDGET COMPLIANCE ..............29
    Section 6.1        Negative Covenants ..............................................29
    Section 6.2        Budget Compliance ...............................................31
ARTICLE VII      INCREASED COSTS; TAXES; SET OFF; ETC............................31
    Section 7.1        Taxes; Withholding, Etc........................................31
    Section 7.2        Right of Set Off.....................................................32
ARTICLE VIII     EVENTS OF DEFAULT ...............................................33
    Section 8.1        Events of Default...................................................33
    Section 8.2        Remedies...............................................................35
    Section 8.3        Remedies Cumulative ...........................................36
    Section 8.4        Application of Proceeds ........................................36
ARTICLE IX       MISCELLANEOUS ......................................................36
    Section 9.1        Amendments and Waivers; Release of DIP Collateral ............36
    Section 9.2        Notices..................................................................37

i

Section 9.3     Expenses .................................................................................38
Section 9.4     Enforceability; Successors and Assigns .................................................40
Section 9.5     Integration .................................................................40
Section 9.6     No Waiver; Remedies .................................................................40
Section 9.7     Setoff .................................................................41
Section 9.8     Execution in Counterparts .................................................................41
Section 9.9     Governing Law; Submission To Jurisdiction; Venue ...........................41
Section 9.10    Waiver of Jury Trial .................................................................42
Section 9.11    Severability .................................................................42
Section 9.12    Survival .................................................................43
Section 9.13    Maximum Lawful Interest .................................................................43
Section 9.14    No Marshalling .................................................................43
Section 9.15    Interpretation .................................................................43
Section 9.16    Ambiguities .................................................................43
Section 9.17    The PATRIOT Act .................................................................44
Section 9.18    Conflicting Provisions in Security Documents ..........................................44
Section 9.19    Conflicting Provisions in the Financing Orders ........................................44
Section 9.20    Modifications .................................................................44
Section 9.21    Release .................................................................44
Section 9.22    Electronic Transactions .................................................................45

SCHEDULE 2.1     DIP Loan Commitment

EXHIBIT A     Budget

EXHIBIT B     Form of Borrowing Certificate

EXHIBIT C     Form of Interim Order

ii

THIS PRIMING SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT is made as of October [\_\_\_], 2024 by and among Film Finances, Inc. ("FFI"), Rainbow Production Services, LLC ("RPS"), Rainbow Digital Services, LLC ("RDS"), and EPS-Cineworks, Inc. ("EPS" and collectively, the "Debtors" and each a "Debtor"), SILAC Insurance Company, in its capacity as Agent (the "Agent"), and SILAC Insurance Company ("SILAC") and Haymarket Insurance Company ("Haymarket" and, together with SILAC, the "DIP Lenders"), each in its capacity as DIP Lenders.

## RECITALS

WHEREAS, on October [\_\_\_], 2024 (the "Petition Date"), the Debtors filed voluntary petitions for relief (the "Chapter 11 Cases") under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") and are continuing to operate their businesses and manage their properties as debtors and debtors in possession under sections 1107 and 1109 of the Bankruptcy Code;

WHEREAS, the Debtors own and operate a completion guarantee business and an equipment rental and post-production services business (collectively, the "Operations");

WHEREAS, Dacian Master Fund LP ("Dacian"), as assignee of SILAC Insurance Company, and Haymarket are lenders under that certain Loan and Security Agreement dated as of August 31, 2022 (as amended and supplemented, the "Loan Agreement," and the loan contemplated thereunder, the "Loan") among FFI, as the borrower, Haymarket, as agent and collateral agent, and the lender parties thereto from time to time, including SILAC, Dacian, and Haymarket;

WHEREAS, the proceeds of the Loan were for the purpose of, *inter alia*, consummating a refinancing of the credit facilities under that certain Loan and Security Agreement dated as of August 18, 2020 among Lumiere Financing LLC, as the borrower, and City National Bank of Florida, as the lender;

WHEREAS, as security for FFI's obligations with respect to the Loan, FFI and RPS, RDS, EPS, FFI Media Holdings Inc., FFI Acquisitions, LLC, Liquid Light Productions, LLC, Film Finances New Mexico, LLC, Film Finances Louisiana, L.L.C., Film Finances Pennsylvania, LLC, Film Finances Alabama, LLC, FF Network, Inc., FF Asia, LLC, and PBL Finance, LLC (collectively, the "US Guarantors") pledged, assigned, transferred, delivered, and granted to the Pre-Petition Secured Party (as defined below), for its own benefit and the benefit of Dacian and Haymarket, a continuing and unconditional security interest in and to any and all property of FFI and each US Guarantor (collectively, the "Collateral");

WHEREAS, the Loan Agreement and each and every other document or agreement delivered as security for, or in respect of, the Loan or any of the other obligations of FFI and the US Guarantors under any of such documents are referred to collectively herein as the "Pre-Petition Credit Agreements," and the Collateral and any other tangible or intangible assets upon which FFI or one or more of the US Guarantors have granted a security interest or lien on or for the benefit of the Pre-Petition Secured Party are referred to collectively herein as the "Pre-Petition Collateral";

WHEREAS, the Debtors have requested, and the DIP Lenders have agreed, to provide a working capital facility to support the Debtors' working capital needs during the Chapter 11 Cases, pursuant to the terms and conditions hereof; and

WHEREAS, the DIP Lenders are only willing to provide the DIP Loans hereunder if the Debtors grant to the DIP Lenders a priming, first priority lien and superpriority administrative expense claim on the DIP Collateral, subject only to the Carve-Out and the Financing Orders, each as defined below;

NOW THEREFORE, in consideration of the premises and the mutual covenants and the agreements herein set forth, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

ARTICLE I
DEFINED TERMS

Section 1.1    Definitions.

(a)    As used in this Agreement, including, without limitation, the above Preamble and Recitals, and all exhibits and schedules hereto, the following terms shall have the following meanings and definitions:

"Account" has the meaning set forth in section 9-102(a)(2) of the UCC.

"Action" means, as against a Person, an action, suit, litigation, arbitration, investigation, complaint, contest, hearing, inquiry, inquest, audit, examination, or other proceeding threatened or pending against or affecting such Person or its property, whether civil, criminal, administrative, investigative, or appellate, in law or equity, before any arbitrator or Governmental Body.

"Affiliate" means, with respect to a Person, any other Person which directly or indirectly, through one or more intermediaries, controls or is controlled by or is under common control with such Person, and without limiting the generality of the foregoing, includes (i) any Person which beneficially owns or holds ten percent (10%) or more of any class of the Capital Stock of such Person or other equity interests in such Person, (ii) any Person of which such Person beneficially owns or holds ten percent (10%) or more of any class of the Capital Stock or in which such Person beneficially owns or holds ten percent (10%) or more of the equity interests, and (iii) any director or executive officer of such Person. For the purposes of this definition, the term "control" (including with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of Capital Stock, by agreement or otherwise.

"Agreement" means this Priming Superpriority Debtor-in-Possession Credit Agreement, as it may be amended, restated, supplemented, or otherwise modified from time to time.

2

Docusign Envelope ID: C1CD163C-8DA4-46F1-AF89-FB1A024BCC76

"Asset Sale" means a sale, lease or sublease (as lessor or sublessor), sale and leaseback, assignment, conveyance, transfer or other disposition to, or any exchange of property with, any Person, in one or more transactions or a series of related transactions, of all or any part of the businesses of the Debtors, and/or of all or any part of the assets or properties of any kind of the Debtors, whether real, personal, or mixed and whether tangible or intangible, whether now owned or hereafter acquired, other than (i) inventory (or other assets) sold or leased in the ordinary course of business, (ii) sales or dispositions of obsolete, worn-out or excess furniture, fixtures, equipment or other property in the ordinary course of business and (iii) the actual or constructive loss of any property or the use thereof.

"Assignee" has the meaning set forth in Section 9.4(b).

"Assignment" has the meaning set forth in Section 9.4(b).

"Authorized Officer" means, as applied to any Person, any individual holding the position of chairman of the board, executive director (or the equivalent thereof), chief executive officer, chief financial officer, chief operating officer, any other executive or officer, any president or vice president or treasurer, chief restructuring officer or restructuring officer or the Person or entity acting in such capacity.

"Bankruptcy Code" has the meaning set forth in the Recitals to this Agreement.

"Bankruptcy Court" has the meaning set forth in the Recitals to this Agreement.

"Bankruptcy Milestones" has the meaning set forth in the Financing Orders.

"Borrowing" means an advance of a DIP Loan made hereunder on the Interim Order Entry Date or thereafter.

"Borrowing Certificate" has the meaning set forth in Section 2.2(b).

"Borrowing Date" means the date of a Borrowing.

"Budget" means, initially, the budget attached hereto as Exhibit A, and, upon entry of the Final Order, the budget attached thereto, in each case itemizing on a weekly basis all uses, and anticipated uses, of the DIP Loans, revenues projected to be received and all expenditures proposed to be made during such period, which Budget may be amended with the written consent of the Agent, in consultation with the DIP Lenders.

"Business Day" means a day other than Saturday or Sunday or other day on which commercial banks in New York, New York are authorized or required by law or other governmental action to close.

"Capital Lease" means, as applied to any Person, any lease of any property (whether real, personal or mixed) by that Person as lessee that, in conformity with GAAP, that is or should be accounted for as a capital lease on the balance sheet of that Person.

"Capital Stock" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), including, without limitation, partnership interests and membership interests, and any and all warrants, rights or options to purchase or other arrangements or rights to acquire any of the foregoing.

"Carve-Out" has the meaning set forth in, before the entry of the Final Order, the Interim Order and, after the entry of the Final Order, the Final Order.

"Cash" means a credit balance in any Deposit Account, money or currency.

"Change of Control" means, with respect to any of the Debtors, any one or more of the following events occurring on or after the Closing Date: (i) the transfer (in one transaction or a series of transactions) of all or substantially all of the assets of such Debtor to any Person or group; (ii) the liquidation or dissolution of such Debtor or the adoption of a plan by the Board of Directors of such Debtor relating to the dissolution or liquidation of such Debtor; (iii) any Person or two or more Persons acting in concert shall have acquired by contract or otherwise, the power to exercise, directly or indirectly, a controlling influence over the management or policies of such Debtor or control the election of members of the board of directors or equivalent governing body of such Debtor; or (iv) any material change in the composition or membership of the Debtor's board of directors, or day to day management of such Debtor, except for any changes approved in advance by the DIP Lenders.

"Chapter 11 Cases" has the meaning set forth in the recitals to this Agreement.

"Closing Date" means the date hereof.

"Committee" means any committee of unsecured creditors appointed in the Chapter 11 Cases.

"Controlled Account" has the meaning set forth in Section 5.1(f) and includes, without limitation, the Operating Account.

"Controlled Account Agreement" has the meaning set forth in Section 5.1(f).

"Consents" means any approval, consent, authorization, or order of, notice to, or registration or filing with, or any other action by, any Governmental Body or other Person.

"Credit Bid" means the submission by the Agent (on behalf of the DIP Lenders) of a bid in connection with a public or private sale to purchase all or any portion of the DIP Collateral in which any of the DIP Obligations are used and applied as a credit against the purchase price.

"Debtors" has the meaning set forth in the Preamble to this Agreement; provided that "Debtors" shall include any of the Debtors' successors and assigns (including, without limitation, any trustee or other fiduciary hereafter appointed as legal representative or with respect to the property of the estates of the Debtors, whether under chapter 11 of the

Bankruptcy Code or any subsequent chapter 7 case and the Debtors' successors upon conclusion of the Chapter 11 Cases).

"Debtor Default Period Rights" has the meaning ascribed to such term in the Financing Orders.

"Default" means a condition or event that, after notice or lapse of time or both, would constitute an Event of Default.

"Deposit Account" means any deposit account (as such term is defined in section 9-102(a)(29) of the UCC), including, without limitation, a demand, time, savings, passbook or like account with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a negotiable certificate of deposit.

"DIP Collateral" means all currently owned or hereafter acquired property and assets of the Debtors of any kind or nature, whether real or personal, tangible or intangible, wherever located, now owned or hereafter acquired or arising and all proceeds, products, rents and profits thereof, including, without limitation, accounts, revenues, inventory, equipment, capital stock in subsidiaries, investment property, instruments, chattel paper, real estate, leasehold interests, contracts, general intangibles, patents, copyrights, trademarks, deposit accounts, intercompany claims, claims against affiliates, Actions, tax refund claims, commercial tort claims, insurance proceeds and insurance premium refunds.

"DIP Collateral Documents" means the Controlled Account Agreements and all other instruments, documents, and agreements delivered by the Debtors pursuant to this Agreement or any of the other DIP Loan Documents pursuant to which the Debtors grant a DIP Lien, or any other Lien, mortgage, or encumbrance, to the DIP Lenders, as any of the foregoing may be amended, restated, supplemented, modified, or replaced from time to time. For the avoidance of doubt, the DIP Collateral Documents do not include the Financing Orders.

"DIP Commitment Period" means (i) with respect to Initial DIP Loans, the period commencing on the Interim Order Entry Date and ending upon the Final Order Entry Date and (ii) with respect to all DIP Loans other than the Initial DIP Loans, the period commencing on the Final Order Entry Date and ending on the Maturity Date.

"DIP Lenders" has the meaning set forth in the Preamble to this Agreement.

"DIP Lien" means any Lien granted under or pursuant to any DIP Collateral Document or the Financing Orders.

"DIP Loan" has the meaning set forth in Section 2.1(a).

"DIP Loan Commitment" means, upon entry of the Interim Order, an amount not to exceed $3,000,000, and upon entry of the Final Order, the amount set forth in Schedule 2.1, or, in each case, such lesser amount as determined in accordance with the Financing Orders and the Budget.

"DIP Loan Document" means any of this Agreement, the DIP Collateral Documents, and all other documents, instruments, or agreements executed and delivered by the Debtors for the benefit of the DIP Lenders in connection herewith.

"DIP Obligations" means all indebtedness, obligations, covenants, duties of payment, or performance of every kind and all other liabilities of the Debtors from time to time owed to the DIP Lenders, whether direct or indirect, joint or several, absolute or contingent, matured or unmatured, liquidated or unliquidated, secured or unsecured, arising by contract, operation of law or otherwise, owing, arising, due, or incurred under this Agreement, the Financing Orders, or any DIP Loan Document or in respect of any of the DIP Loans, or any other instruments at any time evidencing any of the foregoing or otherwise, including, without limitation, all obligations to repay principal of and interest on the DIP Loans, and to pay interest, costs, charges, expenses, professional fees, and all sums chargeable to the Debtors under the DIP Loan Documents and the Financing Orders and Debtors' obligation to provide the DIP Lenders with adequate protection of its interests in the DIP Collateral and other property to be used, sold, leased, or otherwise disposed of by the Debtors under the terms of the Financing Orders.

"Dollars" and the sign "$" mean the lawful money of the United States of America.

"Employee Benefit Plan" means any "employee benefit plan" as defined in Section 3(3) of ERISA that is sponsored, maintained, or contributed to by, or required to be contributed to by, the Debtors.

"Environmental Laws" means all federal, state, local and foreign laws (including without limitation common law), treaties, statutes, regulations and rules whether now or hereinafter in effect relating in any way to the environment, the preservation or reclamation of natural resources, the management, release or threatened release of any Hazardous Material or health and safety matters, including, without limitation, the Resource Conservation and Recovery Act, the Comprehensive Environmental Response Compensation and Liability Act of 1980, the Superfund Amendments and Reauthorization Act of 1986, the Federal Clean Water Act, the Federal Clean Air Act, the Toxic Substances Control Act, in each case as amended, and all rules, regulations, judgments, decrees, orders and licenses arising under all such laws.

"Environmental Liability" means any actual, alleged or contingent liability or obligations of the Debtors directly or indirectly resulting from or based on (i) violations or alleged violations of any Environmental Law, (ii) the generation, use, handling, transportation, management, storage, treatment or disposal of any Hazardous Material, (iii) exposure to any Hazardous Material, (iv) the release or threatened release of any Hazardous Material into the environment, or (v) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with any of the foregoing.

"Environmental Permits" means all permits, licenses, authorizations, registrations, and other governmental consents required by applicable Environmental Laws for the use, storage, treatment, transportation, release, emission and disposal of raw materials, by-

products, wastes and other substances used or produced by or otherwise relating to the operations of the Debtors.

"Equipment" means, as to the Debtors, all of the Debtors' now owned and hereafter acquired equipment, wherever located, including machinery, data processing and computer equipment (whether owned or licensed and including embedded software), vehicles, tools, furniture, fixtures, all attachments, accessions and property now or hereafter affixed thereto or used in connection therewith, and substitutions and replacements thereof, wherever located.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any successor thereto.

"ERISA Affiliate" means, as applied to any Person, (i) any corporation that is a member of a controlled group of corporations within the meaning of Section 414(b) of the Internal Revenue Code of which that Person is a member, (ii) any trade or business (whether or not incorporated) that is a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the Internal Revenue Code of which that Person is a member, and (iii) any member of an affiliated service group within the meaning of Section 414(m) or (o) of the Internal Revenue Code of which that Person, any corporation described in clause (i) above or any trade or business described in clause (ii) above is a member. Any former ERISA Affiliate of the Debtors shall continue to be considered an ERISA Affiliate of the Debtor within the meaning of this definition with respect to the period such entity was an ERISA Affiliate of the Debtors and with respect to liabilities arising after such period for which the Debtors could be liable under the Internal Revenue Code or ERISA.

"Event of Default" means each of the conditions or events set forth in Section 8.1.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to any of the DIP Lenders or required to be withheld or deducted from a payment to such DIP Lender, (i) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (a) imposed as a result of such DIP Lender being organized under the laws of, or having its principal office or, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (b) that are imposed as a result of a present or former connection between such DIP Lender and the jurisdiction imposing such Tax (other than connections arising from such DIP Lenders having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced this Agreement, or sold or assigned an interest in any DIP Loan or any DIP Loan Document), (ii) U.S. federal withholding Taxes imposed on amounts payable to or for the account of such DIP Lender with respect to an applicable interest in a DIP Loan pursuant to a law in effect on the date on which the DIP Lender acquires such interest in the DIP Loan, (iii) Taxes attributable to such DIP Lender's failure to comply with Section 7.1(c), and (iv) any U.S. federal withholding Taxes imposed under FATCA.

7

"FATCA" means Sections 1471 through 1474 of the Internal Revenue Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreement entered into pursuant to Section 1471(b)(1) of the Internal Revenue Code.

"FFI" has the meaning set forth in the Preamble to this Agreement.

"Final Order" means a final order (which must be acceptable in form and substance to the DIP Lenders in their sole discretion) entered or to be entered by the Bankruptcy Court authorizing the secured financing under the DIP Loan Documents.

"Final Order Entry Date" means the date on which the Bankruptcy Court enters the Final Order.

"Financing Orders" means, collectively, the Interim Order, the Final Order and such other orders relating thereto or authorizing the granting of credit by the DIP Lenders to the Debtors on an emergency, interim or permanent basis, pursuant to section 364 of the Bankruptcy Code as may be issued or entered by the Bankruptcy Court in the Chapter 11 Case.

"GAAP" means generally accepted accounting principles in the United States as in effect from time to time, consistently applied throughout the periods to which reference is made.

"Governmental Body" means any agency, bureau, commission, court, department, official, political subdivision, tribunal, or other instrumentality of any administrative, judicial, legislative, executive, regulatory, police or taxing authority of any government, whether supranational, national, federal, state, regional, provincial, local, domestic or foreign, and includes, without limitation, the European Union and its agencies and instrumentalities.

"Hazardous Materials" means any hazardous or toxic substance, waste, contaminant, pollutant, gas or material, including, without limitation, radioactive materials, oil, petroleum and petroleum products and constituents thereof, which are regulated under any Environmental Law, including, without limitation, any substance, waste or material which is (i) designated a "pollutant," "hazardous substance," "extremely hazardous substance" or "toxic chemical" under any Environmental Law, or (ii) regulated in any way under the Regulations of any state or other jurisdiction where any of the Debtors conducts its business or owns any real property or has any leasehold or in which any Relevant Property is located.

"Investment Bank" means Roth Capital Partners, LLC, in its capacity as investment banker to the Debtors.

"Indebtedness" means, with respect to any Person, without duplication, the following: (i) all indebtedness of such Person for borrowed money, (ii) all obligations of such Person for the deferred purchase price of property or services (other than accounts payable and accrued liabilities that would be classified as current liabilities under GAAP if and only for so long as such item of such accounts payable and accrued liabilities is no more than ninety (90) days past due), (iii) all obligations of such Person evidenced by notes, bonds,

8

debentures or similar borrowing or securities instruments, (iv) all obligations of such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person, (v) all obligations of such Person as lessee under Capital Leases, (vi) all obligations of such Person in respect of banker's acceptances and letters of credit, (vii) all obligations of such Person secured by Liens on the assets and property of such Person, (viii) all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Capital Stock or other ownership or profit interest in such Person or any other Person or any warrants, rights or options to acquire such Capital Stock, (ix) net liabilities in respect of such Person's hedge agreements as determined in accordance with GAAP, (x) all obligations of such Person in respect of any guaranty by such Person of any obligation of another Person of the type described in clauses (i) through (ix) of this definition, and (xi) all obligations of another Person of the type described in clauses (i) through (x) secured by a Lien on the property or assets of such Person (whether or not such Person is otherwise liable for such obligations of such other Person).

"Indemnified Taxes" means Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Debtors under any DIP Loan Document.

"Initial DIP Loans" means the amount set forth on Schedule 2.1 or such lesser amount as set forth in the Interim Order and the Budget.

"Intellectual Property" means, collectively, all copyrights, all patents and all trademarks, together with: (i) all inventions, processes, production methods, proprietary information, know-how and trade secrets; (ii) all licenses or user or other agreements granted to the Debtors with respect to any of the foregoing, in each case whether now or hereafter owned or used including the licenses or other agreements with respect to any DIP Collateral; (iii) all customer lists, identification of suppliers, data, plans, blueprints, specifications, designs, drawings, recorded knowledge, surveys, engineering reports, test reports, manuals, materials standards, processing standards, performance standards, catalogs, computer and automatic machinery software and programs; (iv) all sales data and other information relating to sales or service of products now or hereafter manufactured; (v) all accounting information and all media in which or on which any information or knowledge or data or records may be recorded or stored and all computer programs used for the compilation or printout of such information, knowledge, records or data; and (vi) all causes of action, claims and warranties, in each case, now or hereafter owned or acquired by the Debtors in respect of any of the items listed above.

"Interim Order" means an interim order, in the form attached hereto as Exhibit C and, in any event, in form and substance satisfactory to the DIP Lenders in their sole discretion, entered or to be entered by the Bankruptcy Court authorizing the secured financing (including the Initial DIP Loans) under the DIP Loan Documents.

"Interim Order Entry Date" means the date on which the Bankruptcy Court issues the Interim Order, and shall occur no later than November 1, 2024.

"Internal Revenue Code" means the Internal Revenue Code of 1986, as amended to the date hereof and from time to time hereafter, and any successor statute.

"Investment" means (i) any direct or indirect purchase or other acquisition by the Debtors of, or of a beneficial interest in, any of any Capital Stock of any other Person, (ii) any direct or indirect redemption, retirement, purchase or other acquisition for value, by the Debtors from any Person, of any Capital Stock of such Person, and (iii) any direct or indirect loan, advance or capital contribution by the Debtors to any other Person, including all indebtedness and accounts receivable from that other Person that are not current assets or did not arise from sales of inventory to that other Person in the ordinary course of business and/or constitute ordinary trade credit extended in the ordinary course of business. The amount of any Investment shall be the original cost of such Investment plus the cost of all additional Investments, without any adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect to such Investment.

"Knowledge" means, with respect to the Debtors, the actual knowledge of the Debtors' Authorized Officers, following reasonable due diligence.

"Lien" means any mortgage, deed of trust, security interest, charge, pledge, hypothecation, assignment, attachment, deposit arrangement, encumbrance, lien (statutory, judgment or otherwise, but excluding any right of set off arising by operation of law or pursuant to agreements entered into in the ordinary course of business), or other security agreement or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any Capital Lease, any Synthetic Lease, any financing lease involving substantially the same economic effect as any of the foregoing and the filing of any financing statement under the UCC or comparable law of any jurisdiction in respect of the foregoing).

"Loan Agreement" has the meaning set forth in the Preamble to this Agreement.

"Margin Stock" means "margin stock" as defined in Regulation U of the Board of Governors of the Federal Reserve System as in effect from time to time.

"Material Adverse Effect" means any material adverse effect on or material adverse change, taken as a whole, (but excluding the filing of the Chapter 11 Cases) in: (i) the business or assets of the Debtors taken as a whole; (ii) the ability of the Debtor to materially perform their respective obligations hereunder or under of any of the DIP Loan Documents taken as a whole; (iii) the legality, validity, or enforceability of any DIP Loan Document; or (iv) the DIP Collateral or the perfection or priority of any DIP Liens granted to the DIP Lenders under any of the DIP Collateral Documents.

"Maturity Date" means the earliest to occur of (i) January 8, 2025, (ii) the closing date of an Asset Sale of all or substantially all of the Debtors' assets pursuant to an order entered by the Bankruptcy Court (or, in the event of more than one sale, the closing date of the last of such Asset Sales), (iii) the date on which the DIP Lenders accelerate the DIP Obligations (or the DIP Obligations automatically and immediately accelerate) or the DIP Obligations

otherwise become immediately due and payable, pursuant to the terms hereof or of the Financing Orders, as applicable, or (iv) the effective date of a confirmed chapter 11 plan.

"Multiemployer Plan" means any Employee Benefit Plan that is a "multi-employer plan" as defined in Section 3(37) of ERISA.

"Net Asset Sale Proceeds" means, for the Debtors, with respect to any Asset Sale, an amount equal to: (i) Cash payments (including any Cash received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) received by the Debtors from such Asset Sale, minus (ii) the sum of (a) reasonable, customary and documented brokerage, consultant and other reasonable customary and documented fees and expenses actually incurred in connection with such Asset Sale, and (b) Taxes paid or reasonably estimated to be payable as a result of such Asset Sale.

"Net Indebtedness Proceeds" means the proceeds of any Indebtedness incurred by the Debtors after the Petition Date (other than pursuant to this Agreement) minus, if at the time of payment thereof and after giving effect thereto, (i) the Debtors are in pro forma compliance with the provisions of Section 6.2, (ii) any such payment is permitted to be made at such time in accordance with the Budget, and (iii) no Default or Event of Default shall have occurred and be continuing or would result therefrom, reasonable, customary and documented out-of-pocket attorneys' fees, accountants' fees, and other reasonable customary and documented fees and expenses actually incurred in connection with the issuance of such Indebtedness.

"Net Insurance/Condemnation Proceeds" means, for the Debtors, an amount equal to: (i) any Cash payments or proceeds received by or owed to the Debtors (a) under any casualty insurance policy in respect of a covered loss thereunder or (b) as a result of the taking of any assets of the Debtors by any Person pursuant to the power of eminent domain, condemnation or otherwise, or pursuant to a sale of any such assets to a purchaser with such power under threat of such a taking minus (ii) the sum of (a) any actual and reasonable documented costs and expenses (including reasonable out-of-pocket attorney's fees) incurred by the Debtors in connection with the adjustment or settlement of any claims of the Debtors in respect thereof, and (b) any bona fide, reasonable, customary and documented costs actually incurred in connection with any sale of such assets as referred to in clause (i)(b) of this definition, including Taxes paid or reasonably estimated to be payable as a result of any gain recognized in connection therewith.

"Net Proceeds" means, as of any time, the aggregate of Net Asset Sale Proceeds, Net Insurance/Condemnation Proceeds and Net Indebtedness Proceeds.

"Notices" has the meaning set forth in Section 9.2.

"Operating Account" means that certain deposit account, No: SBOSUS33, ABA# 011000028, which operating account may only be changed with the written consent of the Agent.

"PATRIOT Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56).

"Pension Plan" means any Employee Benefit Plan, other than a Multiemployer Plan, that is subject to Section 412 of the Internal Revenue Code or Section 302 of ERISA.

"Permit" means any permit, license, approval, consent, permission, notice, franchise, confirmation, endorsement, waiver, certification, registration, qualification, clearance or other authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any federal, state, local or foreign Regulation.

"Permitted Indebtedness" means the Indebtedness permitted pursuant to Section 6.1(a).

"Permitted Investment" has the meaning set forth in Section 6.1(d).

"Permitted Liens" has the meaning set forth in Section 6.1(b).

"Person" means and includes natural persons, corporations, limited partnerships, general partnerships, limited liability companies, limited liability partnerships, joint stock companies, joint ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, other legal entities and Governmental Bodies.

"Petition Date" has the meaning set forth in the Recitals to this Agreement.

"Post-Petition" means following the Petition Date.

"Pre-Petition Collateral" has the meaning set forth in the Recitals to this Agreement.

"Pre-Petition Credit Agreements" has the meaning set forth in the Recitals to this Agreement.

"Pre-Petition Indebtedness" means the Indebtedness issued or loaned and outstanding under the Pre-Petition Credit Agreement, including, without limitation, the Loan.

"Pre-Petition Lenders" means those lenders party to the Loan Agreement.

"Pre-Petition Obligations" means all obligations of the Debtors arising prior to the Petition Date.

"Pre-Petition Payment" means a payment (by way of adequate protection or otherwise) of principal or interest or otherwise on account of Pre-Petition Obligations or other pre-petition claims against the Debtors.

"Pre-Petition Secured Party" means Haymarket Insurance Company, in its capacities as agent and collateral agent under the Pre-Petition Credit Agreements.

"Regulation" means each applicable law, rule, regulation, or order, by any Governmental Body, central bank or comparable agency and any request or directive (if having the force of law) of any of those Persons and each judgment, injunction, order, writ, decree or award of any Governmental Body, arbitrator, or other Person.

"Released Parties" has the meaning set forth in Section 9.21.

"Relevant Property" means, for the Debtors, all sites, facilities, locations, real property and leaseholds (i) presently or formerly owned, leased, used or operated by the Debtors (whether or not such properties are currently owned, leased, used or operated by the Debtors) or (ii) at which any Hazardous Material has been transported, disposed, treated, stored or released by the Debtors.

"Securities Act" means the United States Securities Act of 1933, as now in effect or as hereafter amended from time to time, and any successor statute, and the rules and regulations promulgated thereunder.

"Subsidiary" means, with respect to any Person, any corporation, partnership, limited liability company, association, joint venture or other business entity of which more than fifty percent (50%) of the total voting power of shares of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, managers, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof.

"Synthetic Lease" means any lease of goods or other property, whether real or personal, which is treated as an operating lease under GAAP and as a loan or financing for United States income tax purposes.

"Tax" or "Taxes" mean any present or future tax, levy, impost, duty, assessment, charge, fee, deduction or withholding of any nature and whatever called, by whomsoever, on whomsoever and wherever imposed, levied, collected, withheld, or assessed.

"UCC" means the Uniform Commercial Code (or any similar or equivalent legislation) as in effect in the State of Delaware; provided that if by reason of mandatory provisions of law, the perfection, the effect of perfection or non-perfection or the priority of the DIP Liens is governed by the Uniform Commercial Code as in effect in a United States jurisdiction other than Delaware, then "UCC" shall mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

"United States Trustee" means the United States Trustee for the District of Delaware.

"Weekly Budget Report" means, a weekly report certified by an Authorized Officer for the Debtors, substantially in the same form as the Budget, indicating (i) a comparative reconciliation, on a line-by-line and aggregate basis, of actual cash receipts and disbursements against the cash receipts and disbursements forecast in the Budget, and the

percentage variance thereof, for (a) the weekly period ended on (and including) the immediately preceding Sunday, (b) a rolling four-week period, and (c) the cumulative period to date; and (ii) a written explanation of such variances.

(b)     Capitalized terms used but not defined above or elsewhere herein shall have the meanings given to such terms in the Financing Orders, as applicable.

ARTICLE II
LOANS

Section 2.1     <u>DIP Loans</u>.

(a)     Subject to the terms and conditions set forth herein and in the Financing Orders, upon Debtors' request for a DIP Loan in accordance with Section 2.2(b), the DIP Lenders agree to make term loans pursuant to this Section 2.1(a) (collectively, the "<u>DIP Loans</u>") during the DIP Commitment Period in an amount equal to such requested DIP Loan.  Each such DIP Loan shall be for purposes consistent with the Budget and otherwise consistent with this Agreement and the Financing Orders; <u>provided</u> that both before and after giving effect to any DIP Loan, the aggregate amount of all DIP Loans made shall not exceed the DIP Loan Commitment.  Once repaid, DIP Loans borrowed hereunder may not be reborrowed.

(b)     Any amount borrowed under this Section 2.1 shall, along with all other DIP Obligations (including accrued and unpaid costs, and expenses), be secured by and entitled to the DIP Liens on the DIP Collateral and the other rights and benefits provided pursuant to the Financing Orders, this Agreement, and the other DIP Loan Documents.

Section 2.2     <u>Borrowing Mechanics</u>.

(a)     The DIP Loans shall be funded by the DIP Lenders into the Operating Account (which must be a Controlled Account), and anything herein to the contrary notwithstanding, shall be disbursed solely in accordance with the Budget and the Financing Orders (both as to timing and amount of any such requests), subject to Sections 3.1 and 3.2.

(b)     Not less than four (4) Business Days prior to any Borrowing Date, the Debtors shall deliver to the Agent a fully executed Borrowing Certificate no later than 10:00 a.m. (New York City time).  Such Borrowing Certificate, a form of which is attached hereto as Exhibit B (each a "<u>Borrowing Certificate</u>"), shall specify the amount of the proposed DIP Loan and the Borrowing Date thereof, and shall certify that the amount of the proposed DIP Loan, after accounting for other available funds held by the Debtors, is reasonably expected to be needed to pay amounts coming due in the fourteen (14) days immediately following such Borrowing Date, as set forth in the Budget.  On the Borrowing Date specified in any Borrowing Certificate, the Agent shall disburse such funds to the Operating Account and shall use reasonable efforts to make the funds available to the Debtors no later than 2:00 p.m. (New York City time) on the requested Borrowing Date. Notwithstanding the foregoing, the Agent shall disburse an initial amount of $3,000,000 as soon as reasonably practicable after entry of the Interim Order and receipt of a Borrowing Certificate and, for the avoidance of doubt, without the passage of four (4) Business Days.

14

Section 2.3    Use of Proceeds.  The proceeds of the DIP Loans shall be used by the Debtors, subject to and in accordance with the Budget and the Financing Orders, solely for (i) working capital and general corporate purposes of the Debtors, and (ii) bankruptcy-related costs and expenses.  Subject to the Financing Orders, none of the proceeds of the DIP Loans shall be used in connection with the investigation (including discovery proceedings), initiation or prosecution of any claims, causes of action, adversary proceedings, or other litigation against SILAC (whether in its capacity as DIP Lender, Agent, lender under the Pre-Petition Credit Agreements, or in any other capacity), Dacian (whether in its capacity as lender under the Pre-Petition Credit Agreements or in any other capacity), or Haymarket (whether in its capacity as DIP Lender, agent and collateral agent under the Pre-Petition Credit Agreements, or in any other capacity), or any of their respective advisors, agents, and sub-agents, including in connection with the validity of the DIP Liens granted to the DIP Lenders, or the Liens granted to the Pre-Petition Secured Party in the Pre-Petition Collateral arising under the Pre-Petition Credit Agreements.

Section 2.4    Evidence of Debt.  Each DIP Lender shall maintain in its internal records an account or accounts evidencing the DIP Obligations owed to such DIP Lender, including the amounts of the DIP Loans owed to it and each repayment and prepayment in respect thereof.  Any such recordation shall be conclusive and binding on the Debtors, absent manifest error; provided, failure to make any such recordation, or any error in such recordation, shall not affect the DIP Loan Commitment, the DIP Loans or any of the DIP Obligations.

Section 2.5    Interest and Fees on Loans.

(a)    Applicable Rate; Payment of Interest.  Interest shall accrue on the full amount of the DIP Loan Commitment from the Interim Order Entry Date through the Maturity Date at a fixed rate per annum equal to ten percent (10%).  All accrued interest shall be due and payable on the Maturity Date.

(b)    Calculation of Interest Rates.  Interest payable pursuant to this Section 2.5 shall be computed on a 30/360 basis.

(c)    Default Interest.  Upon the occurrence and during the continuation of an Event of Default, the DIP Loan Commitment and any accrued interest, fees and other amounts owed hereunder shall bear interest at a simple rate of ten percent (10%) per annum.

Section 2.6    Repayment.  Subject to Sections 2.8 and 2.9, the DIP Loans shall be due and payable, and the Debtors shall be required to repay all of the DIP Obligations (including, without limitation, all accrued and unpaid principal, interest, fees, costs, and expenses on the DIP Loans) on the Maturity Date.

Section 2.7    Prepayments.

(a)    Mandatory Prepayments of Net Proceeds.  No later than the first Business Day following the date of receipt by the Debtors of any Net Proceeds, the Debtors shall prepay the DIP Loans (including the applicable portion of the accrued costs and expenses) as set forth in Section 2.9 in an aggregate amount equal to such Net Proceeds.

(b)     Mandatory Prepayment Certificate. Concurrently with any prepayment of the DIP Loans pursuant to Section 2.7(a), the Debtors shall deliver to the Agent a certificate of an Authorized Officer demonstrating the calculation in reasonable detail of the amount of the applicable Net Proceeds. In the event that the Debtors shall subsequently determine that the actual amount received exceeded the amount set forth in such certificate, the Debtors shall promptly make an additional prepayment of the DIP Loans in accordance with Section 2.9 in an amount equal to such excess, and the Debtors shall concurrently therewith deliver to the Agent a certificate of an Authorized Officer demonstrating the derivation of such excess.

(c)     Voluntary Prepayment. The Debtors may prepay the DIP Loans (including the applicable portion of the accrued costs and expenses) in whole or in part at any time upon three (3) Business Days' prior notice to the Agent; provided that any partial prepayment will be in a minimum amount of $100,000.

Section 2.8     Application of Payments and Proceeds. Any amount required to be paid pursuant to Section 2.7(a) or any other provision of this Agreement, and all proceeds of the DIP Collateral (whether before or after an Event of Default) shall be applied (i) first, to pay any amounts (including reasonable and documented attorneys' fees) payable to the DIP Lenders under Section 9.3 hereof, (ii) second, to pay accrued and unpaid interest, costs, expenses, and other outstanding DIP Obligations, (iii) third, to repay any principal amounts outstanding in respect of the DIP Loans, and (iv) fourth, to the Debtors.

Section 2.9     General Provisions Regarding Payments.

(a)     Payments. All payments by the Debtors of principal, interest, and other DIP Obligations shall be made by the Debtors to the Agent in Dollars in same day funds, without defense, setoff, or counterclaim, free of any restriction or condition, and delivered to the Agent not later than 4:00 p.m. (New York City time) on the date due at the Agent's office for receipt of notices hereunder (or as otherwise instructed by the Agent to the Debtors) without presentment, demand, protest, or notice of any kind, all of which are expressly waived by the Debtors.

(b)     Late Payments. The Agent shall be permitted to consider any payment made by or on behalf of the Debtors that is not made in same day funds prior to 4:00 p.m. (New York City time) as a late payment, and any such late payment shall be deemed received on the next Business Day. The Agent shall give prompt telephonic notice to the Debtors (confirmed in writing) if any payment is considered late hereunder. To the extent any late payment is received, the Agent shall be permitted to declare by notice to the Debtors (confirmed in writing) a Default or Event of Default to the extent so provided under the terms of Section 8.1. Interest shall continue to accrue on any late payment until the Business Day following receipt thereof.

(c)     Payments to Include Accrued Interest. All payments in respect of the principal amount of any DIP Loan shall include payment of accrued interest on the principal amount being repaid or prepaid calculated in accordance with Section 2.5, and all such payments shall be applied to the payment of interest before application to principal.

(d)     Business Days. Whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, such payment shall be made on the next

succeeding Business Day and such extension of time shall be included in the computation of the payment of interest hereunder.

Section 2.10    Termination of DIP Loan Commitments.  Unless previously terminated, the DIP Loan Commitment shall automatically terminate at the end of the DIP Commitment Period. Upon the making of any DIP Loan, the DIP Loan Commitment shall be permanently reduced by an amount equal to the principal amount of such DIP Loan.

ARTICLE III
CONDITIONS PRECEDENT; CONDITIONS SUBSEQUENT

Section 3.1    Conditions Precedent; Closing Date.  The obligation of the DIP Lenders to make any DIP Loan on any date on which the Debtors request a Borrowing is subject to the satisfaction, or waiver in accordance with Section 9.1, of the following conditions on or before the Closing Date:

(a)    Certificate.  The Agent shall have received a certificate of an Authorized Officer of the Debtors with respect to (i) the articles of incorporation or formation of the Debtors, (ii) the bylaws or operating agreements of the Debtors, (iii) the resolutions of the board of directors or managers of the Debtors approving each DIP Loan Document and such other agreements, instruments, certificates or other documents required to be delivered by the Debtors under the DIP Loan Documents and the performance of the obligations of the Debtors thereunder, and (iv) the names and true signatures of any officers of the Debtors who the Debtors desire to sign DIP Loan Documents from time to time (all of whom shall be Authorized Officers).

(b)    Good Standing Certificate.  The Agent shall have received a good standing certificate from the applicable Governmental Body of the jurisdiction of formation of each of the Debtors and in each jurisdiction in which it is qualified as a foreign corporation or other entity to do business, each dated within thirty (30) days prior to the Closing Date.

(c)    Financing Orders.  The Financing Orders, and all motions relating thereto, approving and authorizing the DIP Loans, all provisions thereof, and the priorities and DIP Liens granted under Bankruptcy Code section 364(c) and (d), as applicable, shall be in form and substance satisfactory to each DIP Lender and its counsel in their sole discretion, the Interim Order shall have been entered by the Bankruptcy Court, in the form attached hereto as Exhibit C, on or before the date hereof.  The Final Order shall be scheduled to be issued no later than November 22, 2024, and shall include, without limitation, provisions (i) modifying the automatic stay to permit the creation and perfection of the DIP Liens, (ii) providing for the vacation of such stay to permit the enforcement of the Agent's and the DIP Lenders' rights and remedies under the DIP Loan Documents, (iii) stating that the Agent, DIP Lenders, the Pre-Petition Secured Party, the Pre-Petition Lenders, and all of their respective counsel, advisors, and consultants, shall each be entitled to the benefit of a "good faith" finding pursuant to section 364(e) of the Bankruptcy Code, (iv) prohibiting the assertion of claims arising under sections 506(c) or 552(b) of the Bankruptcy Code against the Agent or the DIP Lenders or the commencement of other actions adverse to the Agent or the DIP Lenders or their respective rights and remedies under the DIP Loan Documents, the Financing Orders, or any other order, (v) prohibiting the incurrence of Indebtedness by Debtors, other than Permitted Indebtedness, with priority equal to or greater than the DIP Loans,

17

(vi) prohibiting any granting or imposition of Liens other than DIP Liens and Permitted Liens, (vii) authorizing and approving the Debtors to execute and deliver the DIP Loan Documents to which each shall be a party and the transactions contemplated therein, including, without limitation, the granting of the super priority status, the first-priority and priming security interests and DIP Liens upon the DIP Collateral and the payment of all fees and expenses due to the Agent and the DIP Lenders, (viii) authorizing and approving the 'roll-up' of Dacian and Haymarket's pre-petition claim on a dollar-for-dollar basis and the securing of such roll-up obligations equally and ratably with the Debtors' obligations with respect to the DIP Loans and under the DIP Loan Documents, and (ix) confirming that the Agent (on behalf of the DIP Lenders) is permitted in all respects to Credit Bid the DIP Loans or the Loan, as applicable, in whole or in part, in connection with any sale or disposition of assets in the Chapter 11 Cases.

(d)    _Compliance with Financing Orders._  No Financing Order shall have been reversed, modified, amended, stayed, or vacated, in the case of any modification or amendment, in a manner, or relating to a matter, without the consent of the Agent, in consultation with the DIP Lenders.  The Debtors shall be in compliance in all material respects with the Financing Orders and all other orders of the Bankruptcy Court binding on it.

(e)    _Debtor-in-Possession._  No trustee or examiner with expanded powers shall have been appointed with respect to the Debtors or their properties.

(f)    _First Day Motions._  All "first day" motions and related orders entered by the Bankruptcy Court in the Chapter 11 Cases shall be in form and substance satisfactory to the DIP Lenders and their counsel.

(g)    _Sale Motion and Bid Procedures._  The Debtors' motion for entry of an order approving bid and sale procedures and to authorize a sale of property free and clear and related orders annexed thereto to be entered by the Bankruptcy Court (including, without limitation, the order approving bid and sale procedures and the order approving a sale) (the "Bid Procedures Order") shall be in form and substance satisfactory to the DIP Lenders and their counsel.

(h)    _Use of Proceeds and Information._  The proceeds of the DIP Loans shall be used by the Debtors solely in accordance with the Budget and the DIP Lenders shall receive such information (financial or otherwise) as may be reasonably requested by the DIP Lenders.

(i)    _Litigation._  There shall not exist any material action, suit, investigation, litigation, or proceeding pending (other than the Chapter 11 Cases) or threatened in any court or before any Governmental Body that, in the reasonable opinion of the DIP Lenders, materially and adversely affects any of the transactions contemplated hereby, or that has or could be reasonably likely to have a Material Adverse Effect.  Litigation pending pre-petition for which the automatic stay has not been modified or which is fully covered by insurance shall not be deemed to be litigation reasonably likely to have a Material Adverse Effect.

(j)    _Cash Management._    Cash management arrangements reasonably satisfactory to the DIP Lenders in form and substance shall be in place.  The DIP Lenders or their advisors shall have completed a review of the Debtors' cash management systems and determined

that all material amounts of cash and cash equivalents of the Debtors are subject to a DIP Lien in favor of the Agent pursuant to Controlled Account Agreements.

(k)     No Default. No Default or Event of Default shall exist at the time of, or after giving effect to, the transactions contemplated on the Closing Date, including the advancing of any DIP Loans.

(l)     Representations and Warranties. All representations and warranties in the DIP Loan Documents shall be true and correct as of the Closing Date in all material respects.

(m)     UCC Financing Statements. Upon request of the Agent, the Debtors shall promptly provide UCC financing statements covering all DIP Collateral that is personal property of the Debtors, for filing in all jurisdictions as may be necessary or, in the opinion of the Agent, desirable, to perfect the security interests created in such DIP Collateral pursuant to the DIP Collateral Documents. The Debtors hereby authorize the Agent to file such UCC financing statements, whether or not actually provided by the Debtors.

(n)     DIP Loan Documents. Each DIP Lender shall have received duly executed copies of each DIP Loan Document (other than any DIP Loan Document which the Agent has allowed to be executed at a later date), with originals to promptly follow. The financing statements and other DIP Loan Documents related to perfection of the security interest and Liens of the Agent in the DIP Collateral shall, at the Agent's option, have been filed in all appropriate jurisdictions (or arrangements for such filings acceptable to the Agent shall have been made).

(o)     Other Actions to Perfect Security Interests. Each DIP Lender shall have received evidence that Debtors shall have taken or caused to be taken any other action, executed and delivered or caused to be executed and delivered any other agreement, document and instrument, and made or caused to be made any other filing and recording (other than as set forth herein), reasonably required by the Agent to perfect, and to ensure the perfection of, its security interests in the DIP Collateral with the priority required by the DIP Loan Documents.

(p)     Other Information. Each DIP Lender shall have received any other financial or non-financial information regarding the Debtors that such DIP Lenders reasonably requested at least five (5) Business Days prior to the Closing Date.

(q)     DIP Lenders' Professional Fees and Costs. The Financing Orders shall require the Debtors, subject to the terms of the Financing Orders, to pay all reasonable out-of-pocket fees and expenses of the Agent and the DIP Lenders incurred in connection with this Agreement and the other DIP Loan Documents, including the fees, costs, and expenses of Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., as counsel to the Agent and SILAC, the fees, costs, and expenses of Goldstein & McClintock LLLP, as counsel to Haymarket, and any other attorneys' fees, costs and expenses of local counsel to the Agent and the DIP Lenders; *provided, however*, that the fees and expenses allowed under the Financing Orders shall be added to the principal balance of the DIP Loans and shall not be required to be paid in cash. For the avoidance of doubt, and notwithstanding anything herein to the contrary, the obligation of the Debtors to pay, and the payment of, the fees and expenses of the Agent and the DIP Lenders as aforesaid shall not be subject to the Budget. The Agent and the DIP Lenders shall be satisfied, in their reasonable

discretion, that all such fees and expenses constitute DIP Obligations under the Financing Orders and are secured by the DIP Liens on the DIP Collateral. Such fees may be paid from an advance under the DIP Loan provided there is availability under DIP Loan Commitment at the relevant time.

(r) No Material Adverse Change. The Debtors, as debtors-in-possession, shall have continued to materially operate their businesses in the ordinary course through the Closing Date, and since the Petition Date there shall have been no Material Adverse Effect taken as a whole.

Section 3.2 Conditions to Each Borrowing. The obligations of the DIP Lenders to make any DIP Loan on any Borrowing Date, including the Closing Date, is subject to the satisfaction, or waiver in accordance with Section 9.1, of the following conditions precedent:

(a) Borrowing Certificate. The Agent shall have received a fully executed and delivered Borrowing Certificate, in accordance with Section 2.2. Each Borrowing Certificate shall be executed by an Authorized Officer of the Debtors and delivered to the Agent on a Business Day.

(b) Representations and Warranties. As of such Borrowing Date (both before and after giving effect to the advance of the DIP Loans and application of its proceeds), the representations and warranties of the Debtors contained in the DIP Loan Documents shall be true and correct in all material respects on and as of that Borrowing Date, as if made on and as of that Borrowing Date (except to the extent such representations and warranties specifically relate to an earlier date, such representations and warranties were true and correct on and as of such earlier date).

(c) No Event of Default. As of such Borrowing Date, no Default or Event of Default shall have occurred and be continuing or would result from the consummation of the applicable Borrowing (or the application of its proceeds).

(d) Consents. Each DIP Lender shall have received such Consents and other information, approvals, opinions, or documents reasonably requested by such DIP Lender in connection with such Borrowing.

(e) Available Commitments. After making the DIP Loans requested on such Borrowing Date, the aggregate outstanding principal amount of the DIP Loans shall not exceed the amount of the DIP Loan Commitment.

(f) No Material Adverse Effect. Since the Interim Order Entry Date, no Material Adverse Effect as to the Debtors taken as a whole shall have occurred after giving effect to the making of the DIP Loans.

(g) Other Information. Each DIP Lender shall have received any other financial or non-financial information regarding the Debtors that such DIP Lender reasonably requested within a reasonable time after a request is made for such information.

Section 3.3    Conditions Subsequent. The Debtors shall timely perform all obligations and commitments in any post-closing agreement between the Agent, the DIP Lenders, and the Debtors with respect to any requirement of Sections 3.1 or 3.2 hereof that the Agent has, in the exercise of its sole and absolute discretion, agreed must be satisfied at a later date.

ARTICLE IV
REPRESENTATIONS AND WARRANTIES

Section 4.1    Representations and Warranties. To induce the Agent and the DIP Lenders to enter into this Agreement and for the DIP Lenders to make each DIP Loan to be made hereby, each Debtor hereby represents and warrants to the Agent and the DIP Lenders as to itself that, on the Closing Date and on each Borrowing Date as follows:

(a)    Status; Authorization. Such Debtor is duly organized, validly existing, and in good standing under the laws of its jurisdiction of formation and is duly qualified and in good standing in every other jurisdiction where it is doing business except where the failure to so qualify could not reasonably be expected to have a Material Adverse Effect, and, subject to the entry by the Bankruptcy Court of the Financing Orders, the execution, delivery and performance by such Debtor of the DIP Loan Documents (i) are within its respective authority, (ii) have been duly authorized, and (iii) do not conflict with or contravene its constitutive documents. Subject to the entry by the Bankruptcy Court of the Financing Orders, the execution, delivery, performance of its obligations, and exercise of its rights under the DIP Loan Documents by such Debtor, including, without limitation, the making of the DIP Loans under this Agreement, (y) do not require any Consents that have not been obtained or notices to third parties that have not been provided except to the extent such failure would not result in a Material Adverse Effect, and (z) are not and will not be in conflict with or be prohibited or prevented by (A) any Regulation, (B) any corporate or entity governance document, corporate or entity minute or resolution of such Debtor or (C) any instrument, agreement or provision thereof, in each case binding on it or affecting any of its property.

(b)    Execution and Binding Effect. Subject to the entry by the Bankruptcy Court of the Financing Orders, upon execution and delivery thereof, each DIP Loan Document shall constitute the legal, valid, and binding obligation of such Debtor, enforceable in accordance with its terms.

(c)    Title to Assets.

(i)    Such Debtor has good and marketable title to all property and assets owned or purported to be owned by it, in each case free of all Liens other than the Permitted Liens.

(ii)    Such Debtor enjoys, and will enjoy, peaceful and undisturbed possession of, or a lease or license to use, all property and assets (subject only to the Permitted Liens) that is necessary for the conduct of its business.

(d)    Litigation. Except for the Chapter 11 Cases, other than with respect to pending litigation stayed by operation of section 362 of the Bankruptcy Code, there are no material legal or other proceedings or investigations pending or, to the Knowledge of such Debtor,

threatened against such Debtor before any court, tribunal, or regulatory authority which could, if adversely determined, alone or together, reasonably be expected to have a Material Adverse Effect. Litigation fully covered by insurance coverage shall not be expected to have a Material Adverse Effect.

(e)     Governmental Approvals and Filings.  Other than the Bankruptcy Court's entry of the Financing Orders and the filings and recordings contemplated by the DIP Collateral Documents, no approval, order, consent, authorization, certificate, license, permit or validation of, or exemption or other action by, or filing, recording or registration with, or notice to, any Governmental Body is or will be necessary in connection with the execution and delivery of this Agreement or any other DIP Loan Document, consummation by such Debtor of the transactions herein or therein contemplated, or performance of or compliance with the terms and conditions hereof or thereof.  Such Debtor is not an "investment company" or a company "controlled" by an "investment company," with the meaning of the Investment Company Act of 1940, as amended.

(f)     Absence of Conflicts.  Subject to the Bankruptcy Court's entry of the Financing Orders, the execution and delivery by such Debtor of this Agreement and each other DIP Loan Document to which it is a party and performance by it hereunder and thereunder will not violate any law (including, without limitation, Regulations T, U and X of the Federal Reserve Board) and will not conflict with or result in a breach of any order, writ, injunction, resolution, decree or other similar document or instrument of any court or Governmental Body or its certificate of incorporation or by-laws or similar constituent documents or create (with or without the giving of notice or lapse of time, or both) a default under or breach of any material agreement, bond, note or indenture, in each case to which it is a party (by successor in interest or otherwise), or by which it is bound or any material portion of its properties or assets is affected, in each case, the effect of which could reasonably be expected to be, have or reflect in a Material Adverse Effect or, except under the DIP Collateral Documents, result in the imposition of any Lien (other than Permitted Liens) of any nature whatsoever upon any of the properties or assets owned by or used in connection with the business of such Debtor.

(g)     DIP Collateral.  From and after the Interim Order Entry Date, the Agent shall have first-priority perfected security interests and DIP Liens in and to all of the DIP Collateral, free and clear of any Liens, and entitled to priority under applicable law, with no financing statements, hypothecations, chattel mortgages, real estate mortgages or similar filings on record with respect to such Debtor or the DIP Collateral anywhere other than such filings in connection with this Agreement, the DIP Collateral Documents or the Permitted Liens. Each of the representations and warranties made by such Debtor in each DIP Collateral Document to which it is a party is true and correct in all material respects as of each date made or deemed made.

(h)     Material Misstatements and Omissions.  Any projections and pro forma financial information contained in or delivered pursuant to any DIP Loan Document (including the Budget and each Weekly Budget Report) or any other document, certificate or written statement furnished to the Agent and the DIP Lenders pursuant to any DIP Loan Document are based upon good faith estimates and assumptions believed by such Debtor to be reasonable at the time made.

(i)     Budgets.  All facts in the Budget and each Weekly Budget Report (when delivered) are accurate in all material respects and such Debtor has disclosed to the Agent and the

DIP Lenders all material assumptions in the Budget and each Weekly Budget Report. After giving effect to the DIP Loans projected to be made under the Budget, such Debtor believes, in good faith and in the exercise of its commercially reasonable judgment, that it has or will have sufficient capital and funds to pay and satisfy the expenses, obligations and liabilities of such Debtor as set forth, as and when provided to be paid or satisfied, in the Budget.

(j)     Labor Practices.  To the Knowledge of such Debtor, such Debtor is not engaged in any unfair labor practice that could reasonably be expected to have a Material Adverse Effect.

(k)     Employee Benefits.  Each of the Employee Benefit Plans intended to qualify under Section 401 of the Internal Revenue Code so qualifies, and nothing has occurred with respect to the operation of such plan which would cause the loss of such qualification or the imposition of any material liability, penalty or tax under ERISA or the Internal Revenue Code. All contributions and premiums required by law or by the terms of each Employee Benefit Plan have been timely made.  Neither such Debtor nor its ERISA Affiliates bear any liability for any Pension Plan or Multiemployer Plan and have not had any liability under any Pension Plan or Multiemployer Plan for the last 6 years.

(l)     Environmental Matters.

(i)     There are no Environmental Liabilities at any Relevant Property, which individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(ii)     Such Debtor: (A) has operated its business in compliance with all applicable Environmental Laws; (B) has obtained all Environmental Permits required by applicable Environmental Laws for the ownership and operation of its properties, and all such Environmental Permits are in full force and effect or such Person has made all appropriate filings for issuance or renewal of such Environmental Permits; (C) to its Knowledge, is not aware of any acts, omissions, events or circumstances that may interfere with or prevent continued compliance with the Environmental Laws and Environmental Permits referred to in the preceding clauses (A) and (B); (D) has not received written notice of any asserted or threatened claim, action, suit, proceeding, hearing, investigation or request for information relating to any environmental matter; and (E) has not received notice from any Governmental Body that such Debtor is a potentially responsible party under any Environmental Law at any disposal site containing Hazardous Materials, nor has such Debtor received any notice that any lien under any Environmental Law against any property of such Debtor exists, except for matters in each case of (A) through (E) above, which individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

(m)     Insurance.  The policies, binders or self-insurance programs for fire, liability, product liability, workmen's compensation, vehicular and other insurance currently held by or on behalf of such Debtor insure its material properties and business activities against such losses and risks as are reasonably believed to be adequate to protect its properties in accordance

23

with applicable law and customary industry practice. As of the date hereof, all such policies, binders and self-insurance programs are in full force and effect. As of the date hereof, such Debtor has not received notice from any insurer or agent of such insurer that substantial capital improvements or other expenditures are required. As of the date hereof, such Debtor has not received notice of cancellation of any material insurance policy or binder.

(n) <u>Absence of Events of Default and Material Adverse Effect</u>. Since the Interim Order Entry Date, no Default or Event of Default has occurred. Since the Interim Order Entry Date, no Material Adverse Effect has occurred.

(o) <u>Compliance with Laws</u>. Except as otherwise excused by the Bankruptcy Code, such Debtor has complied, and is in compliance in all respects, with all laws, except for such instances of non-compliance that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

(p) <u>Margin Regulations</u>. No part of the proceeds of the DIP Loans issued hereunder will be used for the purpose of buying or carrying any Margin Stock or to extend credit to others for the purpose of buying or carrying any Margin Stock, in either case in a manner which would violate or conflict with Regulations T, U or X of the Board Governors of the Federal Reserve System. Such Debtor is not engaged in the business of extending credit to others for the purpose of buying or carrying Margin Stock. Neither the making of the DIP Loans nor any use of proceeds of any such Loans will violate or conflict with the provisions of Regulations T, U or X of the Board of Governors of the Federal Reserve System, as amended from time to time.

(q) <u>Taxes</u>. Such Debtor has filed all federal and other material Post-Petition Tax returns required to be filed by it and has not failed to pay any material post-petition Taxes, or interest and penalties relating thereto, except for post-petition Taxes not yet due and except for those the amount or validity of which is currently being contested in good faith by appropriate proceedings diligently pursued and available to such Debtor and with respect to which adequate reserves have been set aside on its books in accordance with GAAP.

ARTICLE V
AFFIRMATIVE COVENANTS

Section 5.1 <u>Affirmative Covenants</u>. The Debtors covenant and agree that until payment in full of all DIP Obligations (other than indemnification obligations for which no claim has been made as of the applicable date of determination, which indemnity obligations shall continue in full after payment of all DIP Obligations), the Debtors shall perform all the covenants in this Article V applicable to it:

(a) <u>Reporting Requirements</u>. The Debtors shall furnish to the Agent and the DIP Lenders:

(i) no later than 6:00 p.m. (prevailing Pacific time) on Friday of each week or if such Friday is not a Business Day, then the immediate succeeding Business Day, the Weekly Budget Report;

24

(ii)     at any time the Debtors receives any material written notice from any Governmental Body, the Debtors shall provide a copy of such notice to the Agent and the DIP Lenders within one (1) Business Day of receipt, and the Debtors shall provide to the Agent and the DIP Lenders copies of all material reports, certificates and notices that the Debtors may provide to any Governmental Body within one (1) Business Day of transmission;

(iii)    a monthly reporting package, no later than thirty (30) days after the end of each calendar month, including cash flow, income statement and balance sheet for such month, accounts payable and receivable reports with aging information; and

(iv)    as promptly as reasonably practicable from time to time following the Agent's reasonable request therefor, such other information '(including historical information) regarding the operations, business affairs and financial condition of the Debtors, the progress of the Chapter 11 Cases or compliance with the terms of any DIP Loan Document.

In addition to the foregoing, the Debtors agree to cooperate with, and to instruct their advisors (including, without limitation, the Investment Bank) to cooperate with the Agent and the DIP Lenders and their advisors in connection with the marketing of Debtors' assets. Without limiting the generality of the foregoing, the Debtors shall cause the Investment Bank to (i) provide weekly written 'scorecard' updates on its marketing efforts, (ii) participate in calls with the Agent, the DIP Lenders and/or their advisors on a weekly basis (or less frequently, if so agreed by the Agent, in its sole discretion), and (iii) participate in independent calls with the Agent's advisors from time to time and upon request.

(b)     Verification; Site Inspections.  The Debtors shall keep true and accurate (in all material respects) books of account in accordance with past practices and shall permit the Agent and the DIP Lenders, or any of their designated representatives, upon reasonable notice and at the expense of the Debtors, during normal business hours to examine the books of account of the Debtors (and to make copies and/or extracts therefrom) and to discuss the affairs, finances, and accounts of the Debtors with, and to be advised as to the same by, the managers, executives, and officers of the Debtors and to be advised as to such or other business records upon the reasonable request of the Agent and the DIP Lenders.  The Debtors authorize the Agent, the DIP Lenders, and their agents or representatives to, during normal business hours and with reasonable prior notice, perform inspections of the Operations.  Management, advisors, consultants, and senior personnel of the Debtors shall be available upon reasonable advance notice from the Agent and DIP Lenders (or their agents or representatives) for meetings with the Agent, the DIP Lenders, and their agents or representatives during normal business hours with reasonable prior notice and at such reasonable locations.

(c)     Existence; Maintenance of Properties; Compliance with Regulations.  The Debtors shall maintain their corporate/entity/legal existence and business, maintain their assets in good operating conditions and repair (subject to ordinary wear and tear and casualty damage and to all provisions of this Agreement permitting sales of certain of the Debtors' assets), keep their businesses and assets insured in accordance herewith, maintain their chief executive offices in the

United States, continue to engage in the same or substantially similar lines of business as of the Petition Date, and comply in all respects with all Regulations, including without limitation, ERISA and Environmental Laws, except where a failure to do so could not individually or in the aggregate reasonably be expected to have a Material Adverse Effect.

(d)     *Notice of Material Events*.  The Debtors shall notify the Agent and the DIP Lenders promptly in writing upon an Authorized Officer becoming aware of any of the following: (i) the occurrence of any Default or Event of Default; (ii) any noncompliance with any Environmental Law or proceeding in respect thereof which could reasonably be expected to have a Material Adverse Effect; (iii) any change of chief executive office address of the Debtors; (iv) any pending or, to the Knowledge of the Debtors, threatened litigation or similar proceeding affecting the Debtors not subject to the automatic stay under Section 362 involving claims in excess of $100,000 in the aggregate or any material change in any such litigation or proceeding previously reported; (v) claims or liens in excess of $100,000 in the aggregate against any assets or properties of the Debtors encumbered in favor of the Agent; and (vi) any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect.

(e)     Further Assurances.

(i)     The Debtors shall cooperate with the Agent and the DIP Lenders, take such action, execute such documents, and provide such information as the Agent or the DIP Lenders may from time to time reasonably request in order to effect the transactions contemplated by and the purposes and intent of the DIP Loan Documents.

(ii)     The Debtors shall promptly, upon request by the Agent or the DIP Lenders, correct, and cause each of the other parties to the DIP Loan Documents to promptly correct, any defect or error that may be discovered in any DIP Loan Document or in the execution, acknowledgment, or recordation of the DIP Loan Document.  Promptly upon request by the Agent or the DIP Lenders, the Debtors shall execute, authorize, acknowledge, deliver, record, file and register, any and all such further acts, deeds, conveyances, documents, security agreements, pledge agreements, mortgages, deeds of trust, trust deeds, assignments, financing statements and continuations, notices of assignment, transfers, certificates, assurances and other instruments as the Agent or the DIP Lenders may require from time to time in order to carry out more effectively the purposes and intent of each DIP Loan Document.  Without limiting the foregoing, the Debtors shall (A) authorize the filing by the Agent of UCC-1 financing statements for all jurisdictions deemed necessary or desirable by the Agent, and (B) take such action from time to time (including, without limitation, authorizing, filing, executing and/or delivering such assignments, security agreements and other instruments) as shall be reasonably requested by the Agent to create, in favor of the Agent, to the extent required under the respective DIP Collateral Documents and to the maximum extent permitted under applicable law, a first-priority perfected Lien in all of the DIP Collateral.

(f)     Controlled Account Agreements.

(i)     The Debtors shall use their commercially reasonable efforts within two (2) weeks after the Petition Date, as may be extended by the Agent in writing, to enter into an account control agreement in form and substance reasonably acceptable to the Agent (each, a "Controlled Account Agreement") as necessary to provide the Agent, to the extent not prohibited by applicable law, with "control" over, except as set forth below, each Deposit Account of the Debtors (each, a "Controlled Account") as provided for under Section 9-104 of Article 9 of the UCC (or other applicable law) for the purpose of perfecting the security interest which the Agent has in such Deposit Account pursuant to the DIP Collateral Documents. The Debtors further agree to promptly enter into Controlled Account Agreements for any new Deposit Accounts opened during the DIP Commitment Period, which new Deposit Accounts shall only be opened following notice to, and written consent from, the Agent. No arrangement contemplated hereby or by any Controlled Account Agreement in respect of any such Deposit Account of the Debtors, shall be modified by the Debtors without the prior written consent of the Agent. For the avoidance of doubt, to the extent that any Deposit Account is subject to an existing Controlled Account Agreement in favor of the Agent as of the Petition Date, the Debtors shall not be required under this Section 5.1(f) to enter into additional Controlled Account Agreements in favor of the Agent with respect to any such Deposit Accounts.

(ii)     Upon the occurrence and during the continuance of an Event of Default, but subject to the Debtor Default Period Rights, any disbursements of proceeds in any Controlled Account will only be made at the direction of the Agent; prior to the occurrence of an Event of Default, the Debtors will have access to any funds on deposit in the Controlled Accounts for use solely in accordance with this Agreement and the other DIP Loan Documents.   The Agent assumes no responsibility for the Controlled Accounts, including, without limitation, any claim of accord and satisfaction or release with respect to deposits which any banks accept thereunder.  Upon the occurrence and during the continuance of an Event of Default, all remittances which the Debtors receives in payment of any Accounts, and the proceeds of any other DIP Collateral, shall be: (A) kept separate and apart from the Debtors' own funds so that they are capable of identification as the Agent's property; (B) held by the Debtors as trustee of an express trust for the Agent's benefit; and (C) immediately deposited in such accounts designated by the Agent.  Upon the occurrence and during the continuance of an Event of Default, but subject to the Debtor Default Period Rights, all proceeds received or collected by the Agent with respect to the Controlled Accounts, and reserves and other property of the Debtors at any time or times hereafter, may be held by the Agent, as the case may be, without interest to the Debtors until all DIP Obligations are paid in full or applied by the Agent on account of the DIP Obligations. The Agent may release to the Debtors such portions of such reserves and proceeds as the Agent may determine.  The Agent shall not have any duty to protect, insure, collect or realize upon the Controlled Accounts or to preserve rights in them.

(g)    Insurance. The Debtors shall maintain, at their own expense, and keep in effect with responsible insurance companies, such liability insurance for bodily injury and third-party property damage as the Debtors had in place as of the Petition Date. The Debtors shall keep and maintain, at their own expense, the Debtors' material real and personal property insured against loss or damage by fire, theft, explosion, spoilage, and all other risks, each in the same amount as the Debtors had in place as of the Petition Date. The Agent shall be named as an additional insured and/or loss payee, as applicable, on each such insurance policy.

(h)    Information Regarding DIP Collateral. Each Debtor will furnish to the Agent and the DIP Lenders prompt written notice of any change in (i) any of such Debtor's corporate or entity name or any trade name used to identify it in the conduct of its business or such Debtor's chief executive office, its principal place of business or its jurisdiction of organization, or (ii) such Debtor's federal Taxpayer Identification Number. Such Debtor will not affect or permit any change referred to in the preceding sentence unless arrangements satisfactory to the Agent have been made to ensure that all necessary filings will be (or have been) made under the UCC and all other actions have been taken that are required so that such change will not at any time adversely affect the validity, perfection or priority of any Lien established under any DIP Loan Document on the DIP Collateral.

(i)    Existence; Conduct of Business. The Debtors will do or cause to be done all things reasonably necessary to preserve, renew and keep in full force and effect their legal existence and the rights, licenses, permits (including, without limitation, Environmental Permits) privileges, franchises, patents, copyrights, trademarks and trade names material to the conduct of its business, except to the extent that failure to so act, which either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect. The Debtors shall maintain their credit and risk policies substantially as in effect on the Petition Date.

(j)    Payment of Obligations. Proceeds of the DIP Loans shall be used solely as provided in Section 2.3 of this Agreement.

(k)    Compliance with Laws. Except as otherwise excused by the Bankruptcy Code, the Debtors will comply with all laws (including, without limitation, all Environmental Laws), rules, licenses, permits, Regulations and orders of any Governmental Body applicable to it or its property, except where failures to do so, in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(l)    Subsidiaries. Without limitation of the prohibition against forming Subsidiaries under Section 6.1(f) or waiving any Event of Default arising therefrom, if any operating Subsidiary is nonetheless formed or acquired by the Debtors after the Closing Date, the Debtors will, prior to the date upon which such Subsidiary is formed or acquired, notify the Agent and the DIP Lenders thereof and promptly following such formation or acquisition, cause any equity interest in, assets owned or leased by, or Indebtedness owned by or on behalf, of such Subsidiary to be added to the DIP Collateral. The Agent may require that any such Subsidiary be joined to this Agreement or the DIP Collateral Documents as a borrower or debtor hereunder or thereunder pursuant to joinder agreements in form and substance reasonably satisfactory to the Agent.

(m)     Bankruptcy Milestones. The Debtors shall comply with the Bankruptcy Milestones; provided that with respect to Bankruptcy Milestones concerning the designation of, or any action by, a Stalking Horse Bidder, as defined in the Bid Procedures Order, the Debtors shall not be in default if the Agent does not approve any of the bids submitted by the Stalking Horse Bid Deadline, as defined in the Bid Procedures Order, to serve as a stalking horse bid by the Stalking Horse Selection Date, as defined in the Bid Procedures Order.

ARTICLE VI
NEGATIVE COVENANTS/BUDGET COMPLIANCE

Section 6.1     Negative Covenants. The Debtors covenant and agree that until all of the DIP Obligations (other than indemnification obligations for which no claim has been made as of the applicable date of determination, which indemnity obligations shall continue in full after payment of all DIP Obligations) have been paid or satisfied in full, the Debtors shall perform all covenants in this Section 6.1 applicable to them:

(a)     Indebtedness. The Debtors shall not incur, create, assume, become or be liable in any manner with respect to, or permit to exist, any Indebtedness, or guarantee, assume, endorse, or otherwise become responsible for (directly or indirectly), any Indebtedness, performance, obligations or dividends of any other Person, except (the Indebtedness described in the following clauses, the "Permitted Indebtedness"):

(i)     the DIP Obligations;

(ii)     the Pre-Petition Indebtedness; and

(iii)     Indebtedness, including post-petition administrative expenses, incurred in the ordinary course of the Debtors' operations and in compliance with the Budget; provided that such Indebtedness remains at all times unsecured except as provided in Section 6.1(b).

(b)     Liens. The Debtors shall not create or incur any Liens on any of the property or assets of the Debtors, except (the Liens described in the following clauses, the "Permitted Liens"):

(i)     the Liens of the Agent securing the DIP Obligations;

(ii)     Liens securing the Pre-Petition Indebtedness, including the Liens granted pursuant to the Financing Orders and other Liens existing on the date hereof;

(iii)     Liens securing the payment of Taxes, assessments, or other governmental charges or levies either not yet overdue or the validity of which are being contested in good faith by appropriate proceedings diligently pursued and available to the Debtors and with respect to which adequate reserves have been set aside on its books;

(iv) non-consensual statutory Liens (other than Liens securing the payment of Taxes) arising in the ordinary course of the Debtors' businesses to the extent: (A) such Liens secure Indebtedness which is not overdue; or (B) such Liens secure Indebtedness relating to claims or liabilities which are fully insured and being defended at the sole cost and expense and at the sole risk of the insurer or being contested in good faith by appropriate proceedings diligently pursued by the Debtors, in each case prior to the commencement of foreclosure or other similar proceedings and with respect to which adequate reserves have been set aside on its books;

(v) zoning and land use restrictions, easements, encumbrances, licenses, covenants, and other restrictions affecting the use of real property which do not interfere in any material respect with the use of such real property or ordinary conduct of the business of the Debtors as presently conducted thereon or materially impair the value of the real property which may be subject thereto;

(vi) purchase money security interests in Equipment (including Capital Leases) to secure Indebtedness permitted under Section 6.1(a)(ii) hereof;

(vii) pledges and deposits of cash by the Debtors after the date hereof in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security benefits consistent with the current practices of the Debtors as of the date hereof; and

(c) Liens arising from (A) operating leases and the precautionary UCC financing statement filings in respect thereof, and (B) Equipment or other materials which are not owned by the Debtors located on the premises of the Debtor (but not in connection with, or as part of, the financing thereof) from time to time in the ordinary course of business and consistent with current practices of the Debtors and the precautionary UCC financing statement filings in respect thereof.

(d) <u>Investments</u>. The Debtors shall not make any Investments other than Investments in: (i) marketable obligations of the United States maturing within one (1) year; (ii) certificates of deposit, bankers' acceptances and time and demand deposits of United States banks having total assets in excess of $1,000,000,000 or other similar cash equivalents; and (iii) existing Investments on the Closing Date shown on the Budget or financial statements (each of (i) through (iii) above, a "<u>Permitted Investment</u>").

(e) <u>Mergers; Asset Sales</u>. Other than any disposals of obsolete, worn out or surplus property and the license or sublicense of intellectual property, the Debtors shall not, without the written consent of the Agent, (i) consummate a merger, amalgamation or consolidation, (ii) enter into any asset purchase agreement, (iii) purchase, sell, lease or otherwise dispose of assets other than inventory in the ordinary course, (iv) make any changes in the corporate structure or identity of the Debtors which could reasonably be expected to have a Material Adverse Effect, or (v) enter into any binding agreement to do any of the foregoing.

(f)　　Restricted Payments.  The Debtors shall not directly or indirectly, declare, order, pay, make, or set apart any sum for any Indebtedness other than the DIP Loans or the Pre-Petition Indebtedness or any other payments permitted by the Bankruptcy Court subject to the Budget.

(g)　　Subsidiaries.  The Debtors shall not form, or cause to be formed, any Subsidiary without the written consent of the Agent.

(h)　　Chapter 11 Claims.  Except as provided in the Financing Orders, the Debtors will not incur, create, assume, suffer to exist, or permit any other superpriority expense claim under section 364 of the Bankruptcy Code or any or Lien which is senior to or *pari passu* with, the Liens securing the DIP Obligations.

Section 6.2　　Budget Compliance.  The Debtors shall comply with the Budget (subject to the permitted variances provided in the next immediate sentence), and shall not make any payments, or incur any obligations or liabilities, that are not projected and provided for in the Budget.  The Debtors (i) shall not permit payments for any Measuring Period (as defined below) to exceed one hundred ten percent (110%) of the respective amounts, measured on an aggregate basis, as set forth for such Measuring Period; provided that the Debtors shall not permit expenditures for estate professional fees to exceed one hundred percent (100%) of the amount allocated for such expenditures in the Budget for such Measuring Period (but notwithstanding anything to the contrary set forth in the Interim Order or this Agreement, the Debtors may incur estate professional fees and expenses that exceed the amount in the Budget), and (ii) shall not permit receipts for such Measuring Period to be less than ninety percent (90%) of the amounts, on an aggregate basis, set forth for such Measuring Period.  These variances (the "Variances") shall be measured and tested every other week based on a rolling four-week period (the "Measuring Period"); provided, however, that the first Measuring Period that will be tested shall be limited to an approximately two-week period and shall be for the period from the Petition Date to November 10, 2024.  The Debtors may, at any time, amend or reforecast the Budget, either for the period covered by the Budget or for any period thereafter, and the Agent and the DIP Lenders may approve or not approve such amendment in their sole and absolute discretion.  Notwithstanding anything to the contrary in the foregoing, if the Debtors exceed, or on a commercially reasonable basis expect to exceed, any line item in the Budget by at least $50,000, they shall immediately notify the Agent and the DIP Lenders.

ARTICLE VII
INCREASED COSTS; TAXES; SET OFF; ETC.

Section 7.1　　Taxes; Withholdings.

(a)　　Payments to be Free and Clear.  Except as otherwise required under this Section 7.1, all sums payable by the Debtors hereunder and under the other DIP Loan Documents shall (except to the extent required by law) be paid free and clear of, and without any deduction or withholding on account of, any Tax (other than an Excluded Tax) imposed, levied, collected, withheld or assessed by or within the United States of America or any political subdivision in or of the United States of America or any other jurisdiction from or to which a payment is made by

or on behalf of the Debtors or by any federation or organization of which the United States of America or any such jurisdiction is a member at the time of payment.

(b)     Withholding of Taxes. If the Debtors are required by law to make any deduction or withholding on account of any such Tax from any sum paid or payable by the Debtors to the DIP Lenders in the ordinary or general conduct of business: (i) the Debtors shall notify the Agent and the DIP Lenders of any such requirement or any change in any such requirement as soon as the Debtor becomes aware of it; (ii) the Debtors shall pay any such Tax before the date on which penalties attach thereto, such payment to be made (if the liability to pay is imposed on Debtors) for its own account or (if that liability is imposed on the DIP Lenders) on behalf of and in the name of the DIP Lenders, (iii) if such Tax is an Indemnified Tax, the sum payable by the Debtors in respect of which the relevant deduction, withholding or payment is required shall be increased to the extent necessary to ensure that, after the making of that deduction, withholding or payment, the DIP Lenders, as the case may be, receive an amount equal to what it would have received had no such deduction, withholding or payment been required or made, and (iv) within thirty (30) days after paying any sum from which it is required by law to make any deduction or withholding, and within thirty (30) days after the due date of payment of any Tax which it is required by clause (ii) above to pay, the Debtors shall deliver to the Agent and the DIP Lenders evidence satisfactory to the other affected parties of such deduction, withholding or payment and of the remittance thereof to the relevant taxing or other authority.

(c)     Taxpayer Identification. Upon the reasonable request of the Debtors, the DIP Lenders shall deliver to the Debtors two (2) properly completed and duly executed copies of United States Internal Revenue Service Form W-9 (certifying that the DIP Lenders are entitled to an exemption from U.S. backup withholding tax) or any successor form on or before the date the DIP Lenders becomes a party hereto. Upon the reasonable request of the Debtors, the DIP Lenders also agree to deliver to the Debtors two (2) further copies of said Form W-9, properly completed and duly executed, on or before the date that any such form expires or becomes obsolete or after the occurrence of any event requiring a change in the most recent form previously delivered by them to the Debtors, and such extensions or renewals thereof as may reasonably be requested by the Debtors, unless in any such case an event (including, without limitation, any change in treaty, law or regulation) has occurred prior to the date on which any such delivery would otherwise be required that renders all such forms inapplicable or that would prevent the DIP Lenders from duly completing and delivering any such form with respect to them and the DIP Lenders so advises the Debtors.

Section 7.2     Right of Set Off. In addition to any rights now or hereafter granted under applicable law and not by way of limitation of any such rights, upon the occurrence and during the continuance of any Event of Default, the Agent is hereby authorized by the Debtors at any time or from time to time, without notice to the Debtors (except as expressly set forth in the Financing Orders) or to any other Person, any such notice being hereby expressly waived, to set off and to appropriate and to apply any and all deposits (general or special, including Indebtedness evidenced by certificates of deposit, whether matured or unmatured, but not including trust accounts) and any other Indebtedness at any time held or owing by the DIP Lenders are to or for the credit or the account of the Debtors against and on account of the DIP Obligations of the Debtors to the DIP Lenders are hereunder, irrespective of whether or not (i) the DIP Lenders are shall have made any demand hereunder, or (ii) the principal of or the interest on the DIP Loans or any other amounts

due hereunder or the other DIP Loan Documents shall have become due and payable and although such obligations and liabilities, or any of them, may be contingent or unmatured; provided that the Agent shall notify the Debtors promptly upon the exercise of any set-off and the appropriation and application made by the DIP Lenders, but the failure to give such notice shall not affect the validity of such set-off and application.

ARTICLE VIII<br/>EVENTS OF DEFAULT

Section 8.1    Events of Default.  Any one or more of the following events which shall occur and be continuing shall constitute an "Event of Default":

(a)    Failure to Make Payments When Due.  Failure by the Debtors to pay any of the DIP Obligations, including failure by the Debtors to pay when due principal of, or interest on, the DIP Loans, whether at stated maturity, by acceleration, by mandatory prepayment or otherwise, or any other amount due hereunder and set forth in the Budget;

(b)    Failure to Make Adequate Protection Payments.  Failure by the Debtors to timely pay to the Pre-Petition Lenders any and all adequate protection payments in accordance with the Financing Orders.

(c)    Breach of Certain Covenants.  Failure by the Debtors to perform or comply with any material term or condition contained in Section 2.3, Article V, or Article VI, including, without limitation, failure to meet or comply with the terms of the Budget (including permitted variances) or to timely achieve the Bankruptcy Milestones, and such default shall not have been remedied by the Debtors (to the extent possible) or waived by the Agent within three (3) business days after the earlier of (i) the date upon which an Authorized Officer of the Debtors had Knowledge of such default, and (ii) the date upon which notice thereof is given to the Debtors by the Agent;

(d)    Breach of Representations.  Any representation, warranty, certification, or other written statement made or deemed made by the Debtors in any DIP Loan Document or in any statement or certificate at any time given by the Debtors in writing, pursuant hereto or thereto or in connection herewith or therewith shall be false in any material respect as of the date made or deemed made;

(e)    Other Defaults Under DIP Loan Documents.  The Debtors shall default in the performance of or compliance with any term contained in any of the DIP Loan Documents, other than any such term referred to in any other section of this Section 8.1, and such default shall not have been remedied or waived within seven (7) days after the earlier of (i) the date upon which an Authorized Officer of the Debtors had Knowledge of such default, and (ii) the date upon which notice thereof is given to the Debtors by the Agent;

(f)    Conversion or Dismissal of Case.  (i) The entry of an order dismissing the Chapter 11 Cases which does not contain a provision for termination of this Agreement, and payment in full in cash of all Obligations upon entry of such order dismissing the Chapter 11 Cases (other than contingent indemnification obligations for which no claim has been made) or converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or the Debtors

33

files a motion or other pleading seeking entry of such an order or supports or fails to timely oppose such dismissal or conversion; or (ii) the entry of an order whereby a trustee, responsible officer or an examiner having expanded powers under Bankruptcy Code Section 1104 (other than (a) a fee examiner or (b) for purposes of an investigation pursuant to Sections 1106(a)(3) and (4) of the Bankruptcy Code) is appointed or elected in the Chapter 11 Cases, or the Debtors apply for, consent to, support, acquiesce in or fail to promptly oppose, any such appointment, or the Bankruptcy Court shall have entered an order providing for such appointment, in the case of each of clauses (i) and (ii), without the prior written consent of the Agent in its sole discretion;

(g)     Challenges. The Debtors take any action to, or fail to take all reasonable actions necessary to oppose any action by any other Person (including but not limited to: (i) challenging the standing of such party to bring any such action, (ii) filing pleadings, providing evidentiary support, and appearing in court to support and present the same in opposition of such party's action, and (iii) timely prosecuting all available appeals of any order or decision authorizing such party's actions or approving relief granted to such party or timely opposing all appeals of (or attempts to appeal) any decision denying standing or relief to such party) to (a) impair any of the material rights and remedies of the Agent and the DIP Lenders under the DIP Loan Documents, (b) avoid, subordinate, disallow, or require disgorgement by the Agent and the DIP Lenders of any amount received in respect of the DIP Obligations, or (c) challenge the rights, liens or claims of the Pre-Petition Secured Party and/or Pre-Petition Lenders related to the Pre-Petition Indebtedness;

(h)     DIP Loan Documents Impaired. At any time after the execution and delivery thereof, (i) this Agreement or any DIP Loan Document ceases to be in full force and effect (other than by reason of a release of DIP Collateral in accordance with the terms hereof or thereof or the satisfaction in full of the DIP Obligations in accordance with the terms hereof) or shall be declared null and void, or the Agent shall not have or shall cease to have a valid and perfected first priority Lien in any portion of the DIP Collateral purported to be covered by the DIP Collateral Documents subject only to liens permitted under the Financing Orders, or (ii) the Debtors shall contest the validity or enforceability of any DIP Loan Document in writing or deny in writing that it has any further liability under any DIP Loan Document to which it is a party;

(i)     Liens. At any time after the execution and delivery thereof, the Liens created by the DIP Collateral Documents shall not constitute a valid and perfected first priority Lien on the DIP Collateral intended to be covered thereby (to the extent perfection by filing, registration, recordation or possession is required herein or therein) in favor of the Agent, free and clear of all other Liens (other than Permitted Liens), or, except for expiration in accordance with its terms, any of the DIP Collateral Documents shall for whatever reason be terminated or cease to be in full force and effect, or the enforceability thereof shall be contested by the Debtors;

(j)     Condemnation or Forfeiture of DIP Collateral. Any judicial process, condemnation or forfeiture proceedings is brought against any material item or material portion of the DIP Collateral or any rights therein shall be subject to such judicial process, condemnation, or forfeiture proceedings, in each case which is not stayed in the Chapter 11 Cases by the Bankruptcy Code;

(k)     Pre-Petition Payments. The Bankruptcy Court orders the Debtors to pay or the Debtors make any material Pre-Petition Payment which is not permitted under the Budget;

34

(l)     Government Restraint.  Any Governmental Body, by a final, non-appealable order, ruling or other action, shall prevent the Debtors from conducting any material part of the Debtors' businesses, to the extent such prevention could reasonably be expected to result in a Material Adverse Effect;

(m)    Operating Licenses.  The loss, revocation, or termination of any license, permit, lease, or agreement necessary or material to the Debtors' businesses, or the cessation of any material part of the Debtors' businesses, to the extent such loss, revocation, or termination could reasonably be expected to result in a Material Adverse Effect taken as a whole;

(n)    Relief from Automatic Stay.  The Bankruptcy Court shall enter an order granting relief from the automatic stay to any creditor or party in interest (i) to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any material assets of the Debtors, or (ii) to permit other actions that the Agent may, in its reasonable discretion, deem to have a Material Adverse Effect;

(o)    Financing Orders.  The Interim Order and the Final Order, each in form and substance satisfactory to the Agent on behalf of the DIP Lenders, in its sole discretion, are not entered by the Bankruptcy Court by November 1, 2024 or November 22, 2024, respectively, or the Debtors shall fail to comply with, or there is otherwise any material breach or default of, the Financing Orders or any other order of the Bankruptcy Court or any order shall be entered reversing, amending, supplementing, staying, vacating or otherwise modifying in any material respect the Financing Orders without the prior written consent of the Agent;

(p)    Judgments.  Any uninsured judgments as to any Post-Petition obligation shall be rendered against the Debtors and the enforcement thereof shall not be stayed (by operation of law, the rules or orders of a court with jurisdiction over the matter or by consent of the party litigants), or there shall be rendered against the Debtors a nonmonetary judgment with respect to a Post-Petition event, in each case which causes or would reasonably be expected to cause a Material Adverse Effect; or

(q)    Material Impairment.  The filing of a motion, pleading or proceeding by the Debtors which could reasonably be expected to result in a material impairment of the rights or interests of the Agent and the DIP Lenders under the DIP Loan Documents or the Financing Orders or a determination by a court with respect to a motion, pleading or proceeding brought by another party which results in such a material impairment.

Section 8.2    Remedies.  Subject to the Financing Orders, upon the occurrence of an Event of Default then: (i), the Agent may, by written notice to the Debtors, take any or all of the following actions, at the same or different times, in each case without further order of or application to the Bankruptcy Court (subject to the proviso set forth in the last sentence of this paragraph): (a) declare the DIP Loan Commitment terminated, whereupon the DIP Loan Commitments of the DIP Lenders shall forthwith terminate immediately; (b) declare and otherwise accelerate the principal of and any accrued interest in respect of all DIP Loans and any promissory notes evidencing such DIP Loans and all other DIP Obligations owing with respect thereto hereunder and thereunder to be, whereupon the same shall become, forthwith immediately due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the

Debtors; and (c) enforce all of the DIP Liens and security interests created pursuant to the DIP Collateral Documents securing DIP Obligations owing to the DIP Lenders in accordance with applicable Regulations; and (ii) in addition to the foregoing, upon the occurrence of an Event of Default, the Agent may, (a) exercise any right of counterclaim, setoff, banker's lien or otherwise which it may have with respect to money or property of the Debtors, (b) bring any lawsuit, action or other proceeding permitted by law for the specific performance of, or injunction against any violation of, any DIP Loan Document and may exercise any power granted under or to recover judgment under any DIP Loan Document, and (c) exercise any other right or remedy permitted by applicable Regulations or otherwise available to the Agent at law, in equity or otherwise. With respect to the enforcement of DIP Liens or other remedies with respect to the DIP Collateral under the preceding clause (i)(c) or (ii)(c), the Agent shall provide the Debtors with five (5) Business Days' written notice prior to taking the action contemplated thereby; provided that, in any hearing after the giving of the aforementioned notice, the only issue that may be raised by any party in opposition thereto shall be being whether, in fact, an Event of Default has occurred and is continuing, and the Debtors shall not be entitled to seek relief to the extent that such relief would in any way impair or restrict the rights and remedies of the Agent as set forth herein and in the Financing Orders; and provided further that the DIP Lenders shall be under no obligation to fund any DIP Loans during the pendency of such five (5) Business Day period.

Section 8.3    Remedies Cumulative.  No remedy herein conferred upon the Agent is intended to be exclusive of any other remedy and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or any other provision of law.

Section 8.4    Application of Proceeds.  The Agent shall apply any proceeds from its pursuit of any remedy first to costs, fees and expenses provided for herein, then to interest on the DIP Loans which is due and outstanding and then to principal on the DIP Loans which is due and outstanding.

ARTICLE IX
MISCELLANEOUS

Section 9.1    Amendments and Waivers; Release of DIP Collateral.

(a)    General Amendments and Waivers.  No amendment, modification, termination (other than pursuant to the express terms of the DIP Loan Documents) or waiver of any provision of the DIP Loan Documents, or consent to any departure by the Debtors therefrom, shall be effective without the written consent of the Agent.

(b)    Effect of Notices, Waivers or Consents.  Any waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given. No notice to or demand on Debtors in any case shall entitle the Debtors to any other or further notice (except as otherwise specifically required hereunder or under any of the DIP Loan Documents) or demand in similar or other circumstances. Any amendment, modification, termination, waiver, or consent effected in accordance with this Section 9.1 shall be binding upon the Agent, the DIP Lenders and the Debtors, if signed by the Debtors and the Agent.

Section 9.2    Notices. All notices, requests, demands and other communications to any party or given under any DIP Loan Document (collectively, the "Notices") will be in writing and delivered personally, by overnight courier or by registered mail to the parties at the following address or sent by electronic transmission (with confirmation of transmission), to the address specified below (or at such other address as will be specified by a party by like notice given at least five (5) calendar days prior thereto):

(a)    If to the Debtors, at:

FILM FINANCES, INC.
Attn: Peter Coleman
9000 Sunset Blvd., Ste. 1400
Los Angeles, California 90069
Email:peter@ffi.com

with a copy sent contemporaneously by email to (which shall not constitute notice):

BAYARD, P.A.
Attn: Ericka F. Johnson
600 N. King Street, Suite 400
Wilmington, Delaware 19801
Email: ejohnson@bayardlaw.com

- and -

LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.
Attn: David L. Neale
        Krikor J. Meshefejian
2818 La Cienega Avenue
Los Angeles, California 9004
Email: dln@lnbyg.com
        kjm@lnbyg.com

(b)    If to the Agent or SILAC, at:

SILAC, INC.
Attn: Scott D. Matthews
10201 N. Illinois St., Suite 280
Carmel, Indiana 46290
Email: scott.matthews@sterlinglifeco.com

with a copy sent contemporaneously by email to (which shall not constitute notice):

MINTZ, LEVIN, COHN, FERRIS, GLOVSKY
        AND POPEO, P.C.

37

Attn: Frank J. Earley
  Kaitlin R. Walsh
919 Third Avenue
New York, New York
Email: FJEarley@mintz.com
  KRWalsh@mintz.com

(c) If to Haymarket, at:

HAYMARKET INSURANCE COMPANY
415 Bedford Road, Suite 102
Pleasantville, New York 10036
Email: legal@acap.com

with a copy sent contemporaneously by email to (which shall not constitute notice):

Email: fmayer@acap.com
  jgettman@acap.com

- and -

CROKE FAIRCHILD DUARTE & BERES LLC
Attn: Rob Isham
Email: risham@crokefairchild.com

- and -

GOLDSTEIN & MCCLINTOCK LLLP
Attn: Matthew E. McClintock
  Ainsley G. Moloney
111 W. Washington Street, STE 1221
Chicago, Illinois 60602
Email: mattm@goldmclaw.com
  ainsleym@goldmclaw.com

All Notices will be deemed delivered when actually received. Each of the parties will hereafter notify the other in accordance with this Section of any change of address or email address to which notice is required to be mailed.

  Section 9.3 Expenses. Whether or not the transactions contemplated hereby shall be consummated or any DIP Loans shall be made, the Debtors agree to pay promptly, subject to the Financing Orders (but no later than the Maturity Date), upon written demand from the Agent or the DIP Lenders (together with summary backup documentation supporting such reimbursement request) and without the requirement for Bankruptcy Court approval in the event the transactions contemplated hereby are consummated:

(i)      all the reasonable, out-of-pocket costs and expenses of preparation of the DIP Loan Documents and any consents, amendments, waivers or other modifications thereto; the reasonable fees, expenses and disbursements of Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., as counsel to the Agent and SILAC, in connection with the negotiation, preparation, execution and administration of the DIP Loan Documents and any consents, amendments, supplements, waivers or other modifications thereto; and the reasonable fees, expenses and disbursements of Goldstein & McClintock LLLP, as counsel to Haymarket, in connection with the negotiation, preparation, execution and administration of the DIP Loan Documents and any consents, amendments, supplements, waivers or other modifications thereto;

(ii)      all the reasonable, out of pocket costs and expenses of creating and perfecting Liens in favor of the Agent pursuant hereto, including, without limitation, filing and recording fees, expenses, stamp or documentary taxes, search fees, title insurance premiums and reasonable fees, expenses and disbursements of Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., as counsel to the Agent, and any other counsel of the Agent in any other jurisdiction;

(iii)      upon the occurrence and during the continuance of an Event of Default or as otherwise incurred in connection with visits and inspections permitted by Section 5.1(b) (the expenses for which are required to be paid by the Debtors pursuant to such Section), all the actual costs and reasonable fees, expenses and disbursements of any auditors, accountants, consultants or appraisers incurred in connection with the preservation and protection of the Agent or the DIP Lenders' rights under this Agreement and the other DIP Loan Documents;

(iv)      all the actual costs and reasonable expenses, including, without limitation, upon the occurrence and during the continuance of an Event of Default or as otherwise incurred in connection with visits and inspections permitted by Section 5.1(b), the expenses for which are required to be paid by the Debtors pursuant to such Section, the reasonable fees, expenses and disbursements of any appraisers, consultants, advisors and agents employed or retained by the Agent or the DIP Lenders and their counsel in connection with the inspection, verification, custody or preservation of any of the DIP Collateral, to the extent required or permitted hereunder;

(v)      after the occurrence and during the continuance of a Default or an Event of Default, all out-of-pocket costs and expenses, including, without limitation, reasonable attorneys' fees and out-of-pocket costs, incurred by the Agent or the DIP Lenders in enforcing any DIP Obligations of or in collecting any payments due from the Debtors hereunder or under the other DIP Loan Documents by reason of such Default or Event of Default (including in connection with the sale of, collection from, or other realization upon any of the DIP Collateral) or in connection with any negotiations, reviews, refinancing or restructuring of the credit arrangements provided hereunder, including without limitation in the nature of a "workout" or pursuant to any insolvency or bankruptcy cases or proceedings; and

(vi)      the foregoing shall not be construed to limit any other provisions of the DIP Loan Documents regarding costs and expenses to be paid by the Debtors.

For the avoidance of doubt, such amounts shall be added to the principal balance of the DIP Loan and shall not reduce the DIP Loan Commitment available to the Debtors.

Section 9.4      Enforceability; Successors and Assigns.

(a)      Enforceability; Successors and Assigns.  This Agreement will be binding upon and inure to the benefit of and is enforceable by the respective successors and permitted assigns of the parties hereto.  This Agreement may not be assigned by the Debtors hereto without the prior written consent of the Agent.  Any assignment or attempted assignment in contravention of this Section 9.4(a) will be void *ab initio* and will not relieve the assigning party of any obligation under this Agreement.

(b)      Assignments.   The Agent and the DIP Lenders may assign (an "Assignment") all or a portion of their rights and obligations under the DIP Loan Documents (including all or a portion of the DIP Lenders' DIP Loans and DIP Loan Commitment, as the case may be, in a minimum amount of $250,000) to any Person (any such Person receiving such an Assignment, the "Assignee").  Such Assignment may be made without the consent of the Debtors. From and after the date of the Assignment, the Assignee shall be a party hereto and, to the extent of the interest assigned pursuant to the Assignment, have the rights and obligations of the Agent or the DIP Lenders under this Agreement, and the assigning Agent or DIP Lender shall, to the extent of the interest assigned, be released from its obligations under this Agreement.   No Assignment by the Agent or the DIP Lenders shall release the Agent or the DIP Lenders from their obligations hereunder arising prior to the date of such assignment.  The Debtors hereby consent to the disclosure of any information obtained by the Agent in connection with this Agreement to any Person to which the Agent or the DIP Lenders sell, or proposes to sell, their DIP Loans or DIP Loan Commitment; provided any such Person shall agree to keep any such information confidential in a manner and on terms substantially consistent with the Agent's confidentiality obligations.

(c)      Each DIP Lender also shall have the right, without the consent of the Debtors, to participate the Loan with any of its affiliated entities.

Section 9.5      Integration.  This Agreement and the other DIP Loan Documents contain and constitute the entire agreement of the parties with respect to the subject matter hereof and supersede all prior negotiations, agreements, and understandings, whether written or oral, of the parties hereto.

Section 9.6      No Waiver; Remedies.  No failure or delay by any party in exercising any right, power, or privilege under this Agreement or any of the other DIP Loan Documents will operate as a waiver of such right, power or privilege.   A single or partial exercise of any right, power or privilege will not preclude any other or further exercise of the right, power or privilege or the exercise of any other right, power, or privilege.  The rights and remedies provided in the DIP Loan Documents will be cumulative and not exclusive of any rights or remedies provided by law.

Section 9.7    Setoff. The Debtors hereby, subject to the Financing Orders and the Carve-Out, grant to the Agent a continuing lien, security interest, and right of setoff as security for all liabilities and obligations to the DIP Lenders, whether now existing or hereafter arising, upon and against all deposits, credits, collateral and property, now or hereafter in the possession, custody, safekeeping or control of the Agent or any Affiliate and their successors and assigns or in transit to any of them. Regardless of the adequacy of any collateral, if any of the DIP Obligations are due and payable and have not been paid or any Event of Default shall have occurred, any deposits or other sums credited by or due from the DIP Lenders to the Debtors and any securities or other property of the Debtors in the possession of the DIP Lenders may be applied to or set off by the Agent against the payment of DIP Obligations and any and all other liabilities, direct, or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, of the Debtors to the DIP Lenders. **ANY AND ALL RIGHTS TO REQUIRE THE AGENT TO EXERCISE ITS RIGHTS OR REMEDIES WITH RESPECT TO ANY OTHER DIP COLLATERAL WHICH SECURES THE DIP OBLIGATIONS, PRIOR TO EXERCISING ITS RIGHT OF SETOFF WITH RESPECT TO SUCH DEPOSITS, CREDITS OR OTHER PROPERTY OF THE DEBTORS ARE HEREBY KNOWINGLY, VOLUNTARILY, AND IRREVOCABLY WAIVED.**

Section 9.8    Execution in Counterparts. This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement. Delivery of an executed counterpart of this Agreement by electronic transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement.

Section 9.9    Governing Law; Submission To Jurisdiction; Venue.

(a)    SUBJECT TO THE JURISDICTION OF THE BANKRUPTCY COURT, THIS AGREEMENT AND THE OTHER DIP LOAN DOCUMENTS AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER AND THEREUNDER SHALL, EXCEPT AS OTHERWISE PROVIDED IN CERTAIN OF THE OTHER DIP LOAN DOCUMENTS, BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE INTERNAL LAW OF THE STATE OF NEW YORK (WITHOUT REGARD TO CONFLICTS OF LAWS RULES AND PRINCIPLES THEREUNDER) AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE. ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER DIP LOAN DOCUMENT SHALL BE BROUGHT IN THE BANKRUPTCY COURT, OR IN THE EVENT THAT THE BANKRUPTCY COURT DOES NOT HAVE OR DOES NOT EXERCISE JURISDICTION, THEN IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN THE STATE OF DELAWARE, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT OR ANY OTHER DIP LOAN DOCUMENT, THE DEBTORS HEREBY IRREVOCABLY ACCEPT FOR THEMSELVES AND IN RESPECT OF THEIR PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE AFORESAID COURTS. THE DEBTORS HEREBY FURTHER IRREVOCABLY WAIVE ANY CLAIM THAT ANY SUCH COURTS LACKS PERSONAL JURISDICTION OVER THE DEBTORS, AND AGREES NOT TO PLEAD OR CLAIM, IN ANY LEGAL ACTION PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER DIP LOAN DOCUMENT BROUGHT IN THE

AFOREMENTIONED COURTS, THAT SUCH COURTS LACK PERSONAL JURISDICTION OVER THE DEBTORS. THE DEBTORS FURTHER IRREVOCABLY CONSENT TO THE SERVICE OF PROCESS OUT OF THE AFOREMENTIONED COURTS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO THE DEBTORS AT THE ADDRESS SET FORTH IN SECTION 9.2 HEREOF, SUCH SERVICE, NOTWITHSTANDING THE PERIODS OF TIME PROVIDED FOR IN SECTION 9.2, TO BECOME EFFECTIVE 30 DAYS AFTER SUCH MAILING. THE DEBTORS HEREBY IRREVOCABLY WAIVE ANY OBJECTION TO SUCH SERVICE OF PROCESS AND FURTHER IRREVOCABLY WAIVE AND AGREES NOT TO PLEAD OR CLAIM IN ANY ACTION OR PROCEEDING COMMENCED HEREUNDER OR UNDER ANY OTHER DIP LOAN DOCUMENT THAT SERVICE OF PROCESS WAS IN ANY WAY INVALID OR INEFFECTIVE. NOTHING HEREIN SHALL AFFECT THE RIGHT OF THE AGENT AND THE DIP LENDERS TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST THE DEBTORS IN ANY OTHER JURISDICTION.

(b)     THE DEBTORS HEREBY IRREVOCABLY WAIVE ANY OBJECTION WHICH THEY MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY OF THE AFORESAID ACTIONS OR PROCEEDINGS ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER DIP LOAN DOCUMENT BROUGHT IN THE COURTS REFERRED TO IN CLAUSE (a) ABOVE AND HEREBY FURTHER IRREVOCABLY WAIVE AND AGREE NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURTS HAVE BEEN BROUGHT IN AN INCONVENIENT FORUM.

Section 9.10   Waiver of Jury Trial. **THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT THAT THEY MAY HAVE TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION, OR IN ANY LEGAL PROCEEDING, DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY). EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTIES WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.**

Section 9.11   Severability. If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any rule of law, or public policy, all other conditions and provisions of this Agreement will nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner adverse to any party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto will negotiate in good faith to modify this

Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the extent possible.

Section 9.12    Survival.    All representations, warranties, covenants, agreements, and conditions contained in or made pursuant to this Agreement or the other DIP Loan Documents shall survive (i) the making of the DIP Loans and the payment of the DIP Obligations, and (ii) the performance, observance and compliance with the covenants, terms and conditions, express or implied, of all DIP Loan Documents, until the due and punctual (a) indefeasible payment of the DIP Obligations, and (b) performance, observance and compliance with the covenants, terms and conditions, express or implied, of this Agreement and all of the other DIP Loan Documents; provided, however, that the provisions of Article VII and Section 9.3 of this Agreement shall survive (x) indefeasible payment of the DIP Obligations and (y) performance, observance and compliance with the covenants, terms and conditions, express or implied, of this Agreement and all of the other DIP Loan Documents.

Section 9.13    Maximum Lawful Interest.    Notwithstanding anything to the contrary contained herein, in no event shall the amount of interest and other charges for the use of money payable under this Agreement or any other DIP Loan Document exceed the maximum amounts permissible under any law that a court of competent jurisdiction shall, in a final determination, deem applicable. The Debtors, the Agent, and the DIP Lenders, in executing and delivering this Agreement, intend legally to agree upon the rate or rates of interest and other charges for the use of money and manner of payment stated within it; provided, however, that, anything contained herein to the contrary notwithstanding, if the amount of such interest and other charges for the use of money or manner of payment exceeds the maximum amount allowable under applicable law, then, ipso facto as of the Closing Date, the Debtors are and shall be liable only for the payment of such maximum as allowed by law, and payment received from the Debtors in excess of such legal maximum, whenever received, shall be applied to reduce the principal balance of the Loans to the extent of such excess.

Section 9.14    No Marshalling.    The Agent and the DIP Lenders shall not be required to marshal any present or future DIP Collateral and the Debtors hereby agree that they will not invoke any law relating to the marshalling of collateral and irrevocably waive the benefits of any such laws.

Section 9.15    Interpretation.    As used in this Agreement, references to the singular will include the plural and vice versa and references to the masculine gender will include the feminine and neuter genders and vice versa, as appropriate. Unless otherwise expressly provided in this Agreement (i) the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement will refer to this Agreement as a whole and not to any particular provision of this Agreement, and (ii) article, section, subsection, and schedule references are references with respect to this Agreement unless otherwise specified. Unless the context otherwise requires, the term "including" will mean "including, without limitation." The headings in this Agreement and in the Schedules are included for convenience of reference only and will not affect in any way the meaning or interpretation of this Agreement.

Section 9.16    Ambiguities.    This Agreement and the other DIP Loan Documents were negotiated between legal counsel for the parties and any ambiguity in this Agreement or the other

DIP Loan Documents shall not be construed against the party who drafted this Agreement or such other DIP Loan Documents.

Section 9.17 <u>The PATRIOT Act</u>. The DIP Lenders hereby notify the Debtors, that pursuant to the requirements of the PATRIOT Act, they are required to obtain, verify, and record information that identifies the Debtors and other information that will allow the DIP Lenders to identify the Debtors in accordance with the PATRIOT Act.

Section 9.18 <u>Conflicting Provisions in Security Documents</u>. In the event that any provisions of this Agreement conflict with any DIP Collateral Document, the provisions of this Agreement shall govern.

Section 9.19 <u>Conflicting Provisions in the Financing Orders</u>. In the event that any provisions of this Agreement conflict with any provisions in the Financing Orders, the provisions of the Financing Orders shall control.

Section 9.20 <u>Modifications</u>. Except as specifically contemplated in the Financing Orders, the DIP Liens, lien priority, administrative priorities, and other rights and remedies granted to the Agent and the DIP Lenders pursuant to this Agreement and the Financing Orders (specifically, including, but not limited to, the existence, perfection and priority of the DIP Liens provided herein and therein and the administrative priority herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of Indebtedness by the Debtors (pursuant to section 364 of the Bankruptcy Code or otherwise), or by any dismissal or conversion of the Chapter 11 Cases, or by any other act or omission whatsoever (other than in connection with any asset disposition permitted hereunder). Without limitation, notwithstanding any such order, financing, extension, incurrence, dismissal, conversion, act or omission: (i) except for the Carve-Out having priority over the DIP Obligations, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on a parity with any claim of the Agent or the DIP Lenders against the Debtors in respect of any DIP Obligation; (ii) the Liens granted under the DIP Loan Documents shall continue to be valid and perfected and with the specified priority without the necessity that financing statements be filed or that any other action be taken, or document or instrument registered or delivered, under applicable non-bankruptcy law; and (iii) notwithstanding any failure on the part of the Debtors, the Agent or the DIP Lenders to perfect, maintain, protect or enforce the Liens in the DIP Collateral granted under the DIP Loan Documents, the Financing Orders shall automatically, and without further action by any Person, perfect such Liens against the DIP Collateral of the Debtors.

Section 9.21 <u>Release</u>. THE DEBTORS HEREBY ACKNOWLEDGE AND AGREE THAT AS OF THE DATE HEREOF THEY HAVE NO DEFENSE, COUNTERCLAIM, OFFSET, CROSS-COMPLAINT, CLAIM OR DEMAND OF ANY KIND OR NATURE WHATSOEVER THAT CAN BE ASSERTED TO REDUCE OR ELIMINATE ALL OR ANY PART OF THEIR LIABILITY TO REPAY THE DIP OBLIGATIONS (OR THE PRE-PETITION OBLIGATIONS OWED TO THE PRE-PETITION LENDERS) OR TO SEEK AFFIRMATIVE RELIEF OR DAMAGES OF ANY KIND OR NATURE FROM THE AGENT, THE DIP LENDERS, AND DACIAN (IN THEIR CAPACITIES AS AGENT AND DIP

Docusign Envelope ID: C1CD163C-8DA4-46F1-AF89-FB1A024BCC76

LENDERS HEREUNDER AND IN THEIR CAPACITIES AS PRE-PETITION LENDERS, AS APPLICABLE). THE DEBTORS HEREBY VOLUNTARILY AND KNOWINGLY RELEASE AND FOREVER DISCHARGE THE AGENT, THE DIP LENDERS, AND DACIAN (IN THEIR CAPACITIES AS AGENT AND DIP LENDERS HEREUNDER AND IN THEIR CAPACITIES AS PRE-PETITION AGENT AND LENDERS, AS APPLICABLE), THEIR RESPECTIVE AFFILIATES, AND EACH OF THEIR RESPECTIVE AGENTS, EMPLOYEES, SUCCESSORS AND ASSIGNS (COLLECTIVELY, THE "**RELEASED PARTIES**") FROM ALL POSSIBLE CLAIMS, DEMANDS, ACTIONS, CAUSES OF ACTION, DAMAGES, COSTS, EXPENSES, OBLIGATIONS, DEBTS AND LIABILITIES WHATSOEVER, WHETHER KNOWN OR UNKNOWN, ANTICIPATED OR UNANTICIPATED, SUSPECTED OR UNSUSPECTED, FIXED, CONTINGENT OR CONDITIONAL, OR AT LAW OR IN EQUITY, IN ANY CASE ORIGINATING IN WHOLE OR IN PART ON OR BEFORE THE DATE THIS AGREEMENT IS EXECUTED THAT THE DEBTORS MAY NOW OR HEREAFTER HAVE AGAINST THE RELEASED PARTIES, IF ANY, IRRESPECTIVE OF WHETHER ANY SUCH CLAIMS ARISE OUT OF CONTRACT, TORT, VIOLATION OF LAW OR REGULATIONS, OR OTHERWISE, AND THAT ARISE FROM ANY DIP LOANS OR PRE-PETITION INDEBTEDNESS, THE EXERCISE OF ANY RIGHTS AND REMEDIES UNDER THE DIP LOAN DOCUMENTS OR THE PRE-PETITION CREDIT AGREEMENTS AND THEIR RELATED DOCUMENTS, AND/OR NEGOTIATION FOR AND EXECUTION OF THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, ANY CONTRACTING FOR, CHARGING, TAKING, RESERVING, COLLECTING OR RECEIVING INTEREST IN EXCESS OF THE HIGHEST LAWFUL RATE APPLICABLE. NOTWITHSTANDING ANYTHING TO THE CONTRARY SET FORTH HEREIN, THE FOREGOING RELEASE SHALL BE SUBJECT TO THE RIGHTS OF THE COMMITTEE OR ANY OTHER PARTY IN INTEREST UNDER THE FINANCING ORDERS.

Section 9.22 <u>Electronic Transactions</u>. The transaction described herein may be conducted, and related documents may be stored, by electronic means. Copies, telecopies, facsimiles, electronic files, and other reproductions of original executed documents will be deemed to be authentic and valid counterparts of such original documents for all purposes, including the filing of any claim, action or suit in the appropriate court of law.

In witness whereof, the parties hereto have caused this Agreement to be duly executed and delivered by their respective representatives thereunto duly authorized as of the date first written above.

**DEBTORS**:

**FILM FINANCES, INC.**, a California corporation

By: _____
[___]
[___]

**RAINBOW PRODUCTION SERVICES, LLC,**
a Delaware limited liability company

By: _____
[___]
[___]

**RAINBOW DIGITAL SERVICES, LLC,**
a California limited liability company

By: _____
[___]
[___]

**EPS-CINEWORKS, INC.**, a California corporation

By: _____
[___]
[___]
[___]

[PRIMING SUPERPRIORITY
DEBTOR-IN-POSSESSION CREDIT AGREEMENT]

**AGENT:**

**SILAC INSURANCE COMPANY**

By: _____

[___]
[___]

[PRIMING SUPERPRIORITY
DEBTOR-IN-POSSESSION CREDIT AGREEMENT]

Docusign Envelope ID: C1CD163C-8DA4-46F1-AF89-FB1A024BCC76

**DIP LENDER:**

**SILAC INSURANCE COMPANY**

By: _____

      [___]
      [___]

[PRIMING SUPERPRIORITY
DEBTOR-IN-POSSESSION CREDIT AGREEMENT]

Docusign Envelope ID: C1CD163C-8DA4-46F1-AF89-FB1A024BCC76

**DIP LENDER**:

**HAYMARKET INSURANCE COMPANY**

By: _____

[___]
[___]

Docusign Envelope ID: C1CD163C-8DA4-46F1-AF89-FB1A024BCC76

## SCHEDULE 2.1

## DIP LOAN COMMITMENTS

| **DIP Loans** | **Commitment Amount** |
|---|---|
| Initial DIP Loans | $3,000,000 |
| DIP Loans (less Initial DIP Loans) | $5,000,000 |
| DIP Loan Commitment (cumulative) | $8,000,000 |

## EXHIBIT A

**Budget**

## **EXHIBIT B**

### **Form of Borrowing Certificate**

## Borrowing Certificate

Reference is hereby made to that certain Priming Superpriority Debtor-In-Possession Credit Agreement (the "DIP Credit Agreement") dated as of October [\_\_\_], 2024, by and among Film Finances, Inc., Rainbow Production Services, LLC, Rainbow Digital Services, LLC, and EPS-Cineworks, Inc. (collectively, the "Debtors"), SILAC Insurance Company, in its capacity as Agent (the "Agent"), and SILAC Insurance Company ("SILAC") and Haymarket Insurance Company ("Haymarket" and, together with SILAC, the "DIP Lenders"), each in its capacity as a DIP Lender. Capitalized terms used but not defined herein shall have the meanings given to them in the DIP Credit Agreement. The undersigned, in his/her capacity as an Authorized Officer of the Debtors, and not individually, hereby certifies as follows as of _____, 2024 (the "Borrowing Date"):

1.    DIP Loans.  Pursuant to the terms of the DIP Credit Agreement, the Debtors are authorized to borrow DIP Loans in an amount equal to the DIP Loan Commitment during the DIP Commitment Period, solely in compliance with the DIP Credit Agreement. The Debtors hereby request an advance of DIP Loans in the aggregate amount of $_____ (the "Borrowing") to be transferred to the Debtors within five (5) Business Days of the Borrowing Date.

2.    Representations and Warranties.  On and as of the Borrowing Date (both before and after giving effect to the Borrowing requested hereby and application of such proceeds), the representations and warranties of the Debtors contained in the DIP Loan Documents are true and correct in all material respects (except to the extent such representations and warranties specifically relate to an earlier date, such representations and warranties are true and correct on and as of such earlier date).

3.    No Default or Event of Default.  As of the Borrowing Date, no event has occurred or is continuing or would result from the consummation of the Borrowing requested hereby, or the application of such proceeds, that would constitute a Default or an Event of Default.

4.    Available Commitments. After making the DIP Loans requested by this Borrowing, the aggregate outstanding principal amount of the DIP Loans will not exceed the DIP Loan Commitment.

5.    Use of Proceeds.  The proceeds of the DIP Loans advanced under this Borrowing will be used by the Debtors in accordance with the Budget and the DIP Credit Agreement.

[remainder of page intentionally left blank; signature page(s) to follow]

Exhibit B - Form of Borrowing Certificate

IN WITNESS WHEREOF, the undersigned has executed this Borrowing Certificate as of the date first above written.

**DEBTORS:**

**FILM FINANCES, INC.,** a California corporation

By: _____

[___]
[___]

**RAINBOW PRODUCTION SERVICES, LLC,**
a Delaware limited liability company

By: _____

[___]
[___]

**RAINBOW DIGITAL SERVICES, LLC,**
a California limited liability company

By: _____

[___]
[___]

**EPS-CINEWORKS, INC.,** a California corporation

By: _____

[___]
[___]

Exhibit B - Form of Borrowing Certificate

Docusign Envelope ID: C1CD163C-8DA4-46F1-AF89-FB1A024BCC76

## EXHIBIT C

### Form of Interim Order

Exhibit C - Form of Interim Order

Docusign Envelope ID: 25CEF4BC-1816-4D54-92DF-646EA7096670

**Exhibit B**

**DIP Credit Agreement**

[attached]

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) |
| | ) **Chapter 11** |
| **RAINBOW PRODUCTION SERVICES,** | ) |
| **LLC,** *et al.*,[1] | ) **Case No. 24-[____]** |
| | ) **Joint Administration Requested** |
| **Debtors.** | ) |
| | ) Related Docket No. [____] |
| | ) |

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN POST-PETITION
FINANCING, (II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL,
(III) PROVIDING ADEQUATE PROTECTION, (IV) GRANTING LIENS, SECURITY
INTERESTS, AND SUPERPRIORITY CLAIMS, (V) SCHEDULING A FINAL
HEARING, AND (VI) GRANTING RELATED RELIEF**

This Interim Order (I) Authorizing the Debtors to Obtain Post-Petition Financing, (II)
Authorizing the Debtors to Use Cash Collateral, (III) Providing Adequate Protection,
(IV) Granting Liens, Security Interests, and Superpriority Claims, (V) Scheduling a Final Hearing,
and (VI) Granting Related Relief (this "Interim Order") is entered by this Court after adequate
notice and a hearing, held October ___, 2024, upon *Debtors' Motion for Entry of Interim and Final
Orders (I) Authorizing the Debtors to Obtain Post-Petition Financing, (II) Authorizing the Debtors
to Use Cash Collateral, (III) Providing Adequate Protection, (IV) Granting Liens, Security
Interests, and Superpriority Claims, (V) Scheduling a Final Hearing, and (VI) Granting Related
Relief* (the "Motion"),[2] and upon the terms agreed to by and among the above-captioned debtors
and debtors in possession (the "Debtors"), SILAC Insurance Company, in its capacity as Agent
with respect to the DIP Credit Agreement (as defined below) (the "Agent"), SILAC Insurance

---

[1]   The address of the Debtors is 9000 Sunset Blvd., Ste. 1400, Los Angeles, CA 90069.  The last four digits of
the Debtors' federal tax identification numbers are: (i) Rainbow Production Services, LLC (4758); (ii) Rainbow
Digital Services, LLC (9827); (iii) Film Finances, Inc. (7130) and (iv) EPS-Cineworks, Inc. (3355).

[2]   All defined terms used but not defined herein shall have the meanings ascribed to them in the Motion, the Pre-
Petition Credit Agreements, or the DIP Loan Documents, as applicable.

Company, in its capacity as a DIP Lender with respect to the DIP Credit Agreement ("SILAC"),

Haymarket Insurance Company, in its capacity as a DIP Lender with respect to the DIP Credit

Agreement ("Haymarket" and, together with SILAC, the "DIP Lenders"), Haymarket Insurance

Company, in its capacity as agent and as collateral agent with respect to the Loan Agreement (the

"Pre-Petition Secured Party"), Dacian Master Fund LP, in its capacity as a lender with respect to

the Loan Agreement and with authority to act on behalf of the Pre-Petition Lenders (as defined

below) and the Pre-Petition Secured Party (the "Pre-Petition Dacian Lender"), and Haymarket

Insurance Company, in its capacity as a lender with respect to the Loan Agreement (the "Pre-

Petition Haymarket Lender" and, together with the Pre-Petition Dacian Lender and the lender

parties under the Loan Agreement from time to time, the "Pre-Petition Lenders"). Upon the terms

of the Motion, the stipulations, acknowledgements, and agreements of the Debtors, the Agent, the

DIP Lenders, the Pre-Petition Lenders, and the Pre-Petition Secured Party (collectively, the

"Parties"), the Declaration of Peter Coleman submitted in support of the Motion, the statements of

the Parties and their counsel at the hearing on the Motion, and the record of the proceedings, the

Court makes the following findings of fact and conclusions of law:[3]

## FINDINGS OF FACT

### The Debtors' Chapter 11 Cases; Procedural Background; Jurisdiction and Notice

    A.    On October [    ], 2024 (the "Petition Date"), the Debtors each filed a voluntary

petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code")

in the United States Bankruptcy Court for the District of Delaware (the "Court") and thereby

commenced their cases thereunder (the "Chapter 11 Cases"). Since the Petition Date, the Debtors

---

[3]    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

have been operating their businesses and managing their property as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. As of the date hereof, no committee of unsecured creditors (a "Committee") has been appointed in the Chapter 11 Cases. No request has been made for the appointment of a trustee or examiner in the Chapter 11 Cases.

B.     The Court has jurisdiction over the Chapter 11 Cases and the Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue of the Chapter 11 Cases and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C.     The Debtors have served notice of the Motion and the hearing thereon pursuant to sections 102, 105, 361, 362, 363, and 364 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, and 6004, and Local Bankruptcy Rules 2002-1, 9013-1, and 9013-3, which notice was sent to, among others: (i) the Office of the United States Trustee; (ii) the Agent; (iii) the DIP Lenders; (iv) the Pre-Petition Secured Party; (v) the Pre-Petition Lenders; (vi) the Debtors' other prepetition secured lenders; (vii) the Internal Revenue Service; (viii) the California Franchise Tax Board; (ix) the parties included on the Debtors' consolidated list of their 30 largest unsecured creditors; (x) the United States Attorney for the District of Delaware; (xi) the state attorneys general in each state where the Debtors conduct their business; (xii) counterparties to all leases of real property; and (xiii) all parties entitled to notice pursuant to Bankruptcy Rule 2002 (the "Notice Parties"). Under the circumstances, such notice complies with the Bankruptcy Code and the applicable Bankruptcy Rules and Local Rules with respect to the relief requested.

**The Secured Obligations**

D.     Subject to paragraph 33 herein, the Debtors admit, stipulate, and agree that Debtor Film Finances, Inc. ("FFI") is obligated to the Pre-Petition Lenders under that certain Loan and Security Agreement dated as of August 31, 2022 (as amended and supplemented, the "Loan

Agreement," and the loan contemplated thereunder, the "Loan") among FFI, as the borrower, the Pre-Petition Secured Party, and the Pre-Petition Lenders. Prior to the Petition Date, SILAC Insurance Company assigned its rights and obligations as a Pre-Petition Lender to the Pre-Petition Dacian Lender.

E.     Subject to paragraph 33 herein, the Debtors admit, stipulate, and agree that proceeds of the Loan were for the purpose of, *inter alia*, consummating a refinancing of the credit facilities under that certain Loan and Security Agreement dated as of August 18, 2020 among Lumiere Financing LLC, as the borrower, and City National Bank of Florida, as the lender.

F.     Subject to paragraph 33 herein, the Debtors admit, stipulate, and agree that as security for FFI's obligations with respect to the Loan, FFI and FFI Media Holdings Inc., FFI Acquisitions, LLC, Liquid Light Productions, LLC, Debtor Rainbow Production Services LLC, Debtor EPS-Cineworks Inc., Debtor Rainbow Digital Services, LLC, Film Finances New Mexico, LLC, Film Finances Louisiana, L.L.C., Film Finances Pennsylvania, LLC, Film Finances Alabama, LLC, FF Network, Inc., FF Asia, LLC, and PBL Finance, LLC (collectively, the "US Guarantors") pledged, assigned, transferred, delivered, and granted to the Pre-Petition Secured Party, for its own benefit and the benefit of the Pre-Petition Lenders, a continuing and unconditional security interest in and to any and all property of FFI and each US Guarantor.

**The Claim**

G.     The Debtors admit, stipulate, and agree that as of October 25, 2024, the amounts due and owing by FFI with respect to the Loan and the obligations under the Pre-Petition Credit Agreements (as defined below) are as follows (collectively, the "Claim"):

(i)     Unpaid principal on the Loan in the amount of $52,343,428.34;

(ii)    Accrued but unpaid interest on the Loan in the aggregate amount of $16,150,814.59; and

4

(iii)   Subject to the terms of, and to the extent provided in, the Pre-Petition Credit Agreements, unliquidated, accrued, and unpaid fees and expenses of the Pre-Petition Secured Party, the Pre-Petition Lenders, and their professionals incurred through the Petition Date. Such amounts, when liquidated, shall be added to the aggregate amount of the Claim.

**Security for the Obligations**

H.      Subject to paragraph 33 herein, the Debtors admit, stipulate, and agree that as security for the Debtors' obligations with respect to the Loan and the Pre-Petition Credit Agreements: (i) FFI entered into the Loan Agreement, wherein FFI and each US Guarantor granted to the Pre-Petition Secured Party, for its own benefit and the benefit of the Pre-Petition Lenders, a continuing and unconditional security interest in and to any and all property of the Debtors and each additional US Guarantor, of any kind or description, tangible or intangible, wheresoever located and whether then existing or thereafter arising or acquired, and (ii) the US Guarantors entered into that certain Guaranty of Payment and Performance dated as of August 31, 2022 (as amended and supplemented, the "Guaranty") among the US Guarantors and certain foreign FFI affiliates in favor of the Pre-Petition Secured Party on behalf of the Pre-Petition Lenders, wherein each US Guarantor granted to the Pre-Petition Secured Party a continuing and unconditional security interest in and to any and all property of FFI and each US Guarantor, of any kind or description, tangible or intangible, wheresoever located and whether then existing or thereafter arising or acquired.

I.      The Loan Agreement, the Guaranty, and the various other agreements, documents, and instruments evidencing the obligations of FFI and the US Guarantors with respect to the Loan, or providing security for such obligations, are referred to collectively herein as the "Pre-Petition Credit Agreements."

J.      Subject to paragraph 33 herein, the Debtors admit, stipulate, and agree that pursuant to the Pre-Petition Credit Agreements, the Pre-Petition Secured Party holds a legal, valid,

5

enforceable, perfected and non-avoidable first priority lien and security interest in substantially all of the Debtors and the additional US Guarantors' real and personal property (all such collateral, the "Pre-Petition Collateral," and the liens on such Pre-Petition Collateral, the "Pre-Petition Liens").

K.    Subject to paragraph 33 herein, the Debtors admit, acknowledge, and agree that the Claim (i) constitutes a legal, valid, binding, enforceable, and non-avoidable obligation of the Debtors; (ii) is not subject to setoff, defense, claim, counterclaim, or subordination of any kind; and (iii) is secured by first-priority Pre-Petition Liens in the Pre-Petition Collateral.

**The Debtors' Need for Use of Cash Collateral**

L.    The Debtors have requested the use of the Cash Collateral (as defined below) of the Pre-Petition Lenders and the Pre-Petition Secured Party in connection with the Chapter 11 Cases. The Pre-Petition Lenders and the Pre-Petition Secured Party only consent to the use of their Cash Collateral upon the express terms of this Interim Order.

M.    Without the use of the Cash Collateral, the Debtors' continued operation as a going concern would be disrupted, and the Debtors and their estates and creditors would be immediately and irreparably harmed.   The Debtors would not have the funds necessary to maintain their operations, pay employee compensation, payroll taxes, overhead, and other expenses. The Debtors require use of the Cash Collateral as provided herein.

**The Debtors' Need for Debtor in Possession Financing**

N.    A critical need exists for the Debtors to obtain funds to cover the operational, capital, and administrative needs of their operations, solely to the extent set forth under the Budget and under the DIP Facility (as each is defined below).   The Debtors are unable to obtain postpetition financing on an unsecured basis under sections 364(c)(1) or 503(b)(1) of the

6

Bankruptcy Code. Further, the Debtors assert that they are unable to obtain secured credit from sources other than the DIP Lenders that would be allowable under sections 364(c)(2), 364(c)(3), and 364(d)(1) of the Bankruptcy Code for the purposes set forth in this Interim Order. Further, the Pre-Petition Lenders and the Pre-Petition Secured Party would not consent to any priming liens and would have argued that the Debtors could not have provided adequate protection for any such proposed financing.

O.       In addition to the use of the Pre-Petition Lenders' and the Pre-Petition Secured Party's Cash Collateral, the DIP Lenders have agreed to provide the requested Initial DIP Loans (as defined below) under the DIP Facility in accordance with the terms of this Interim Order, in the amounts, categories, and timeframes set forth in the Budget, which shall be used for the necessary operational costs and other costs and expenses of administration of the Chapter 11 Cases.

P.       Without the Initial DIP Loans, the Debtors will be unable to pay necessary payroll, costs, and operating expenses in a manner that will avoid irreparable harm to the Debtors' estates. At this time, the Debtors' ability to finance the ongoing operations of the Debtors' businesses, and the availability of sufficient liquidity through the incurrence of new indebtedness for borrowed money and other financial accommodations as provided herein are vital to the preservation and maintenance of the going concern of the Debtors' estates.

Q.       The Debtors have requested that the DIP Lenders provide the Initial DIP Loans up to an aggregate amount of $3,000,000.00 (the "Initial DIP Loans," and all principal, interest, and any other obligations owed with respect to the Initial DIP Loans, the "Initial DIP Obligations"), which funds shall be used by the Debtors solely to the extent provided in the Budget attached hereto as **Exhibit 1**. At the expiration of the Interim Order, the DIP Lenders, subject to entry of a final order in a form acceptable to the DIP Lenders (the "Final Order"), shall continue to advance

funds through additional DIP loans (together with the Initial DIP Loans, the "DIP Loans") up to an aggregate amount of $8,000,000.00, inclusive of the Initial DIP Loans (collectively, the "DIP Facility").

R.      The DIP Lenders are willing to provide the Initial DIP Loans, subject to the terms and conditions set forth herein, provided that the Post-Petition Liens (as defined below) and the various claims, superpriority claims, and other protections granted pursuant to this Interim Order will not be affected by any subsequent reversal or modification of this Interim Order or any other order, as provided in section 364(e) of the Bankruptcy Code.

S.      The DIP Lenders' lending of the DIP Loans is conditioned upon the grant of a lien that: (i) will prime and remain senior to the Pre-Petition Secured Party's Pre-Petition Liens; and (ii) will otherwise constitute a first priority lien in all Post-Petition Collateral (as defined below), subject only to the Carve-Out (as defined below) and the terms of this Interim Order.

T.      The Debtors have represented to the Court that the terms of the Initial DIP Loans have been negotiated in good faith and at arm's length among the Debtors, the Agent, and the DIP Lenders; that the terms of the Initial DIP Loans are at least as favorable to the Debtors as those available from alternative sources, under all of the circumstances; that given the current market conditions and under the particular circumstances of the Chapter 11 Cases, no other sources of funding are available on better overall terms; and that given the exigencies of the cases, the Debtors believe the Initial DIP Loans are the best and only option.

U.      The Debtors, the Agent, and the DIP Lenders have represented to the Court that they have negotiated at arm's length and have acted in good faith in the negotiation and preparation of the DIP Credit Agreement and this Interim Order, have been represented by counsel, and intend to be and are bound by their respective terms. The Debtors have represented to the Court that the

terms and conditions of this Interim Order, the DIP Loan Documents (as defined below), and the DIP Loans are fair and commercially reasonable under the circumstances, reflect the Debtors' exercise of their prudent business judgment consistent with their fiduciary duties, are supported by reasonably equivalent value and fair consideration, and are enforceable in accordance with applicable law.

**Need for Adequate Protection**

V. Pursuant to the Bankruptcy Code and in light of the foregoing, the Debtors are required to provide adequate protection to the Pre-Petition Lenders and the Pre-Petition Secured Party in respect of the use of the Pre-Petition Collateral (including Cash Collateral) and granting of the priming Post-Petition Liens. The Debtors wish to provide adequate protection of the security interests in and liens on the Pre-Petition Collateral pursuant to the terms set forth in this Interim Order, and the Pre-Petition Lenders and the Pre-Petition Secured Party have consented to the Debtors' use of Cash Collateral and the granting of the priming Post-Petition Liens in accordance with the terms of this Interim Order.

W. Good cause has been shown for the entry of this Interim Order. The terms of this Interim Order, inclusive of the adequate protection provided to the Pre-Petition Lenders and the Pre-Petition Secured Party relating to the Pre-Petition Liens, are fair and commercially reasonable, reflect the Debtors' prudent business judgment consistent with their fiduciary duties, and constitute reasonably equivalent value and fair consideration. Entry of this Interim Order is in the best interest of the Debtors, their creditors, and their estates.

X. Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and Local Rule 4001-2(b).

### NOW THEREFORE, THE COURT ORDERS AS FOLLOWS:

**Motion Granted**

    1.    The Motion is hereby **GRANTED** on an interim basis in accordance with the terms and conditions set forth in this Interim Order. Any objections to the Motion with respect to the entry of this Interim Order that have not been withdrawn, waived, or settled, and any reservations of rights included therein, are hereby denied and overruled with respect to this Interim Order.

**Approval of DIP Facility and DIP Loan Documents**

    2.    The DIP Facility and DIP Loan Documents are hereby approved on an interim basis as set forth herein. The Debtors in exercising their prudent business judgment consistent with their fiduciary duties are expressly and immediately authorized and empowered to execute and deliver that certain Priming Superpriority Debtor-in-Possession Credit Agreement between the Debtors, the Agent, and the DIP Lenders (the "DIP Credit Agreement") and all documents executed in connection therewith (collectively with the DIP Credit Agreement, the "DIP Loan Documents"), and to incur and perform under all instruments, certificates, agreements, and documents which may be required or necessary for the performance by the Debtors under the DIP Facility and the creation and perfection of the Post-Petition Liens described in and provided for in this Interim Order and the DIP Loan Documents, which constitute reasonably equivalent value and fair consideration.

    3.    The Debtors shall be liable for the repayment in full of the Initial DIP Obligations, upon entry of this Interim Order, and all DIP Obligations, upon the entry of the Final Order.

    4.    The DIP Facility and DIP Loan Documents have been negotiated in good faith and at arm's length among the Debtors, the Agent, and the DIP Lenders, and the Initial DIP Loans shall be deemed to have been extended by the DIP Lenders in good faith (as that term is used in section 364(e) of the Bankruptcy Code) and in express reliance upon, and with the full benefit of

the protections afforded by, section 364(e) of the Bankruptcy Code, whether or not this Interim Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise.

5.     Absent the relief granted by this Interim Order, the Debtors' estates and creditors would suffer immediate and irreparable harm. Accordingly, the entry of this Interim Order and related authorization of borrowings of the Initial DIP Loans under the DIP Facility and DIP Loan Documents are in the best interests of the Debtors' estates and creditors.

6.     The Debtors are hereby authorized to borrow the Initial DIP Loans pursuant to the DIP Loan Documents, to be used in accordance with the budget attached hereto as **Exhibit 1**, itemizing on a weekly basis all uses and anticipated uses, revenues projected to be received, and all expenditures proposed to be made during such period, which budget may be amended at the request of the Debtors and with the written consent of the Agent and is incorporated herein by reference (as it may be amended, supplemented, replaced, or otherwise modified from time to time solely with the consent of the Agent, in its sole discretion, the "Budget"). The proceeds of the Initial DIP Loans shall be used for such purposes as are expressly permitted under the DIP Loan Documents, this Interim Order, and the Budget.

7.     In furtherance of the foregoing and without further approval of this Court, the Debtors are authorized to perform all acts, to make, execute, and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages, and financing statements), and to pay at the Maturity Date (as defined below) all amounts due under the DIP Facility, including fees, in each case as may be reasonably required or necessary for the Debtors' performance of the Initial DIP Loans, including, without limitation:

(i)      the execution, delivery, and performance of the DIP Loan Documents and any exhibits, schedules, and other documents related thereto;

(ii)     the execution, delivery, and performance of one or more non-material amendments to the DIP Loan Documents, in each case in such form as the Debtors, the Agent,

and the DIP Lenders may agree (it being understood that no further approval of the Court, other than with respect to the Final Order, shall be required for amendments to the DIP Loan Documents that do not shorten the maturity of the extensions of credit thereunder, increase the commitments, or increase the rate of interest payable thereunder);

(iii)   the non-refundable payment to the Agent and the DIP Lenders of the reasonable costs and expenses as may be due from time to time in connection with the Initial DIP Loans in accordance with the terms of the DIP Loan Documents and the Budget; and

(iv)   the performance of all other acts required under the DIP Loan Documents in connection with the Initial DIP Loans.

**The Initial DIP Loans**

8.   <u>Initial DIP Loans</u>.  Pursuant to sections 361 and 364 of the Bankruptcy Code and the terms and conditions hereof, until the occurrence of an Event of Default (as defined below), the Debtors are hereby authorized to borrow the Initial DIP Loans pursuant to the terms, conditions, and provisions of this Interim Order and the DIP Credit Agreement in an aggregate amount up to $3,000,000.00; <u>provided</u>, <u>however</u>, that the Debtors shall use the proceeds of the Initial DIP Loans solely in compliance with the Budget and as expressly set forth herein.

9.   <u>DIP Credit Agreement Terms</u>.

(i)   Interest shall accrue on the full amount committed under the DIP Facility from the date of entry of this Interim Order (the "<u>Interim Order Entry Date</u>") through the Maturity Date at a fixed rate per annum equal to ten percent (10%).  All accrued interest shall be due and payable on the Maturity Date.

(ii)   Upon the occurrence and during the continuation of an Event of Default, the full amount committed under the DIP Facility and any accrued interest, fees, and other amounts owed under the DIP Loan Documents shall bear additional interest at a simple rate of ten percent (10%) per annum.

(iii)   Upon entry of a Final Order, and subject to the terms of paragraph 33 of this Interim Order, for each dollar advanced under the DIP Facility, one dollar of the pre-petition indebtedness on account of the Claim shall be 'rolled up' and shall constitute, for all purposes, an obligation of the Debtors under the DIP Credit Agreement ("<u>Roll-Up Obligations</u>").  For the avoidance of doubt, and without limiting the generality of the foregoing, the Roll-Up Obligations shall be secured, equally and ratably, with all other DIP Obligations, by the Post-Petition Collateral,

and shall be repaid, on the Maturity Date or otherwise, on a ratable basis with all other DIP Obligations.

(iv)     The Initial DIP Obligations and all principal, interest, and any other obligations owed with respect to the Roll-Up Obligations (together with the Initial DIP Obligations, the "DIP Obligations") shall be due and payable upon the earliest of (i) January 8, 2025; (ii) the closing date of the sale of all or substantially all of the Debtors' assets pursuant to an order entered by the Court (or, in the event of more than one sale, the closing date of the last of such sales); (iii) the date on which the DIP Lenders accelerate the DIP Obligations (or the DIP Obligations automatically and immediately accelerate) or the DIP Obligations otherwise become immediately due and payable; or (iv) the effective date of a confirmed chapter 11 plan (the earliest of such date, the "Maturity Date").

10.     Conditions to the Initial DIP Loans.  The funding of the Initial DIP Loans is conditioned upon the entry of this Interim Order and compliance with the terms herein and in the DIP Credit Agreement.

11.     Disbursements of Initial DIP Loans.  The following conditions and processes shall govern the funding of the Initial DIP Loans:

(i)     not less than four (4) business days prior to any borrowing date (each, a "Borrowing Date"), the Debtors shall deliver to the Agent a fully executed Borrowing Certificate (as defined below) by no later than 10:00 a.m. (New York City time). Such Borrowing Certificate, a form of which is attached as Exhibit B to the DIP Credit Agreement (each, a "Borrowing Certificate"), shall specify the amount of the proposed DIP Loan and the Borrowing Date thereof, and shall certify that the amount of the proposed DIP Loan, after accounting for all other available funds held by the Debtors, is reasonably expected to be needed to pay amounts coming due in the fourteen (14) days immediately following such Borrowing Date, as set forth in the Budget. On the Borrowing Date specified in any Borrowing Certificate, the Agent shall disburse such funds to the Operating Account (as defined in the DIP Credit Agreement) and shall use reasonable efforts to make the funds available to the Debtors no later than 2:00 p.m. (New York City time) on the requested Borrowing Date;

(ii)     notwithstanding paragraph 11(i) herein, the Agent shall disburse the Initial DIP Loans up to the amount of $3,000,000 (the "Initial DIP Loan Draw") as soon as reasonably practicable after the Interim Order Entry Date and receipt of a Borrowing Certificate without the passage of four (4) Business Days;

(iii)     such expenditures have not been subject to any prior requisition, payment, or reimbursement from any other source;

(iv)     after making the requested DIP Loan, the aggregate outstanding principal amount of the Initial DIP Loans will not exceed the lesser of the amount authorized under this Interim Order or under the DIP Credit Agreement;

(v)      the representations and warranties of the Debtors contained in this Interim Order and in the DIP Credit Agreement shall be true and correct in all material respects immediately prior to, and after giving effect to, the DIP Loan;

(vi)     the Debtors are in compliance in all material respects with each of the covenants contained in this Interim Order and the DIP Loan Documents; and

(vii)    no Event of Default exists under the terms of this Interim Order or under the DIP Loan Documents.

12.     <u>Use of Initial DIP Loan Proceeds</u>. The Initial DIP Loans shall be used solely as set forth in the Budget for: (i) the necessary operation and associated maintenance costs in the amounts, categories, and timeframe set forth in the Budget; and (ii) other costs and expenses of administration of the Chapter 11 Cases in the amounts, categories, and timeframe set forth in the Budget.

13.     <u>Effectiveness of Initial DIP Loans</u>. From and after the Interim Order Entry Date, the terms and conditions hereof shall constitute the valid and binding obligations of the Debtors, enforceable against the Debtors in accordance with the terms of this Interim Order for all purposes during the Chapter 11 Cases, any subsequently converted cases of any of the Debtors under chapter 7 of the Bankruptcy Code, or after the dismissal of the Chapter 11 Cases. No obligation, payment, transfer, or grant of security under this Interim Order shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable law (including without limitation, under sections 502(d), 548, or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any defense, reduction, setoff, recoupment, or counterclaim.

14.     <u>Payments to the Agent and Waivers</u>. Any and all payments or proceeds remitted to the Agent pursuant to the provisions of this Interim Order or otherwise shall be received by the

Agent free and clear of any claim, charge, assessment, or other liability, including, without limitation, upon entry of a Final Order, any such claim or charge arising out of or based on sections 506(c) and/or 552(b) of the Bankruptcy Code, whether directly or indirectly, all of which are hereby waived by the Debtors and their estates.

**Security for the Initial DIP Loans**

15.    <u>Post-Petition Liens</u>. Pursuant to section 364(c)(2), (c)(3) and (d) of the Bankruptcy Code and as security for the DIP Obligations and the obligations under the DIP Loan Documents, the Agent is hereby granted valid, binding, enforceable, and perfected first priority mortgages, pledges, liens, and security interests (the "<u>Post-Petition Liens</u>") in all currently owned or hereafter acquired property and assets of the Debtors of any kind or nature, whether real or personal, tangible or intangible, wherever located, now owned or hereafter acquired or arising and all proceeds, products, rents, and profits thereof, including, without limitation, accounts, revenues, inventory, equipment, capital stock in subsidiaries, investment property, instruments, chattel paper, real estate, leasehold interests, contracts, general intangibles, patents, copyrights, trademarks, deposit accounts, intercompany claims, claims against affiliates, causes of action (including, upon entry of a Final Order, causes of action under chapter 5 of the Bankruptcy Code and proceeds thereof), tax refund claims, commercial tort claims, insurance proceeds, and insurance premium refunds (all of the foregoing, the "<u>Post-Petition Collateral</u>").

16.    The Post-Petition Liens are in addition to the superpriority administrative expense claim set forth in paragraph 17 hereof, and pursuant to sections 364(c) and 364(d), shall be valid, binding, continuing, enforceable, fully-perfected, senior, and priming on all Post-Petition Collateral that (i) will be and remain senior to the Pre-Petition Liens, Replacement Liens, and Supplemental Liens granted to the Pre-Petition Secured Party and the Pre-Petition Lenders as

adequate protection for their Pre-Petition Liens; and (ii) will otherwise constitute a first priority lien on all other assets of the Debtors, subject only to the Carve-Out and the terms of this Interim Order.

17. <u>Superpriority Administrative Expense Claim</u>. The Initial DIP Loans shall have the status of a superpriority administrative expense claim (the "<u>Superpriority Claim</u>") pursuant to section 364(c)(1) of the Bankruptcy Code and have priority over all other unpaid administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113, or 1114 of the Bankruptcy Code (subject only to the Carve-Out), and shall at all times be senior to the rights of the Debtors, any successor trustee, or any creditor in the Chapter 11 Cases or any subsequent proceedings under the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other nonconsensual lien, levy, or attachment. Subject to the Carve-Out, the Superpriority Claim granted to the Agent by this paragraph 17 shall be payable from and have recourse to all pre-and postpetition property of the Debtors and all proceeds thereof.

**Debtors' Use of Cash Collateral**

18. The Debtors are hereby authorized to use cash collateral (as defined in section 363(a) of the Bankruptcy Code) and advances under the DIP Facility (collectively, the "<u>Cash Collateral</u>").

19. The Debtors' use of Cash Collateral shall be solely as set forth in the Budget and as otherwise provided in this Interim Order for: (i) the necessary ordinary course operation and maintenance costs in the amounts, categories, and timeframe set forth in the Budget; and (ii) other costs and expenses of administration of the Chapter 11 Cases in the amounts, categories, and

16

timeframe set forth in the Budget. Except on the terms and conditions of this Interim Order and the DIP Credit Agreement, the Debtors are prohibited from using Cash Collateral at any time or for any other purpose absent consent of the Agent, or further order of the Court.

**Adequate Protection for the Pre-Petition Liens and Pre-Petition Collateral**

20. <u>Adequate Protection in Favor of the Pre-Petition Secured Party and the Pre-Petition Lenders</u>. As adequate protection of the Pre-Petition Lenders' and the Pre-Petition Secured Party's interests in the Pre-Petition Collateral, including Cash Collateral, pursuant to sections 361, 363, and 552(b) of the Bankruptcy Code, and the Pre-Petition Lenders' and the Pre-Petition Secured Party's consent to the priming of their liens and claims by the Post-Petition Liens and the Superpriority Claim provided to the Agent, the Pre-Petition Dacian Lender is hereby provided the following adequate protection:

(i)    <u>Replacement Liens</u>. As adequate protection solely for any diminution in the value of the Pre-Petition Collateral, including based upon the priming by the Agent ("<u>Diminution</u>"), the Pre-Petition Dacian Lender shall have valid, binding, enforceable, and perfected additional and replacement mortgages, pledges, liens, and security interests in all Post-Petition Collateral (other than avoidance actions under chapter 5 of the Bankruptcy Code) and the proceeds, rents, products, and profits therefrom, whether acquired or arising before or after the Petition Date, to the same extent, priority, and validity that existed for the Pre-Petition Secured Party as of the Petition Date (such liens, the "<u>Replacement Liens</u>"); <u>provided</u>, <u>however</u>, the Replacement Liens shall be subject to (x) the Post-Petition Liens, (y) the Carve-Out, and (z) valid and perfected liens existing on or arising after the Petition Date which, solely by operation of law, have priority over such Replacement Liens, if any;

(ii)   <u>Supplemental Liens</u>. As additional adequate protection solely for any Diminution, the Pre-Petition Dacian Lender shall have a valid, perfected, and enforceable continuing supplemental lien on, and security interest in, all of the assets of the Debtors of any kind or nature whatsoever within the meaning of section 541 of the Bankruptcy Code (other than avoidance actions under chapter 5 of the Bankruptcy Code), whether acquired or arising before or after the Petition Date, and the proceeds, rents, products, and profits therefrom (collectively, the "<u>Supplemental Liens</u>"); <u>provided</u>, <u>however</u>, the Supplemental Liens shall be subject to (w) the Post-Petition Liens, (x) the Replacement Liens, (y) the Carve-Out, and (z) valid and perfected liens existing on or arising after the Petition Date which, solely by operation of law, have priority over such Supplemental Liens, if any;

17

(iii)   Pre-Petition Superpriority Claim. As additional adequate protection solely for any Diminution, the Pre-Petition Dacian Lender shall receive a superpriority expense claim allowed under section 507(b) of the Bankruptcy Code (the "Pre-Petition Superpriority Claim") against all assets of the Debtors' estates (other than avoidance actions under chapter 5 of the Bankruptcy Code). The Pre-Petition Superpriority Claim shall have priority over any and all other unpaid administrative expenses now existing or hereafter arising, of any kind whatsoever, of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546, 726, 1113, or 1114 of the Bankruptcy Code, and shall at all times be senior to the rights of the Debtors, any successor trustee, or any creditor in the Chapter 11 Cases or any subsequent proceedings under the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other nonconsensual lien, levy, or attachment; provided, however, the Pre-Petition Superpriority Claim shall be subject to the (x) the Post-Petition Liens, (y) the Superpriority Claim, and (z) the Carve-Out;

(iv)   Adequate Protection Payments. The Debtors shall make, and are hereby authorized to make, *pro rata* adequate protection payments to the Pre-Petition Lenders in the amount of $50,000.00 per month (the "Adequate Protection Payments"), commencing on the Interim Order Entry Date and continuing through the Maturity Date, with such Adequate Protection Payments to be made by wire transfer to the Pre-Petition Lenders on the first day of each month (other than the month in which this Interim Order is entered).

(v)   Financial Reports. The Debtors shall provide the Pre-Petition Lenders and the Pre-Petition Secured Party with all reports, documents, and other materials, including financial reports, as may be required in this Interim Order and such other and further access to the Debtors' books and records, advisors, and professionals as may be reasonably requested by the Pre-Petition Lenders and the Pre-Petition Secured Party from time to time.

(vi)   Right to Seek Additional Adequate Protection. This Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the Pre-Petition Dacian Lender to request further or alternative forms of adequate protection at any time or the rights of the Debtors or any other party to contest such request.

**Covenants**

21.   Covenants. The Debtors shall observe all covenants in this Interim Order and the

DIP Credit Agreement at all times prior to and after the Termination Date (as defined below). The

Debtors agree as follows (and the Parties acknowledge that failure to comply with such covenants shall constitute an Event of Default under this Interim Order):

    (i)    The Debtors shall comply with the Budget (subject to the permitted variances provided in the next immediate sentence), and shall not make any payments, or incur any obligations or liabilities, that are not projected and provided for in the Budget. The Debtors (i) shall not permit expenditures for any Measuring Period (as defined below) to exceed one hundred ten percent (110%) of the respective amounts, measured on an aggregate basis, as set forth in the Budget for such Measuring Period; provided that the Debtors shall not permit expenditures for estate professional fees to exceed one hundred percent (100%) of the amount allocated for such expenditures in the Budget for such Measuring Period (but notwithstanding anything to the contrary set forth in this Interim Order or the DIP Credit Agreement, the Debtors may incur estate professional fees and expenses that exceed the amount in the Budget); and (ii) shall not permit receipts for such Measuring Period to be less than ninety percent (90%) of the amounts, on an aggregate basis, as set forth in the Budget for such Measuring Period. These variances (the "Variances") shall be measured and tested every other week based on a rolling four-week period (the "Measuring Period"); provided, however, that the first Measuring Period that will be tested shall be limited to an approximately two-week period from the Petition Date to November 10, 2024. Subject to paragraph 7(ii) above, the Debtors may, at any time, amend or reforecast the Budget, either for the period covered by the Budget or for any period thereafter, and the Agent and the DIP Lenders may approve or not approve such amendment in their sole and absolute discretion.

    (ii)    The Debtors shall provide the following reports and information to the Agent, the DIP Lenders, and the United States Trustee:

        a.  no later than 6:00 p.m. (prevailing Pacific time) on Friday of every week or if such Friday is not a business day, then the immediate succeeding business day, the "Weekly Budget Report" which means a weekly report certified by an Authorized Officer for the Debtors, substantially in the same form as the Budget, indicating (i) a comparative reconciliation, on a line-by-line and aggregate basis, of actual cash receipts and disbursements against the cash receipts and disbursements forecasted in the Budget, and the dollar and percentage variance thereof, for (a) the weekly period ended on (and including) the immediately preceding Sunday, (b) a rolling four-week period, and (c) the cumulative period to date; and (ii) a written explanation of such variances;

        b.  if the Debtors receive any material written notice from any Governmental Body (as defined in the DIP Credit Agreement), the Debtors shall provide a copy of such notice within one (1) business day of receipt, and the Debtors shall provide copies of all material reports, certificates and notices that the

Debtors may provide to any Governmental Body within one (1) business day of transmission;

c. a monthly reporting package, no later than twenty (20) days after the end of each calendar month, including cash flow, income statement, and balance sheet for such month, accounts payable, and receivable reports with aging information; and

d. as promptly as reasonably practicable from time to time, following a reasonable request therefor from the Agent, such other information (including historical information) regarding the operations, business affairs, and financial condition of the Debtors, the progress of the Chapter 11 Cases, and/or compliance with the terms of any DIP Loan Document.

**Bankruptcy Milestones**

22.     The Debtors agree that failure to comply with the following milestone covenants

(the "Bankruptcy Milestones") shall constitute an Event of Default, unless any such conditions

have been waived or modified by the Agent in its sole discretion:

(i)     On Tuesday of each week (or such other day as may be agreed upon by the Parties), the Debtors shall make available representatives reasonably acceptable to the Agent for a telephone conference call with the Agent, the DIP Lenders, and their respective agents, advisors, and/or representatives to discuss the cash flows and operations of the Debtors' operations, including the Debtors' compliance with the Budget, the status of the sale process with respect to the sale of substantially all of the Debtors' assets, and such other matters as are relevant or are reasonably requested by the Agent and the DIP Lenders;

(ii)    On the Petition Date, the Debtors shall file a bid procedures and sale motion (the "Bid Procedures Motion"), in form and substance acceptable to the Agent and the DIP Lenders, with respect to a sale of substantially all of the Debtors' assets;

(iii)   On or before November 26, 2024, one or more orders (x) approving the bid procedures (the "Bid Procedures Order") and (y) granting the related relief requested in the Bid Procedures Motion, each in form and substance reasonably acceptable to the Agent and the DIP Lenders, shall be entered;

(iv)    Each milestone date set forth in the Bid Procedures Order; and

(v)     On or before November 22, 2024, the Final Order on the Motion shall be entered.

23.     Each of the Bankruptcy Milestones may be extended or waived in writing by the

Agent, which writing may be an email.

24.    <u>No Liens or Encumbrances</u>.  Prior to payment in full of the DIP Obligations, the Debtors shall not sell, pledge, hypothecate, or otherwise encumber any Pre-Petition Collateral or Post-Petition Collateral (any such sale, pledge, hypothecation, or other transfer shall be void *ab initio* other than the adequate protection granted to the Pre-Petition Dacian Lender pursuant to this Interim Order).  Further, there shall be no other claim or expense having priority or being *pari passu* to the priority granted to the Agent and the Pre-Petition Dacian Lender in this Interim Order while any portion of the DIP Obligations remain outstanding, except with respect to the Carve-Out.

25.    <u>No Waiver</u>.  No consent by the Agent, the DIP Lenders, the Pre-Petition Secured Party, and/or the Pre-Petition Lenders to any administrative claims, including fees and expenses of professionals, sought to be assessed against or attributed to the Agent, the DIP Lenders, the Pre-Petition Secured Party, and/or the Pre-Petition Lenders, as applicable, in the Pre-Petition Collateral, or the Post-Petition Collateral pursuant to the provisions of sections 506(c) and/or 552(b) of the Bankruptcy Code or otherwise by, through or on behalf of the Debtors and their estates, shall be implied from any action, inaction, or acquiescence.

26.    <u>No Challenge</u>.  Notwithstanding anything else herein, subject to the proviso at the last sentence of this paragraph 26, no amounts under the Carve-Out, the proceeds of the DIP Loans, and the proceeds of Pre-Petition Collateral (including Cash Collateral) and Post-Petition Collateral shall be used for the purpose of: (i) objecting to or contesting in any manner, or in raising any defenses to, the validity, extent, perfection, priority, or enforceability of: (a) the Claim or the Pre-Petition Liens, (b) the DIP Loans or the Post-Petition Collateral, or (c) any other rights or interests of the Agent, the DIP Lenders, the Pre-Petition Secured Party, and/or the Pre-Petition Lenders; (ii) asserting any claims or causes of action, including, without limitation, any actions under chapter

21

5 of the Bankruptcy Code against the Agent, the DIP Lenders, the Pre-Petition Secured Party,

and/or the Pre-Petition Lenders, or any of their respective advisors, agents, or sub-agents or

invoking the equitable doctrine of "marshalling" or any other similar doctrine with respect to any

of the Pre-Petition Collateral, the Post-Petition Collateral, or otherwise; (iii) preventing, hindering,

or delaying the enforcement or realization by the Agent and/or the Pre-Petition Dacian Lender, as

applicable, upon any of the Pre-Petition Collateral or Post-Petition Collateral; (iv) incurring

indebtedness except as permitted by this Interim Order; (v) funding acquisitions, capital

expenditures, capital leases, or other transactions not in the ordinary course of the Debtors'

business other than as set forth in the Budget; (vi) modifying any adequate protection granted

pursuant to this Interim Order; or (vii) commencing or prosecuting any motion, proceeding, or

cause of action against the Agent, the DIP Lenders, the Pre-Petition Secured Party, the Pre-Petition

Lenders, or their respective agents, sub-agents, attorneys, advisors, or representatives, including

the commencement or prosecution of formal discovery proceedings in anticipation thereof, or

challenging any lien thereof.  Notwithstanding the foregoing, not more than $25,000.00 of the

Cash Collateral (the "Lien Investigation Cap") may be made available to reimburse the Committee,

if appointed, upon appropriate application therefor, for the Committee's fees and expenses in

investigating the validity, priority, perfection, and enforceability of the Claim and/or the Pre-

Petition Secured Party's liens in the Pre-Petition Collateral.

**Events of Default**

27.    Each of the following shall be considered an Event of Default ("Event of Default")

under the DIP Facility and this Interim Order:

    (i)    the failure to make payments on the DIP Loans (including interest payments) or amounts due under the DIP Credit Agreement or this Interim Order, as and when due;

    (ii)    the failure to make Adequate Protection Payments to the Pre-Petition Lenders as

and when due in accordance with this Interim Order;

(iii)    the Final Order, in form and substance satisfactory to the Agent and the DIP Lenders, has not been entered on or before November 20, 2024;

(iv)    this Interim Order is stayed, reversed, vacated, amended, or otherwise modified in any respect without the prior written consent of the Agent, except by the Final Order;

(v)    failure to meet or comply with any of the Bankruptcy Milestones, as may be modified, that are set forth in this Interim Order;

(vi)    the selection by the Debtors of a stalking horse bidder or winning bidder not acceptable to the Agent;

(vii)    the Bid Procedures Order is stayed, reversed, vacated, amended, or otherwise modified in any respect without the prior written consent of the Agent;

(viii)    the dismissal of the Chapter 11 Cases, conversion of the Chapter 11 Cases to chapter 7 cases, or suspension of the Chapter 11 Cases under section 305 of the Bankruptcy Code;

(ix)    the appointment of a chapter 11 trustee, receiver, or manager or an examiner with enlarged powers (beyond those set forth in section 1104(c) and 1106(a)(3) and (4) of the Bankruptcy Code);

(x)    the filing by the Debtors of a chapter 11 plan not acceptable to the Agent;

(xi)    the granting of relief from the automatic stay to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) with respect to a material asset of the Debtors, by any entity other than the Agent on any Post-Petition Collateral;

(xii)    any superpriority administrative expense claim or lien that is *pari passu* with or senior to the claims, charges, or liens of the Agent, the DIP Lenders, the Pre-Petition Secured Party, and/or the Pre-Petition Lenders shall have arisen or be authorized or allowed;

(xiii)    the payment of or granting adequate protection with respect to prepetition indebtedness of the Debtors other than as set forth in the Budget or as provided for in this Interim Order;

(xiv)    any of the DIP Loan Documents cease to be valid or effective or are contested by the Debtors;

(xv)    the failure by the Debtors to comply with any of the affirmative covenants set forth in, or the taking of any action in violation of the negative covenants set forth in, the DIP Loan Documents;

(xvi)  the cessation of Post-Petition Liens, Replacement Liens, Supplemental Liens, Superpriority Claims, or Pre-Petition Superpriority Claim granted pursuant to this Interim Order to be valid, perfected, and enforceable in all respects;

(xvii)  the filing of any Challenge (as defined below) to the Pre-Petition Liens, the Pre-Petition Collateral, or the claims of the Pre-Petition Lenders or the Pre-Petition Secured Party by (i) the Debtors or any affiliate of the Debtors or (ii) any other party, and such party's Challenge is (x) supported or not timely objected to by the Debtors or (y) upheld by the Court;

(xviii)  the payment of estate professional fees by the Debtors other than to the extent set forth in the Budget; or

(xix)  the occurrence of an Event of Default under the DIP Credit Agreement.

**Termination and Maturity**

28.  Notwithstanding anything herein, the Debtors shall no longer, pursuant to this Interim Order or otherwise, be authorized to borrow funds and/or use Cash Collateral for any purpose hereunder upon the earliest of: (i) the occurrence of an Event of Default or (ii) the Maturity Date (such earlier date, the "Termination Date"); provided, however, that the Agent shall provide five (5) business days (the "Default Notice Period") written notice via email to counsel to the Debtors, counsel to any Committee, and the United States Trustee of any Event of Default (the "Default Notice") and the Debtors may continue to use Cash Collateral pursuant to the Budget for five (5) business days after receipt of such Default Notice while the Debtors seek an expedited hearing to contest whether an Event of Default has occurred, and the Agent, the DIP Lenders, the Pre-Petition Secured Party, and the Pre-Petition Lenders consent to the holding of such an expedited hearing within five (5) business days of such a filing and to the Debtors' use of Cash Collateral, solely to the extent necessary to avoid immediate and irreparable harm, pending such hearing (collectively, the "Debtor Default Period Rights").

29.  Notwithstanding the occurrence of an Event of Default, the Agent may elect in writing not to terminate the Debtors' authority to borrow funds and/or use Cash Collateral

hereunder, to waive defaults hereunder, to forbear from the exercise of rights and remedies hereunder and, subject to Court approval and the approval of the Agent, to modify the Maturity Date and any Event of Default. Any such continued extension of financial accommodations shall be without prejudice to the Agent's ability to terminate funding.

30.    Notwithstanding the occurrence of an Event of Default or anything herein to the contrary, all of the rights, remedies, benefits, and protections provided to the Agent, the DIP Lenders, the Pre-Petition Secured Party, and the Pre-Petition Lenders shall survive the Termination Date. Upon the Termination Date, the principal of and accrued interest and all other amounts owed to the DIP Lenders under the DIP Obligations shall be immediately due and payable.

**Exercise of Rights**

31.    (i) Subject to the Debtor Default Period Rights, without further order from the Court, the automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit, upon the occurrence of any Event of Default, (a) the DIP Lenders to cease making any advances under the DIP Facility, including the Initial DIP Loans, and (b) upon entry of the Final Order, the Agent, upon prior written notice to be filed with the Court, to exercise all of its rights and remedies under the DIP Credit Agreement or related documents.

(ii)    The Agent and the Pre-Petition Lenders shall be entitled to apply the payments or proceeds of the Post-Petition Collateral or the Pre-Petition Collateral as they deem appropriate, subject to the Carve-Out, and in no event, upon entry of a Final Order, shall the Agent and the Pre-Petition Lenders be subject to the equitable doctrine of "marshalling" or any other similar doctrine with respect to any of the Post-Petition Collateral or otherwise. In the event that it is determined by final order of the Court that the Pre-Petition Lenders are not entitled under Bankruptcy Code section 506(b) to any postpetition adequate protection payment, interest, fees,

25

and expenses relating to the Claim, then any payments or proceeds remitted to the Pre-Petition

Lenders shall reduce the Claim held by the Pre-Petition Lenders and the Pre-Petition Secured

Party.

32.    Release. Subject to paragraph 33 herein, the Debtors hereby release the Agent, the

DIP Lenders, the Pre-Petition Secured Party, the Pre-Petition Lenders, and their respective agents,

attorneys, officers, directors, and employees from all claims and/or causes of action by, and

liabilities owing to, the Debtors arising out of or based upon or related to, in whole or in part, the

Loan, the DIP Facility, and any aspect of the prepetition relationship between the Agent, the DIP

Lenders, the Pre-Petition Secured Party, the Pre-Petition Lenders, and the Debtors and any other

acts or omissions by the Agent, the DIP Lenders, the Pre-Petition Secured Party, and/or the Pre-

Petition Lenders in connection with either the Pre-Petition Credit Agreements or their prepetition

relationship with the Debtors. Further, subject to paragraph 33 herein, the Debtors and their estates

waive any and all right to object to or contest the amount of the Claim or the Pre-Petition Secured

Party's Pre-Petition Liens in the Pre-Petition Collateral and agree that all such claims and security

interests have been duly perfected and are in all respects valid and enforceable first priority security

interests and liens, subject and subordinate only to (i) Post-Petition Liens to the extent set forth

herein and (ii) the Carve-Out. For the avoidance of doubt, the waiver and stipulation set forth in

this paragraph 32 shall not affect any party in interest or a Committee's rights under paragraph 33

herein.

33.    Investigation Period. As to claims against the Pre-Petition Secured Party, the Pre-

Petition Lenders, and SILAC Insurance Company, any party in interest (including any Committee,

but excluding the Debtors) may file an adversary proceeding or contested matter (a "Challenge")

(i) challenging the amount, validity, extent, enforceability, perfection or priority of the Claim or

the Pre-Petition Liens in respect thereof, or (ii) otherwise asserting any claims or causes of action against the Pre-Petition Secured Party, the Pre-Petition Lenders, or SILAC Insurance Company on behalf of the Debtors' estates so long as any Challenge is made on or before the date that is seventy-five (75) days after the Interim Order Entry Date (the "Investigation Period"). Any such Challenge brought after the conclusion of the Investigation Period shall be barred.  If no Challenge is commenced by a party during the Investigation Period against the Pre-Petition Secured Party, the Pre-Petition Lenders, or SILAC Insurance Company, then as to such party, (i) the Claim shall constitute an allowed claim, not subject to subordination or recharacterization and otherwise unavoidable, for all purposes in the Chapter 11 Cases and any subsequent chapter 7 case or cases, (ii) the Pre-Petition Liens on the Pre-Petition Collateral shall be deemed legal, valid, binding, perfected, not subject to defense, counterclaim, offset of any kind, subordination and otherwise unavoidable, (iii) the Pre-Petition Secured Party, the Claim, and the Pre-Petition Liens on the Pre-Petition Collateral shall not be subject to any other or further claims, causes of action, or challenges by any party in interest (including, without limitation, any successor thereto) on behalf of the Debtors' estates; and (iv) the Pre-Petition Secured Party, the Pre-Petition Lenders, SILAC Insurance Company, and their respective agents, attorneys, officers, directors and employees, shall be deemed released of all claims and/or causes of action of the Debtors by the Debtors, any Committee, the Debtors' estates, all parties in interest, and any subsequently appointed trustee arising out of or based on any facts or circumstances occurring prior to the date hereof whether in their capacities as Pre-Petition Secured Party, Pre-Petition Lenders, Agent, DIP Lenders, or in any other capacity whatsoever; provided further that if one or more claims under this paragraph 33 are timely and properly filed, then except for such claims, all other potential claims and causes of action of the Debtors were, and are hereby, deemed forever waived and barred.  Notwithstanding

the foregoing, no claims or cause of actions of any kind or nature may be asserted against the Agent or the DIP Lenders or the liens and claims granted to the Agent or the DIP Lenders under and/or related to the DIP Facility or the DIP Obligations. Nothing in this Interim Order shall be deemed to confer standing on any Committee or any other non-Debtor party in interest to commence a Challenge, and such Committee or other non-Debtor party in interest shall be required to assert standing and satisfy the applicable standard for establishing standing to pursue estate causes of action. Notwithstanding the foregoing, the timely filing of a motion seeking standing to file a Challenge consistent with applicable law and rules of procedure before the expiration of the Investigation Period, which attaches a draft complaint setting forth the legal and factual bases of the proposed Challenge, shall toll the Investigation Period only as to the party that timely filed such standing motion, and solely with respect to the Challenge(s) asserted in the draft complaint, until entry of an order granting the motion for standing to prosecute such Challenge(s) described in the draft complaint and permitted by the Court, provided, further that if standing is denied by the Court, the Investigation Period shall be deemed to have immediately expired with respect to such Challenge(s).

34.    Funding Termination Following a Challenge.  Upon and as of the date of any Challenge to the Pre-Petition Liens, the Pre-Petition Collateral, or the claims of the Pre-Petition Secured Party and/or the Pre-Petition Lenders by (i) the Debtors or any affiliate of the Debtors or (ii) any other party that is (x) supported or not timely objected to by the Debtors or (y) upheld by the Court (such date, the "Challenge Termination Date"), the DIP Lenders shall immediately have no further obligation to fund additional amounts under the DIP Facility and the consensual use of Cash Collateral shall terminate at the later of five (5) days from the Challenge Termination Date or the date the Court rules on any timely-filed Expedited Cash Collateral Motion (as defined

below), with an outside date for termination of the use of Cash Collateral on the date that is ten

(10) business days from the Challenge Termination Date (unless extended by order of the Court).

Prior to the Challenge Termination Date, the Debtors or the Committee, if appointed, may file a

motion seeking nonconsensual use of Cash Collateral on shortened notice of three (3) days (the

"Expedited Cash Collateral Motion"). A hearing on the Expedited Cash Collateral Motion will be

set for the first available hearing date three (3) days or more from the date it is filed.

35.    Section 364(e); Section 506(c); Section 552(b). The Agent and the DIP Lenders

shall be entitled to all of the benefits of section 364(e) of the Bankruptcy Code for all Initial DIP

Loans. Except to the extent of the Carve-Out and, upon entry of the Final Order, no expenses of

administration of the Chapter 11 Cases or any future proceeding that may result therefrom,

including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be

charged against or recovered from the Post-Petition Collateral, the Pre-Petition Collateral, or

collateral subject to Replacement Liens and Supplemental Liens, pursuant to section 506(c) or

552(b) of the Bankruptcy Code or any similar principle of law, without the prior written consent

of the Agent and the Pre-Petition Dacian Lender, in consultation with the Pre-Petition Secured

Party, and no such consent shall be implied from any other action, inaction, or acquiescence by

the Agent and/or the Pre-Petition Dacian Lender. **For the avoidance of doubt, and
notwithstanding anything else in this Interim Order, nothing in this Interim Order shall be
construed as a waiver of sections 506(c) or 552(b) of the Bankruptcy Code, with such waiver
to be addressed at the time of the final hearing on the Motion.**

**Carve-Out**

36.    In partial consideration of the Debtors' acknowledgement of the Claim and the

Debtors' waiver, upon entry of a Final Order, of any claims under sections 506(c) and 552(b) of

the Bankruptcy Code, the Agent, the DIP Lenders, the Pre-Petition Secured Party, and the Pre-

Petition Lenders, consent to the payment of certain expenses and professional fees incurred during the pendency of these Chapter 11 Cases that shall be superior in all instances to the liens and claims of the Agent, the DIP Lenders, the Pre-Petition Secured Party, the Pre-Petition Lenders, and all other parties (the "Carve-Out"). For purposes hereof, the "Carve-Out" means the sum of (i) an aggregate amount not to exceed the sum of: (a) the unpaid dollar amount of the fees and expenses of professionals retained by the Debtors or a Committee, if any, to the extent (1) incurred or accrued prior to the Termination Date and remaining unpaid and (2) provided for under the Budget, plus (b) the dollar amount of the fees and expenses of the professionals retained by the Debtors or a Committee, if any, to the extent incurred or accrued after the Termination Date in an aggregate amount not to exceed $100,000.00, in each of the foregoing (a) and (b) solely to the extent allowed by the Court, plus (ii) the statutory fees of the United States Trustee pursuant to 28 U.S.C. § 1930 and the fees of the Clerk of this Court plus any interest at the statutory rate, plus (iii) the reasonable fees and expenses incurred by any chapter 7 trustee appointed by the Court under section 726(b) of the Bankruptcy Code, not to exceed $15,000.00 in the aggregate. Prior to the payment of such fees and expenses from the amount available under the Carve-Out, such professionals shall first apply any retainers held by such professional to their allowed fees and expenses. Nothing herein shall constitute a waiver of any right of the Agent or the Pre-Petition Dacian Lender to object to fees and expenses of any professionals or to challenge any assertion that any amount of the fees and expenses remain unpaid (or the right to respond thereto). Except to the extent of and in consideration of the Carve-Out, subject to entry of the Final Order, (y) no expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Agent, the DIP Lenders, the Pre-Petition Secured Party, the

Pre-Petition Lenders, the Pre-Petition Collateral, or the Post-Petition Collateral pursuant to section 506(c) of the Bankruptcy Code or a similar principal of law; and (z) the "equities of the case" exception under section 552(b) of the Bankruptcy Code is waived as to the Agent, the DIP Lenders, the Pre-Petition Secured Party, the Pre-Petition Lenders, the Pre-Petition Collateral, and the Post-Petition Collateral. Any payment or reimbursement made in respect of any Carve-Out expenses incurred on or after an Event of Default shall permanently reduce the Carve-Out on a dollar-for-dollar basis. Subject to the terms of this Interim Order, prior to the Termination Date, the Debtors shall be permitted to pay allowed professional fees and expenses as the same may be due and payable, subject to the Budget.

37.     For the avoidance of doubt, no portion of the Carve-Out, any Cash Collateral, or proceeds of the DIP Facility may be used for the payment of the fees and expenses of any person or firm incurred in connection with the challenging of any of the liens or claims of, or the initiation or prosecution of any claim or actions against, the Agent, the DIP Lenders, the Pre-Petition Secured Party, and/or the Pre-Petition Lenders, in any capacity.

38.     Credit Bid. The Agent, in consultation with the Pre-Petition Party, has an absolute right to credit bid the DIP Obligations in connection with any sale or other disposition of the Post-Petition Collateral under the Bankruptcy Code. The Pre-Petition Secured Party, in consultation with the Pre-Petition Lenders, has an absolute right to credit bid the Claim in connection with any sale or other disposition of the Pre-Petition Collateral under the Bankruptcy Code.

**Miscellaneous**

39.     Proofs of Claim. The Agent, the DIP Lenders, the Pre-Petition Secured Party, and the Pre-Petition Lenders shall not be required to file proofs of claim in any of the Chapter 11 Cases in connection with the Claim or the DIP Obligations, as applicable, and the Debtors' stipulations herein shall be deemed to constitute timely filed proof of claims in connection with the Claim and

31

Docusign Envelope ID: 5E2DA34B-04E0-4FBB-9D64-F502F28F7E45

Docusign Envelope ID: C1CD163C-8DA4-46F1-AF89-FB1A024BCC76

the DIP Obligations. Notwithstanding the foregoing, the Agent and the Pre-Petition Dacian Lender are hereby authorized and entitled, in their sole discretion, but not required, to file (and amend and/or supplement, as they see fit) proofs of claim in connection with the Claim or the DIP Obligations, as applicable.

40.     The Debtors shall execute and deliver to the Agent and the Pre-Petition Dacian Lender, as applicable, any and all such agreements, financing statements, instruments and other documents as such parties may reasonably request to evidence, confirm, validate or perfect the liens granted pursuant hereto. The Debtors are authorized to do and perform all acts, to make, execute and deliver all instruments and documents, including the DIP Loan Documents; provided, however, that this Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the Post-Petition Liens, Replacement Liens, and Supplemental Liens to the Agent and the Pre-Petition Dacian Lender, as applicable, without the necessity of filing or recording any financing statement, mortgage, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action to validate or perfect the Post-Petition Liens, Replacement Liens, and Supplemental Liens to the Agent and the Pre-Petition Dacian Lender, as applicable, or to entitle those liens to the priorities granted herein.

41.     Based on the findings herein set forth, and in accordance with section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Interim Order are hereafter modified, amended, or vacated by a subsequent order of this or any other Court, no such modification, amendment, or vacation shall affect the validity and enforceability of any lien or priority authorized or created by this Interim Order. Notwithstanding any such modification, amendment, or vacation, any claim granted to the Agent or the Pre-Petition Dacian Lender

hereunder arising prior to the effective date of such modification, amendment, or vacation shall be governed in all respects by the original provisions of this Interim Order and the Agent and the Pre-Petition Dacian Lender shall be entitled to all of the rights, remedies, privileges, and benefits, including the liens and priorities granted herein, with respect to any such claim.

42.  <u>Payments to Agent and the DIP Lenders</u>.  The Agent and the DIP Lenders will be paid their reasonable and documented fees, costs, and expenses contemplated under the DIP Credit Agreement, including, without limitation, legal and other professional fees and expenses (the "<u>DIP Fees</u>").  In the absence of a Termination Event, within ten (10) business days of the Agent and/or any DIP Lender charging the DIP Loans for payment of DIP Fees (which charge shall be made by increasing the principal balance of the DIP Loan in an amount equal to the allowed DIP Fees, but shall not reduce the amount of the DIP Loan available to the Debtors), the Agent and/or the DIP Lender will submit a written statement to counsel to the Debtors, Pre-Petition Lenders, the Pre-Petition Secured Party, the Committee, if appointed, and the United States Trustee itemizing the DIP Fees in reasonably sufficient detail that the Agent and/or the DIP Lender charged against the DIP Loans, and such parties shall have fourteen (14) days from the date of such statement to object to any amount in such statement.  If the parties are unable to resolve an objection to a statement within a reasonable amount of time, any party subject to the dispute may seek resolution by motion from this Court.  DIP Fees shall be deemed allowed unless otherwise (i) agreed by the parties in writing or (ii) ordered by the Court.  The Agent, the DIP Lenders, the Pre-Petition Secured Party, the Pre-Petition Lenders, and their respective professionals shall not be required to comply with the United States Trustee Fee Guidelines or any other fee application and approval process.  Upon a Termination Event, all DIP Fees will be due and payable immediately.

43.     Deemed Request for Stay Relief.  This Interim Order shall be deemed to constitute a request by the Pre-Petition Secured Party and the Pre-Petition Lenders for relief from the automatic stay with respect to the Pre-Petition Collateral and for adequate protection as of the Petition Date and shall suffice for all purposes of section 507(b) of the Bankruptcy Code.

44.     No Control.  None of the Agent, the DIP Lenders, the Pre-Petition Secured Party, or the Pre-Petition Lenders shall be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person," "managing agent," or "owner or operator" (as such terms or any similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, as amended, or any similar Federal or state statute) with respect to the operation or management of the Debtors, notwithstanding any consent to this Interim Order and extending financial accommodations of any type, kind or nature under this Interim Order.

45.     DIP Obligations.  The DIP Obligations shall not be discharged by the entry of an order confirming a plan of reorganization or a plan of liquidation in the Chapter 11 Cases, but rather shall be required to be indefeasibly paid in full in cash on the effective date of such plan.

46.     No Third-Party Beneficiaries.  The provisions of this Interim Order shall be binding upon and inure to the benefit of the Agent, the DIP Lenders, the Pre-Petition Secured Party, the Pre-Petition Lenders, the Debtors, and their respective successors and assigns (including any trustee or other fiduciary hereafter appointed as a legal representative of the Debtors or with respect to the property of the estates of the Debtors).  No rights are created hereunder for the benefit of any third party, any creditor, or any direct, indirect, or incidental beneficiary.

47.     Modification of Stay.  The automatic stay imposed by virtue of section 362 of the Bankruptcy Code was, and is hereby, vacated and modified insofar as necessary to permit (i) the Debtors to grant the Post-Petition Liens, the Replacement Liens, and the Supplemental Liens to

the Agent and the Pre-Petition Dacian Lender, as applicable, (ii) the Pre-Petition Lenders to accept and receive disbursements and/or payments and to apply moneys pursuant to the Pre-Petition Credit Agreements, (iii) the Parties to take any action specifically authorized or contemplated by this Interim Order and implement the DIP Facility, including the Agent's ability to exercise all of its rights and remedies under the DIP Credit Agreement or related documents as provided herein, and (iv) all acts, actions, and transfers contemplated herein, including without limitation, transfers or application of Cash Collateral and other funds to the Agent as provided herein.

48.  Effectiveness. The findings of fact and conclusions of law contained in this Interim Order shall take effect immediately upon the Interim Order Entry Date. The liens and claims granted to the Agent and the Pre-Petition Dacian Lender under this Interim Order, and the priority thereof, and any payments made pursuant to this Interim Order shall be binding (subject to the terms of this Interim Order) on the Debtors, any successor trustee or examiner, and all creditors of the Debtors, as provided in section 364(e) of the Bankruptcy Code.

49.  Any notice required hereunder shall be served on:

(a)  *counsel to the Debtors*:

> Bayard, P.A.
> Attn:  Ericka F. Johnson, Esq.
> 600 N. King Street, Suite 400
> Wilmington, DE 19801
> ejohnson@bayardlaw.com
>
> - and -
>
> Levene, Neale, Bender, Yoo & Golubchik L.L.P.
> Attn:  David L. Neale, Esq.
>         Krikor J. Meshefejian, Esq.
> 2818 La Cienega Avenue
> Los Angeles, CA 9004
> DLN@lnbyg.com
> KJM@lnbyg.com

(b)  *counsel to the Agent, SILAC, or the Pre-Petition Dacian Lender:*

Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
Attn:   Frank J. Earley, Esq.
            Katlin R. Walsh, Esq.
919 Third Avenue
New York, NY 10022
FJEarley@mintz.com
KRWalsh@mintz.com

(c)  *counsel to Haymarket, the Pre-Petition Secured Party, or the Pre-Petition Haymarket Lender:*

Goldstein & McClintock LLLP
Attn:   Matthew E. McClintock, Esq.
            Ainsley G. Moloney, Esq.
111 W. Washington Street, STE 1221
Chicago, IL 60602
mattm@goldcmlaw.com
ainsleym@goldmclaw.com

(d)  *the Office of the United States Trustee for Region 3*

50.  <u>Final Hearing</u>.  A final hearing with respect to this Interim Order is hereby scheduled for _____, at which time any party in interest may present any timely filed objections to the entry of a Final Order.  The Debtors shall promptly serve a copy of this Interim Order and a notice of the final hearing upon the Notice Parties.  Such notice shall state that objections to the entry of a Final Order shall be in writing and shall be filed with the United States Bankruptcy Clerk for the District of Delaware no later than _____.  Any objections by creditors or other parties in interest to any of the provisions of a Final Order incorporating the terms of this Interim Order, or including any other or different provisions, may be deemed waived unless filed and served in accordance with this paragraph.

51.    To the extent there exists any conflict between the Motion, any other motion, pleading, document, agreement or term sheet, any DIP Loan Document, and the terms of this Interim Order, this Interim Order shall govern and control.

Docusign Envelope ID: C1CD163C-8DA4-46F1-AF89-FB1A024BCC76

## Exhibit 1

### Budget

**Exhibit C**

**Purchase Agreement**

[attached]

**G&M Draft 10/24/24**

ASSET PURCHASE AGREEMENT

DATED AS OF OCTOBER ☐, 2024

BY AND BETWEEN

FILM SERVICES INTERNATIONAL, LLC, AS PURCHASER,

AND

FILM FINANCES, INC., RAINBOW PRODUCTION SERVICES, LLC, RAINBOW DIGITAL SERVICES LLC AND EPS CINEWORKS, INC.,

AS SELLER.

# TABLE OF CONTENTS

ARTICLE I PURCHASE AND SALE OF THE ACQUIRED ASSETS; ASSUMPTION OF ASSUMED
   LIABILITIES .................................................................................................................1
     1.1    Purchase and Sale of the Acquired Assets ....................................1
     1.2    Excluded Assets ...............................................................................2
     1.3    Assumption of Certain Liabilities...................................................2
     1.4    Excluded Liabilities .........................................................................3
     1.5    Assumption/Rejection of Certain Contracts ..................................3

ARTICLE II CONSIDERATION; PAYMENT; CLOSING ...................................................5
     2.1    Consideration; Payment...................................................................5
     2.2    Closing...............................................................................................5
     2.3    Closing Deliveries by Seller ...........................................................5
     2.4    Closing Deliveries by Purchaser ....................................................6

ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLER ..............................6
     3.1    Organization and Qualification.......................................................6
     3.2    Authorization of Agreement ...........................................................6
     3.3    Conflicts; Consents...........................................................................6
     3.4    Assigned Contracts ..........................................................................7
     3.5    Brokers...............................................................................................7
     3.6    Due Diligence ..................................... **Error! Bookmark not defined.**
     3.7    No Additional Representations or Warranties ...............................7

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF PURCHASER .......................7
     4.1    Organization and Qualification.......................................................7
     4.2    Authorization of Agreement ...........................................................8
     4.3    Conflicts; Consents...........................................................................8
     4.4    Financing...........................................................................................9
     4.5    No Litigation ....................................................................................9
     4.6    Certain Arrangements .....................................................................9
     4.7    Solvency............................................................................................9
     4.8    No Additional Representations or Warranties ...............................9

ARTICLE V BANKRUPTCY COURT MATTERS .............................................................10
     5.1    Bankruptcy Actions ........................................................................10
     5.2    Cure Costs .......................................................................................13
     5.3    Sale Order .......................................................................................13
     5.4    Approval .........................................................................................13

ARTICLE VI COVENANTS AND AGREEMENTS ...........................................................14
     6.1    Conduct of Business of Seller........................................................14
     6.2    Access to Information .....................................................................14
     6.3    Reasonable Efforts; Cooperation ..................................................15
     6.4    Further Assurances; Receipt of Misdirected Assets .....................16

i

## TABLE OF CONTENTS

| | | |
|---|---|---|
| 6.5 | Employees | 16 |
| **ARTICLE VII CONDITIONS TO CLOSING** | | **16** |
| 7.1 | Conditions Precedent to the Obligations of Purchaser and Seller | 16 |
| 7.2 | Conditions Precedent to the Obligations of Purchaser | 17 |
| 7.3 | Conditions Precedent to the Obligations of Seller | 17 |
| 7.4 | Waiver of Conditions | 18 |
| **ARTICLE VIII TERMINATION** | | **18** |
| 8.1 | Termination of Agreement | 18 |
| 8.2 | Effect of Termination | 19 |
| **ARTICLE IX TAXES** | | **20** |
| 9.1 | Transfer Taxes | 20 |
| 9.2 | Allocation of Purchase Price | 20 |
| 9.3 | Cooperation | 20 |
| 9.4 | Preparation of Tax Returns and Payment of Taxes | 20 |
| **ARTICLE X MISCELLANEOUS** | | **20** |
| 10.1 | Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers | 20 |
| 10.2 | Expenses | 21 |
| 10.3 | Notices | 21 |
| 10.4 | Binding Effect; Assignment | 22 |
| 10.5 | Amendment and Waiver | 23 |
| 10.6 | Third Party Beneficiaries | 23 |
| 10.7 | Non-Recourse | 23 |
| 10.8 | Severability | 23 |
| 10.9 | Construction | 23 |
| 10.10 | Schedules | 23 |
| 10.11 | Complete Agreement | 24 |
| 10.12 | Specific Performance | 24 |
| 10.13 | Jurisdiction and Exclusive Venue | 25 |
| 10.14 | Governing Law; Waiver of Jury Trial | 25 |
| 10.15 | Counterparts and PDF | 26 |
| 10.16 | Bulk Sales Laws | 26 |
| 10.17 | Fiduciary Obligations | 26 |
| **ARTICLE XI ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS** | | **26** |
| 11.1 | Certain Definitions | 26 |
| 11.2 | Index of Defined Terms | 31 |
| 11.3 | Rules of Interpretation | 31 |

## INDEX OF SCHEDULES

## TABLE OF CONTENTS

Schedule 1.1          Scheduled Subsidiaries

Schedule 1.2          Excluded Assets

Schedule 1.3(a)       Designated Contracts

Schedule 1.3(b)       Assumed Pre-Petition Indebtedness

Schedule 3.3          Seller Conflicts; Consents

Schedule 4.3          Purchaser Conflicts; Consents

Schedule 6.1(a)       Conduct of Business of Seller

Schedule 11.1(y)      Permitted Encumbrances

iii

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement"), dated as of October __, 2024, is made by and between Film Services International, LLC, a Delaware limited liability company ("Purchaser"), and Film Finances, Inc., a California corporation ("FFI"), Rainbow Production Services LLC, a Delaware limited liability company ("RPS"), Rainbow Digital Services, LLC, a California limited liability company ("RDS"), and EPS Cineworks, Inc., a California corporation ("EPS") (collectively, "Seller"). Purchaser and Seller are referred to herein individually as a "Party" and collectively as the "Parties." Capitalized terms used herein shall have the meanings set forth herein or in Article XI.

WHEREAS, Seller intends to file a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), thereby commencing a chapter 11 bankruptcy case (the "Bankruptcy Case").

WHEREAS, Purchaser desires to purchase the Acquired Assets (as defined below) and assume the Assumed Liabilities (as defined below) from Seller, and Seller desires to sell, convey, assign, and transfer to Purchaser the Acquired Assets together with the Assumed Liabilities, in a sale authorized by the Bankruptcy Court pursuant to, *inter alia*, sections 105, 363, and 365 of the Bankruptcy Code, and in accordance with the other applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this Agreement and the Sale Order.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants, and agreements set forth herein, intending to be legally bound hereby, Purchaser and Seller hereby agree as follows.

## ARTICLE I

## PURCHASE AND SALE OF THE ACQUIRED ASSETS; ASSUMPTION OF ASSUMED LIABILITIES

1.1     Purchase and Sale of the Acquired Assets. On the terms and subject to the conditions set forth herein and in the Sale Order, at the Closing, Seller shall sell, transfer, assign, convey, and deliver to Purchaser, and Purchaser shall purchase, acquire, and accept from Seller, all of Seller's right, title and interest in and to, as of the Closing, all of the assets of the Seller other than the Excluded Assets (as defined below) (collectively, the "Acquired Assets"), free and clear of all interests, claims, liens and encumbrances pursuant to section 363(f) of the Bankruptcy Code. The Acquired Assets shall include, without limitation, all of Seller's rights, title and interests in and to the specific Seller's Subsidiaries listed on Schedule 1.1 hereto (the "Scheduled Subsidiaries"); all of Seller's tangible property, cash, cash equivalents, accounts, equipment, software and computer programs, hardware, intellectual property, company names, product names, trade names, prepaid expenses and deposits; the Designated Contracts (as defined below), books and records (excluding books and records under Section 1.2(ix)); any policies and procedures relating to the Seller's business, telephone and facsimile numbers; all licenses and permits to the extent transferable; all benefits, and all insurance policies and programs relating to the Seller's

business that can be assigned to Purchaser and which are designated by the Purchaser as Designated Contracts (as defined below) (collectively, the "Insurance Programs"); all proceeds and other amounts payable under such Insurance Programs on account of any liability covered by such Insurance Program for any period first accruing after the Closing; any rights, claims or causes of action of Seller against third parties (other than those that constitute Excluded Assets); and any and all proceeds of all the foregoing assets.  Notwithstanding anything to the contrary set forth in this Agreement, Purchaser may, in Purchaser's sole discretion and at any time prior to Closing, designate any Acquired Asset to be an Excluded Asset, notwithstanding the inclusion of such asset, right, or property as an Acquired Asset pursuant to this Agreement.  In each case, Purchaser shall deliver written notice to Seller of its election to designate such asset, right, or property as an Excluded Asset.

      1.2    Excluded Assets. The following are not included in the Acquired Assets and are not being sold to Purchaser (collectively, the "Excluded Assets"): (i) income tax receivables, (ii) deferred tax assets, (iii) employee advances, (iv) contracts and leases that are not Assigned Contracts, (v) the Purchase Price and all rights of the Seller under this Agreement, (vi) all personnel records and other books, records, and files that the Seller is required by law, if any, to retain in their possession, (vii) any claim, right or interest of Seller in or to any refund, rebate, abatement or other recovery for taxes, together with any interest due thereon or penalty rebate arising therefrom, (viii) applicable federal, state, and local taxes, (ix) proceeds from any Insurance Program relating to a liability covered by such Insurance Program for a period accruing prior to the Closing; (x) copies of any books and records relating to any of the foregoing; (xi) any computers or other property not owned by Seller or its subsidiaries (including without limitation any computers or other property owned by Seller's employees); (xii) any rights, claims or causes of action under Chapter 5 of the Bankruptcy Code; (xiii) the Hamilton Arbitration; and (xiv) any other asset designated by Purchaser, in its sole discretion, prior to the Closing, as listed on Schedule 1.2 hereto.

      1.3    Assumption of Certain Liabilities. On the terms and subject to the conditions set forth herein and in the Sale Order, effective as of the Closing, in addition to the consideration provided by the Purchase Price in accordance with Section 2.1, Purchaser shall irrevocably assume from Seller (and from and after the Closing Date pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and Seller shall irrevocably transfer, assign, convey, and deliver to Purchaser, only the following Liabilities, without duplication and only to the extent not paid prior to the Closing Date (collectively, the "Assumed Liabilities"):

      (a)    The Liabilities of Seller from and after the Closing Date (including, for the avoidance of doubt, cure costs as contemplated in section 365(b) of the Bankruptcy Code) with respect to contracts and leases (collectively, the "Designated Contracts") that Purchaser chooses to assume at Closing, which list of Designated Contracts is included as Schedule 1.3(a) hereto and may be amended by Purchaser up to the Closing;

      (b)    A portion of the Liabilities of Seller remaining under the Pre-petition Indebtedness after payment of the Purchase Price that Purchaser chooses to assume at Closing (the "Assumed Pre-Petition Indebtedness"), which Assumed Pre-Petition Indebtedness is included as Schedule 1.3(b) hereto and may be amended by Purchaser up to the Closing;

(c)     all Liabilities (including all government charges or fees) arising out of the ownership of the Acquired Assets, in each case, from and after the Closing Date;

(d)     all Liabilities (including, for the avoidance of doubt, Taxes other than income Taxes of Seller) relating to amounts required to be paid, or actions required to be taken or not to be taken, by Purchaser under the Transaction Agreements; and

(e)     all Taxes with respect to the Acquired Assets for any taxable period (or portion thereof) beginning after the Closing Date.

1.4     Excluded Liabilities. Purchaser shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, Seller or relating to the Acquired Assets, of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing on the Closing Date or arising thereafter as a result of any act, omission, or circumstances taking place prior to the Closing Date, other than the Assumed Liabilities or any Action resulting from or otherwise relating to the Assumed Liabilities (any and all such Liabilities that are not specifically identified herein as Assumed Liabilities being referred to collectively herein as the "Excluded Liabilities").

1.5     Assumption/Rejection of Certain Contracts.

(a)     Assumption and Assignment of Executory Contracts. Seller shall provide timely and proper written notice of the motion seeking entry of the Sale Order to all parties to any executory Contracts or unexpired leases to which Seller is a party and take all other actions reasonably necessary to provide Seller with the ability to assign any Designated Contracts to Purchaser at Closing pursuant to section 365 of the Bankruptcy Code. The Sale Order shall provide that as of and conditioned on the occurrence of the Closing, Seller shall assign or cause to be assigned to Purchaser (as applicable), all of the Contracts on the final list of Designated Contracts (all such Designated Contracts that are assigned to Purchaser at Closing or following the Closing Date pursuant to this Section 1.5, the "Assigned Contracts"). Seller shall prepare a notice to be approved in connection with the motion for approval of the Sale Order that will be served on all Contract counterparties and which shall (i) identify with particularity all the Contracts that might be assumed and assigned to Purchaser and (ii) set forth Seller's good faith estimate of the amounts necessary to cure any defaults under each such Contract as determined by Seller based on Seller's books and records. The notice shall provide a process for contract counterparties to object to assumption and assignment and/or the proposed cure amounts as part of the sale process. At the Closing, Seller shall assume and assign to Purchaser all Assigned Contracts pursuant to the Sale Order, this Agreement, the Assumption and Assignment Agreement(s) (as defined herein) and any related Transaction Agreements. At the Closing: (i) cure costs (as contemplated in section 365(b) of the Bankruptcy Code, the "Cure Costs") will be paid by Purchaser and (ii) Purchaser shall assume, and thereafter in due course and in accordance with its respective terms pay, fully satisfy, discharge and/or otherwise perform all of the post-Closing obligations under each Assigned Contract pursuant to section 365 of the Bankruptcy Code. To the maximum extent permitted by the Bankruptcy Code, Seller shall use commercially reasonable efforts to assume and transfer and assign all Acquired Assets to Purchaser pursuant to sections 363 and 365 of the Bankruptcy Code

as of the Closing Date, including taking all actions required by the Bankruptcy Court to obtain a final order containing a finding that the proposed assumption and assignment of the Assigned Contracts to Purchaser satisfies all applicable requirements of section 365 of the Bankruptcy Code.

(b)    Non-Assignment.

(i)    Notwithstanding anything to the contrary in this Agreement, a Contract shall not be an Assigned Contract hereunder and shall not be assigned to, or assumed by, Purchaser to the extent that such Contract is rejected by Seller or terminated by Seller or any other party thereto, or terminates or expires by its terms, on or prior to such time as it is to be assumed by Purchaser as an Assigned Contract hereunder and is not continued or otherwise extended upon assumption.

(ii)    Notwithstanding anything to the contrary in this Agreement, to the extent an Acquired Asset requires a Consent or Governmental Authorization (other than, and in addition to, that of the Bankruptcy Court) in order to permit the sale or transfer to Purchaser of Seller's rights over such asset, and such Consent or Governmental Authorization has not been obtained prior to such time as it is to be transferred by Purchaser as an Acquired Asset hereunder, such asset shall not be transferred to, or received by, Purchaser at the Closing. In the event that any Acquired Asset is deemed not to be assigned pursuant to this clause 1.5(b)(ii), the Closing shall nonetheless take place subject to the terms and conditions set forth herein and, for the avoidance of any doubt, without any reduction of the Purchase Price.  Thereafter, through the earlier of (i) such time as such Consent or Governmental Authorization is obtained or (ii) six (6) months following the Closing Date Seller and Purchaser shall (A) use reasonable best efforts to secure such Consent or Governmental Authorization as promptly as practicable after the Closing Date and (B) cooperate in good faith in any lawful and commercially reasonable arrangement reasonably proposed by Purchaser which does not materially delay or otherwise materially frustrate the Debtor's cessation of operations and wind-up of its affairs, including subcontracting, licensing, or sublicensing to Purchaser any or all of Seller's rights and obligations with respect to any such Acquired Asset, under which (1) Purchaser shall obtain (without infringing upon the legal rights of such third party or violating any Law) the economic rights and benefits (net of the amount of any related Tax costs imposed on Seller or its Affiliates or any direct costs associated with the retention and maintenance incurred by Seller or its Affiliates) with respect to any such Acquired Asset for which a Consent and/or Governmental Authorization has not been obtained and (2) Purchaser shall assume any related burden and obligation with respect to such Acquired Asset. Upon satisfying any requisite Consent or Governmental Authorization requirement applicable to such Acquired Asset after the Closing Date, such Acquired Asset shall promptly be transferred and assigned to Purchaser in accordance with the terms of this Agreement, the Transaction Agreements, the Sale Order and the Bankruptcy Code.

## ARTICLE II

## CONSIDERATION; PAYMENT; CLOSING

2.1     Consideration; Payment.

(a)     The Purchaser shall provide the following aggregate consideration (collectively, the "Purchase Price") as payment for the Acquired Assets:

(i)     Assumption of the Assumed Liabilities;

(ii)     Full and final satisfaction of the DIP Obligations under, and as defined in, the DIP Credit Agreement including, for the avoidance of doubt, any and all inchoate obligations; and

(iii)     Final satisfaction of the Pre-Petition Indebtedness in and of an amount to make the total of 2.1(a)(ii) and this 2.1(a)(iii) an aggregate amount of $22,000,000.

2.2     Closing. The closing of the purchase and sale of the Acquired Assets, the satisfaction of the Purchase Price, the assumption of the Assumed Liabilities and the consummation of the other transactions contemplated by this Agreement and the related Transaction Agreements (the "Closing") will take place remotely via the electronic exchange of documents and signatures at 10:00 a.m. Eastern Time on the second (2nd) Business Day following full satisfaction or due waiver (by the Party entitled to the benefit of such condition) of the closing conditions set forth in Article VII (other than conditions that by their terms or nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions), or at such other place and time as the Parties may agree in writing. The date on which the Closing actually occurs is referred to herein as the "Closing Date."

2.3     Closing Deliveries by Seller. At or prior to the Closing, Seller shall deliver to Purchaser:

(a)     a bill of sale and assumption and assignment agreement in a form acceptable to the Purchaser in its sole and absolute discretion (the "Assumption and Assignment Agreement") duly executed by Seller;

(b)     assignments of membership interests, stock transfers and stock powers (as applicable) representing all of Seller's ownership interests in the Scheduled Subsidiaries;

(c)     an IRS Form W-9 executed by Seller or Seller's regarded owner for U.S. federal income Tax purposes; and

(d)     an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Seller certifying that the conditions set forth in Sections 7.2(a) and 7.2(b) have been satisfied (to the extent not otherwise waived by Purchaser).

2.4    <u>Closing Deliveries by Purchaser</u>. At the Closing, Purchaser shall deliver to (or at the direction of) Seller:

(a)    the Assumption and Assignment Agreement, duly executed by Purchaser;

(b)    evidence satisfactory to Seller that the satisfaction of the DIP Obligations and the Prepetition Indebtedness to be effectuated pursuant to <u>Section 2.1(a)</u> has occurred; and

(c)    an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Purchaser certifying that the conditions set forth in <u>Sections 7.3(a)</u> and <u>7.3(b)</u> have been satisfied (to the extent not otherwise waived by Seller).

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as (i) disclosed in any forms, statements or other documents filed with the Bankruptcy Court or (ii) set forth in the Schedules delivered by Seller concurrently herewith and subject to <u>Section 10.10</u>, Seller represents and warrants to Purchaser as follows.

3.1    <u>Organization and Qualification</u>. Each of the entities compromising Seller is a corporation or limited liability company (as the case may be, as set forth in the preamble to this Agreement), duly organized, validly existing, and in good standing under the laws of its state of formation.

3.2    <u>Authorization of Agreement</u>. Seller's execution, delivery and performance of this Agreement and the other Transaction Agreements to which it is a party, and the consummation by Seller of the transactions contemplated hereby and thereby, subject to requisite Bankruptcy Court approvals, have been duly authorized by all requisite corporate action and no other corporate proceedings on its part are necessary to authorize the execution, delivery and performance by Seller of this Agreement or any other Transaction Agreements and the consummation by Seller of the transactions contemplated hereby and thereby. Subject to requisite Bankruptcy Court approvals, this Agreement and the other Transaction Agreements to which Seller is a party have been, or will be, duly executed and delivered by Seller and, assuming due authorization, execution and delivery hereof and thereof by the other parties hereto and thereto, constitute, or will constitute, legal, valid and binding obligations of Seller, enforceable against Seller in accordance with their terms, except that such enforceability (a) may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other similar Laws of general application affecting or relating to the enforcement of creditors' rights generally and (b) is subject to general principles of equity, whether considered in a proceeding at law or in equity (collectively, the "<u>Enforceability Exceptions</u>").

3.3    <u>Conflicts; Consents</u>. Assuming that (a) requisite Bankruptcy Court approvals are obtained and (b) the notices, authorizations, approvals, Orders, permits or consents set forth on <u>Schedule 3.3</u> hereto are made, given or obtained (as applicable), neither the execution and delivery by Seller of this Agreement or the other Transaction Agreements, nor the consummation by Seller of the transactions contemplated hereby or thereby, nor performance or compliance by Seller with any of the terms or provisions hereof or thereof, will (i) conflict with or violate any provision of

6

Seller's certificate of incorporation or bylaws (except to the extent permitted by the Bankruptcy Court or otherwise trumped by the requisite Bankruptcy Court approvals) or (ii) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any properties or assets of Seller.

3.4 <u>Assigned Contracts</u>. Subject to requisite Bankruptcy Court approvals and assumption by Seller of the applicable Assigned Contract in accordance with applicable Law and except (i) as a result of the commencement of the Bankruptcy Case and (ii) with respect to any Assigned Contract that has previously expired in accordance with its terms, been terminated, restated, or replaced: (A) each Assigned Contract is valid and binding on Seller and (to the Knowledge of Seller) each other party thereto, and, is in full force and effect (to the Knowledge of Seller as to any counterparty), subject to any Enforceability Exceptions; (B) Seller, and, to the Knowledge of Seller, any other party thereto, has performed all obligations required to be performed by it under each Assigned Contract save and except, in the case of Seller, the payment of any Cure Costs that are to be paid by Purchaser pursuant to this Agreement, the Assumption & Assignment Agreement, or any related Transaction Agreements; (C) Seller has received no written notice of the existence of any breach or default on the part of Seller under any Assigned Contract; (D) there are no events or conditions which, after either notice or lapse of time or both, will constitute a material default on the part of Seller, or to the Knowledge of Seller, any counterparty under such Assigned Contract, which will not be cured by virtue of their assignment and payment of the Cure Costs; and (E) to the Knowledge of Seller, Seller has not received any written notice from any Person that such Person intends to terminate or not renew any Assigned Contract except as has been disclosed in writing by Seller to Purchaser within five business days of receipt thereof.

3.5 <u>Brokers</u>. Other than with respect to the investment banker that Seller intends to retain in connection with its Bankruptcy Case pursuant to Order of the Bankruptcy Court (the "<u>Investment Banker</u>"), no broker, investment banker, financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission, or the reimbursement of expenses in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of Seller. All such brokers' fees, specifically including any and all fees attributable to its Investment Banker, shall be the sole responsibility of the Seller.

3.6 <u>No Additional Representations or Warranties</u>. Except for the representations and warranties contained in this Agreement and the related Transaction Agreements, Purchaser acknowledges that neither Seller nor any other Person on behalf of Seller makes any other express or implied representation or warranty with respect to Seller, the Acquired Assets, the Excluded Assets, the Assumed Liabilities, the Excluded Liabilities or with respect to any other information provided to Purchaser by Seller.

### ARTICLE IV

### REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Seller as follows.

4.1 <u>Organization and Qualification</u>. Purchaser is a limited liability company duly organized under the laws of the State of Delaware and has all requisite power and authority

necessary to carry on its business as it is now being conducted. Purchaser is duly licensed or qualified to do business and is in good standing (where such concept is recognized under applicable Law) in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets leased by it makes such licensing or qualification necessary, except where the failure to be so licensed, qualified or in good standing would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on Purchaser's ability to consummate the transactions contemplated by this Agreement and the other Transaction Agreements.

4.2    Authorization of Agreement. Purchaser has all necessary power and authority to execute and deliver this Agreement and the other Transaction Agreements to which it is a party and to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance by Purchaser of this Agreement and the other Transaction Agreements to which it is a party, and the consummation by Purchaser of the transactions contemplated hereby and thereby, have been duly authorized by all requisite corporate or similar organizational action and no other corporate or similar organizational proceedings on its part are necessary to authorize the execution, delivery and performance by Purchaser of this Agreement and the other Transaction Agreements to which it is a party and the consummation by it of the transactions contemplated hereby and thereby. This Agreement and the other Transaction Agreements to which it is a party have been, or will be, duly executed and delivered by Purchaser and, assuming due authorization, execution and delivery hereof and thereof by the other parties hereto and thereto, constitute legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their terms, except that such enforceability may be limited by the Enforceability Exceptions.

4.3    Conflicts; Consents. Assuming that (a) requisite Bankruptcy Court approvals are obtained and any requisite notices or filings are delivered to or filed with the Bankruptcy Court, and (b) the notices, authorizations, approvals, Orders, permits or consents set forth on Schedule 4.3 hereto are made, given or obtained (as applicable), neither the execution and delivery by Purchaser of this Agreement or the other Transaction Agreements to which it is a party, nor the consummation by Purchaser of the transactions contemplated hereby or thereby, nor performance or compliance by Purchaser with any of the terms or provisions hereof or thereof, will (i) conflict with or violate any provision of Purchaser's articles of incorporation or bylaws or similar organizational documents, (ii) violate any Law or Order applicable to Purchaser or its assets or require Purchaser to file, seek, or obtain any notice, authorization, approval, Order, permit, or registration with or consent of or with any Governmental Body, (iii) violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or give rise to a right of termination, modification, or cancelation of any obligation or to the loss of any benefit, any of the terms or provisions of any loan or credit agreement or other Contract to which Purchaser is a party or by which it or its assets are bound or accelerate Purchaser's obligations under any such Contract, or (iv) result in the creation of any Encumbrance on any properties or assets of Purchaser or any of its Subsidiaries, except, in the case of clauses (ii) through (iv), as would not, individually or in the aggregate, reasonably be expected to prevent or materially impair, alter or delay the ability of Purchaser to consummate the transactions contemplated under this Agreement and the other

Transaction Agreements and to perform and comply with the terms and provisions hereunder and thereunder.

4.4    <u>Financing</u>. Purchaser has, and at all times from the date hereof through the Closing Date will have, sufficient funds in an aggregate amount necessary to satisfy the Purchase Price, to perform the Assumed Liabilities as they become due in accordance with their terms and to consummate all of the other transactions contemplated by this Agreement and the other Transaction Agreements. Purchaser is and shall be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assigned Contracts and the related Assumed Liabilities. Purchaser acknowledges that its obligations under this Agreement are not subject to any conditions regarding its ability to obtain financing for any portion or all of the Purchase Price.

4.5    <u>No Litigation</u>. There are no Actions pending or, to Purchaser's Knowledge, threatened against or affecting Purchaser that seek to prevent, restrain, materially delay, prohibit or otherwise challenge the consummation, legality or validity of the transactions contemplated hereby (or by the other Transaction Agreements) or that would, individually or in the aggregate, reasonably be expected to delay the Closing or that would otherwise adversely affect Purchaser's performance of its obligations, covenants, or the consummation of the transactions contemplated by this Agreement or the other Transaction Agreements to which it is a party.

4.6    <u>Certain Arrangements</u>. As of the date hereof, there are no Contracts, undertakings, commitments, agreements or obligations, whether written or oral, between any member of the Purchaser Group, on the one hand, and any member of the management of Seller or its board of directors, any holder of equity or debt securities of Seller, or any lender or creditor of Seller, on the other hand, relating in any way to the acquisition of the Acquired Assets, the assumption of the Assumed Liabilities or the transactions contemplated by this Agreement or the Transaction Agreements or that would be reasonably likely to prevent, restrict, impede or affect adversely the ability of Seller to entertain, negotiate or participate in any such transactions.

4.7    <u>Solvency</u>. As of the date hereof Purchaser is, and immediately after giving effect to the transactions contemplated hereby and by the other Transaction Agreements, Purchaser shall be, Solvent. "<u>Solvent</u>" means, with respect to any Person, such Person: (a) is able to pay its debts as they become due; (b) owns property that has a fair saleable value greater than the amounts required to pay its debt (including a reasonable estimate of the amount of all contingent Liabilities) and (c) has adequate capital to carry on its business. No transfer of property is being made and no obligation is being incurred in connection with the transactions contemplated hereby with the intent to hinder, delay or defraud either present or future creditors of Purchaser or Seller. Purchaser has not incurred, and does not plan to incur, debts beyond its ability to pay as they become absolute and matured. There are no bankruptcy, reorganization or arrangement Actions pending, being contemplated by or, to the knowledge of Purchaser, threatened against Purchaser.

4.8    <u>No Additional Representations or Warranties</u>. Except for the representations and warranties contained in the Transaction Agreements, Seller acknowledges that neither Purchaser nor any other Person on behalf of Purchaser makes any other express or implied representation or warranty with respect to Purchaser or with respect to any other information provided to Seller by Purchaser.

9

**ARTICLE V**

**BANKRUPTCY COURT MATTERS**

5.1    <u>Bankruptcy Actions</u>.

(a)    On the day of the filing of its Bankruptcy Case, Seller shall file motions with the Bankruptcy Court seeking approval of the Bidding Procedures Order and the Sale Order; <u>provided</u> <u>that</u> Seller may modify such motions pursuant to discussions with the United States Trustee assigned to the Bankruptcy Case, the Bankruptcy Court, any creditor or committee representing a group of creditors in the Bankruptcy Case, or any other party in interest, with such modifications in form and substance acceptable to Purchaser in its sole and absolute discretion.

(b)    Seller shall comply with all of its obligations under the Bidding Procedures Order and the Sale Order (after entry of such Orders by the Bankruptcy Court). Without limiting the generality of the foregoing, Seller shall seek approval of Purchaser as the stalking horse bidder for the Acquired Assets entitled to the protections of the Break-Up Fee and the Expense Reimbursement contemplated in Section 5.1(f) hereof.

(c)    From the date hereof until the earlier of (i) the termination of this Agreement in accordance with <u>Article VIII</u> hereof or (ii) the Closing Date, Seller shall use commercially reasonable efforts to obtain entry by the Bankruptcy Court of the Bidding Procedures Order and the Sale Order.

(d)    Purchaser shall promptly take all actions as are reasonably requested by Seller to assist in obtaining the Bankruptcy Court's entry of the Sale Order, and any other Order reasonably necessary in connection with the transactions contemplated by this Agreement as promptly as practicable, including furnishing affidavits, financial information, or other documents or information for filing with the Bankruptcy Court and making such employees and other Advisors of Purchaser and its Affiliates available to testify before the Bankruptcy Court for the purposes of, among other things, providing necessary assurances of performance by Purchaser under this Agreement, and demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code, as well as demonstrating Purchaser's ability to pay and perform or otherwise satisfy any Assumed Liabilities following the Closing.

(e)    Each of Seller and Purchaser shall (i) appear formally or informally in the Bankruptcy Court if reasonably requested by the other Party or required by the Bankruptcy Court in connection with the transactions contemplated by this Agreement or the other Transaction Agreements and (ii) keep the other reasonably apprised of the status of material matters related to this Agreement or the other Transaction Agreements, including, upon reasonable request, promptly furnishing the other with copies of notices or other communications received by such Party from the Bankruptcy Court with respect to the transactions contemplated hereunder or thereunder.

(f)    If an Auction is conducted, and Purchaser is not the prevailing party at the conclusion of such Auction (such prevailing party or parties, the "<u>Successful Bidder</u>") but is the next highest bidder at the Auction, Purchaser shall be required to serve as a back-up bidder (the "<u>Backup Bidder</u>") and keep Purchaser's bid to consummate the transactions contemplated by this

Agreement on the terms and conditions set forth in this Agreement and the other Transaction Agreements (as the same may be revised in the Auction) open and irrevocable until the later of (i) thirty (30) days following the hearing to consider the Sale Order or (ii) such date as this Agreement is terminated in accordance with Section 8.1 hereof. If the Successful Bidder fails to consummate the applicable Alternative Transaction as a result of a breach or failure to perform on the part of such Successful Bidder, the Backup Bidder will be deemed to have the new prevailing bid, and Seller may consummate the transactions contemplated by this Agreement and the other Transaction Agreements on the terms and conditions set forth in this Agreement (as the same may have been improved upon in the Auction).

(g)     This Agreement shall serve as the Stalking Horse Bid for the marketing and sale of the Acquired Assets and the Assumed Liabilities in the Bankruptcy Case, including, but not limited to, in connection with the Auction.  In light of Purchaser submitting the opening bid and acting as a "stalking horse buyer" for the Acquired Assets and the Assumed Liabilities (*i.e.*, having its bid be subject to higher and better bids as described above), the Bidding Procedures Order shall grant the Purchaser the following protections:

(i)     Purchaser shall receive a break-up fee of Three Percent (3%) of the portion of the Purchase Price consisting of the satisfaction of the DIP Obligations and the Pre-Petition Indebtedness set forth in Section 2.1(a)(ii) and (iii) hereof (the "Break-Up Fee") in the event that (a) the Purchaser is not selected by the Seller as the Successful Bidder or Backup Bidder at the Auction, (b) an Alternative Transaction to the Successful Bidder (or a back-up bidder other than the Purchaser) closes, or (c) Seller terminates under Section 8.1(i) hereof (together, the "Bid Protection Trigger Events").

For the avoidance of doubt, if the Break-Up Fee becomes due pursuant to the terms of this Agreement and the Sale Order, such fee shall be paid only once.

(ii)     Upon either (1) the occurrence of a Covered Termination (as defined herein) or (2) the occurrence of the Bid Protection Trigger Events, in accordance with the Bidding Procedures Order, Seller shall pay Purchaser by wire transfer to an account designated by Purchaser, reimbursement of all reasonable costs and expenses incurred in connection with Purchaser's efforts to negotiate and consummate the Transaction contemplated herein (including, without limitation, all fees and expenses of Purchaser's attorneys and other Advisors), provided, however, that such reimbursement shall be capped at $300,000 (the "Expense Reimbursement").

(iii)     The Break-Up Fee and/or the Expense Reimbursement shall be paid within five (5) Business Days after the later of (a) the closing of an Alternative Transaction, (b) the date on which Seller terminates under Section 8.1(i), or (c) the date upon which Purchaser provides Seller with summary documentation (redacted as appropriate for attorney-client privilege and work product issues) setting forth the reasonable costs and expenses incurred by Purchaser that are subject to the Expense Reimbursement, as applicable.

(iv)     To the extent the Break-Up Fee and/or the Expense Reimbursement become due pursuant to the terms of this Agreement, the Bidding Procedures Order, and/or the Sale Order, such Break-Up Fee and/or Expense Reimbursement shall be entitled to priority ahead of all other administrative priorities which may be or have been incurred in the Bankruptcy Case

(subject to any "Carve-Out" under the DIP Credit Agreement or any other debtor in possession financing) and shall not be subject to any encumbrances granted or suffered by Seller (including, but not limited to, all liens and claims); *provided, however*, that the Break-Up Fee and Expense Reimbursement shall be payable directly out of the proceeds of, and as a precondition to an alternative transaction. Notwithstanding anything to the contrary in this Agreement (if any), in the event a Covered Termination or the Bid Protection Triggering Events occur, Purchaser shall make no other claims against Seller arising hereunder other than with respect to the Break-Up Fee and/or Expense Reimbursement, as applicable. The Break-Up Fee, Expense Reimbursement and other protections described hereunder and in the Bidding Procedures Order shall be referred to in this Agreement as the "Bid Protections." Upon the filing of its Bankruptcy Case, Seller shall seek the Bankruptcy Court's approval of the Bid Protections through the Bidding Procedures Order, the Sale Order, or such other motion or Order as is otherwise appropriate.

(v)     If an Auction is conducted, any Potential Bidder, as that term is defined in the Bidding Procedures, must (a) provide a cash deposit in an amount equal to 10% of the purchase price of such bid, (b) provide a markup of this Agreement showing any changes that the Proposed Bidder is seeking, and (c) submit an initial minimum overbid of Five Hundred Thousand and 00/100 Dollars ($500,000) above the Purchase Price with subsequent overbids increasing in a minimum amount of Fifty Thousand and 00/100 Dollars ($50,000), subject to increase based on agreement among Seller and Purchaser.

(h)     Seller and Purchaser acknowledge that this Agreement and the sale of the Acquired Assets are subject to higher and better bids and Bankruptcy Court approval. Purchaser acknowledges that Seller must take reasonable steps to demonstrate that it has sought to obtain the highest or otherwise best price for the Acquired Assets, including giving notice thereof to the creditors of the Seller and other interested parties, providing information about Seller to prospective bidders, entertaining higher and better offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the Acquired Assets (or any portion thereof in connection with an Alternative Transaction), conducting an Auction. The bidding procedures to be employed with respect to this Agreement and any Auction shall be those reflected in the Bidding Procedures Order.

(i)     Notwithstanding any other provision of this Agreement to the contrary, Purchaser acknowledges that Seller and its Affiliates and Advisors are and may continue soliciting inquiries, proposals or offers for the Acquired Assets in connection with any Alternative Transaction.

(j)     Purchaser shall provide adequate assurance of future performance as required under section 365 of the Bankruptcy Code for the Assigned Contracts. Purchaser agrees that it will take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assigned Contracts, such as furnishing affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making Purchaser's Advisors available to testify before the Bankruptcy Court.

(k)    Nothing in this <u>Section 5.1</u> shall prevent Seller from modifying the bidding procedures as necessary or appropriate, in consultation with Pre-Petition Lenders, to maximize value for Seller's estate in accordance with Seller's fiduciary obligations.

5.2    <u>Cure Costs</u>. Subject to entry of the Sale Order, Purchaser shall, on or prior to the Closing Date (or, in the case of any Contract that is to be assigned following the Closing Date pursuant to <u>Section 1.5</u>, on or prior to the date of such assignment), pay the Cure Costs and cure any and all other defaults and breaches under the Assigned Contracts so that such Contracts may be assumed by Seller and assigned to Purchaser in accordance with the provisions of section 365 of the Bankruptcy Code and this Agreement.

5.3    <u>Sale Order</u>. The Sale Order shall, among other things, (a) approve, pursuant to sections 105, 363, and 365 of the Bankruptcy Code, (i) the execution, delivery and performance by Seller of this Agreement, (ii) the sale of the Acquired Assets to Purchaser on the terms set forth herein and free and clear of all Encumbrances (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances) and the assumption of the Assumed Liabilities on the terms set forth herein, and (iii) the performance by Seller of its obligations under this Agreement, (b) authorize and empower Seller to assume and assign to Purchaser the Assigned Contracts, (c) find that Purchaser is a "good faith" buyer within the meaning of section 363(m) of the Bankruptcy Code, find that Purchaser is not a successor to Seller, and grant Purchaser the protections of section 363(m) of the Bankruptcy Code, (d) find that Purchaser shall have no Liability or responsibility for any Liability or other obligation of Seller arising under or related to the Acquired Assets as of the Closing Date other than as expressly set forth in this Agreement, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, environmental, successor, or transferee Liability, labor law, de facto merger, or substantial continuity, (e) find that Purchaser has provided adequate assurance (as that term is used in section 365 of the Bankruptcy Code) of future performance in connection with the assumption of the Assigned Contracts and (f) find that Purchaser has no Liability for any Excluded Liability. Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining Bankruptcy Court approval of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (x) demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code and (y) establishing adequate assurance of future performance within the meaning of section 365 of the Bankruptcy Code.

5.4    <u>Approval</u>. Seller's obligations under this Agreement and in connection with the transactions contemplated hereby are subject to entry of and, to the extent entered, the terms of any Orders of the Bankruptcy Court (including entry of the Sale Order). Nothing in this Agreement or any of the other Transaction Agreements shall require Seller, its Advisors or its Affiliates to give testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or its stakeholders.

## ARTICLE VI

## COVENANTS AND AGREEMENTS

6.1    Conduct of Business of Seller.

(a)    Except (i) as required by applicable Law, Order or a Governmental Body, (ii) as required, limited or prohibited by the Bankruptcy Court, the Bankruptcy Case or the Bankruptcy Code or Seller's debtor-in-possession financing or use of cash collateral, as the case may be, (iii) as expressly contemplated, required or permitted by this Agreement or the other Transaction Agreements, (iv) to the extent related to an Excluded Asset or an Excluded Liability or (v) as set forth on Schedule 6.1(a) hereto, during the period from the date of this Agreement until the Closing Date (or such earlier date and time on which this Agreement is terminated pursuant to Article VIII), unless Purchaser otherwise consents in writing (such consent not to be unreasonably withheld, delayed or conditioned), Seller shall operate its business and the business of any of its Subsidiaries in the Ordinary Course and shall not:

(i)    sell or lease to any Person, in a single transaction or series of related transactions, any of the Acquired Assets, except (A) Ordinary Course dispositions of obsolete, surplus or worn-out assets or assets that are no longer used or useful in the conduct of the business of Seller and (B) other sales and leases in the Ordinary Course;

(ii)    grant any Encumbrance (other than Permitted Encumbrances) on any material Acquired Assets other than to secure indebtedness under the DIP Credit Agreement and indebtedness or other obligations in existence at the date of this Agreement (and required to be so secured by their terms);

(iii)    take any action that is not consistent with Seller's operation of its business in the Ordinary Course in any material respects; or

(iv)    authorize any of, or commit or agree, in writing or otherwise, to take any of, the foregoing actions.

(b)    Nothing contained in this Agreement is intended to give Purchaser or its Affiliates, directly or indirectly, the right to control or direct Seller's or its Subsidiaries' operations or business prior to the Closing, and nothing contained in this Agreement is intended to give Seller, directly or indirectly, the right to control or direct Purchaser's or its Subsidiaries' operations. Prior to the Closing, each of Purchaser and Seller shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over its and its Subsidiaries' respective operations.

6.2    Due Diligence; Access to Information.

(a)    This Agreement is subject to continued due diligence by Purchaser into the condition and suitability of the Acquired Assets through October 31, 2024 (the "Diligence Period"). During the Diligence Period, Seller shall use good faith efforts to provide Purchaser with any and all documentation and all access reasonably requested by Purchaser. Purchaser may

14

terminate this Agreement at any time during the Diligence Period if it determines, in its sole and absolute discretion, that the Acquired Assets are not satisfactory to Purchaser for any reason.

(b)     From the date hereof until the Closing Date (or the earlier termination of this Agreement pursuant to Article VIII), Seller will provide Purchaser and its authorized Advisors with access to the books and records of Seller upon reasonable advance notice and during regular business hours, in order for Purchaser and its authorized Advisors to access such information regarding the Acquired Assets and the Assumed Liabilities as is necessary in Purchaser's discretion in order to consummate the transactions contemplated by this Agreement; provided that (i) such access does not unreasonably interfere with the normal operations of Seller, and (ii) nothing herein will require Seller to provide access to, or to disclose any information to, Purchaser if such access or disclosure (A) would waive any legal privilege or (B) would be in violation of applicable Laws, fiduciary duty, or the provisions of any agreement to which Seller is bound.

(c)     From and after the Closing Date, Seller covenants and agrees with Purchaser that it will not at any time, except in performance of its obligations hereunder, directly or indirectly, disclose or publish, or permit its employees, agents or representatives to disclose or publish, any confidential information relating to the Acquired Assets and Assumed Liabilities or use any such information in a manner that could reasonably be expected to be detrimental to the interests of Purchaser, unless (a) such disclosure is made to the Investment Banker, (b) such disclosure is made to a Potential Bidder, as that term is defined in the Bidding Procedures, pursuant and subject to the terms of the Bidding Procedures and the Bidding Procedures Order, and execution of a non-disclosure or confidentiality agreement customary for such a transaction, (c) such information becomes generally known to the public through no fault of a Seller or its employees, agents or representatives, (d) Seller or the disclosing party is advised in writing by counsel that disclosure is required by Law, (e) Seller or the disclosing party reasonably believes that such disclosure is required in connection with a subpoena served upon or in the defense of a lawsuit against the disclosing party, or (f) to the extent the Seller or the disclosing party reasonably believes that such disclosure is required to enforce the disclosing party's rights under this Agreement; provided that, prior to disclosing any information pursuant to clauses (d) and (e) above, such Person shall give prior notice, if permitted by applicable Law, to Purchaser and, to the extent practicable, provide Purchaser with the opportunity to contest such disclosure and shall reasonably cooperate with efforts to prevent such disclosure.

6.3     Reasonable Efforts; Cooperation.

(a)     Subject to the other terms of this Agreement, each Party shall, and shall cause its Advisors to, use its reasonable best efforts to perform its obligations hereunder and to take, or cause to be taken, and do, or cause to be done, all things necessary, proper or advisable to cause the transactions contemplated herein and by the other Transaction Agreements to be effected as soon as practicable, but in any event on or prior to the Outside Date, in accordance with the terms hereof and to cooperate with each other Party and its Advisors in connection with any step required to be taken as a part of its obligations hereunder.

(b)     The obligations of Seller pursuant to this Agreement, including this Section 6.3, shall be subject to any Orders entered, or approvals or authorizations granted or

15

required, by or under the Bankruptcy Court or the Bankruptcy Code (including in connection with the Bankruptcy Case), Seller's debtor-in-possession financing, and Seller's obligations as a debtor-in-possession to comply with any Order of the Bankruptcy Court (including the Bidding Procedures Order and the Sale Order) and Seller's duty to seek and obtain the highest or otherwise best price for the Acquired Assets as required by the Bankruptcy Code.

      6.4    <u>Further Assurances; Receipt of Misdirected Assets</u>.

      (a)    From time to time, as and when requested by any Party and at such requesting Party's expense, any other Party will execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, all such conveyances, notices, assumptions assignments, releases, documents and instruments and will take, or cause to be taken, all such further or other actions as such requesting Party may reasonably deem necessary or desirable to evidence and effectuate the transactions contemplated by this Agreement; <u>provided</u> that nothing in this <u>Section 6.4</u> will prohibit Seller or any Affiliate of Seller from ceasing operations or winding up its affairs following the Closing.

      (b)    From and after the Closing, if Seller receives any right, property, or asset that is an Acquired Asset, Seller shall promptly transfer such right, property, or asset to Purchaser, and such asset will be deemed the property of Purchaser held in trust by Seller for Purchaser until so transferred. From and after the Closing, if Purchaser receives any right, property, or asset that is an Excluded Asset, Purchaser shall promptly transfer such asset to Seller, and such asset will be deemed the property of Seller held in trust by Purchaser for Seller until so transferred.

      6.5    <u>Employees</u>. Purchaser may enter into employment agreements to take effect upon the Closing with such senior executives and employees of Seller that are agreed to among Purchaser and such executives and employees, as the case may be. Seller authorizes Purchaser to engage in discussions with such senior executives and employees as to the terms of their employment agreements prior to the Auction.

**ARTICLE VII**

**CONDITIONS TO CLOSING**

      7.1    <u>Conditions Precedent to the Obligations of Purchaser and Seller</u>. The respective obligations of each Party to this Agreement to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, joint written waiver by Seller and Purchaser) on or prior to the Closing Date, of each of the following conditions:

      (a)    no court of competent jurisdiction shall have issued, enacted, entered, promulgated or enforced any Order (including any temporary restraining Order or preliminary or permanent injunction) restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement that is still in effect; and

      (b)    the Bankruptcy Court shall have entered the Sale Order in form and substance acceptable to Purchaser in its sole and absolute discretion.

16

7.2     <u>Conditions Precedent to the Obligations of Purchaser</u>. The obligations of Purchaser to consummate the transactions contemplated by this Agreement are subject to the Diligence Period having expired or been waived in writing by Purchaser and the satisfaction (or to the extent permitted by Law, written waiver by Purchaser in its sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)     (i) the representations and warranties of Seller set forth in <u>Article III</u> shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date, except that representations and warranties that are made as of a specified date need be true and correct in all material respects as of such date;

(b)     Seller shall not have breached in a manner that is material with respect to the transactions contemplated hereby, taken as a whole, the covenants required to be performed or complied with by Seller under this Agreement on or prior to the Closing Date (or will have cured any such breach to the extent necessary to satisfy this condition);

(c)     No Event of Default under the DIP Credit Agreement shall have occurred and be continuing;

(d)     Seller shall have changed its name to a name that does not contain the terms "FFI," "Film Finances," or any other terms or words that are similar thereto;

(e)     Seller shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in <u>Section 2.3</u>;

(f)     Purchaser shall have entered into employment agreements with the following employees of Seller: Peter Coleman, Billy Cheung, Gregory Trattner, and Steve Berman; and

(g)     Purchaser shall have received reasonably satisfactory evidence that Seller has made all premium and other payments required to be made by Seller prior to the Closing Date in order to allow Purchaser to continue Seller's current liability insurance coverage after the Closing.

7.3     <u>Conditions Precedent to the Obligations of Seller</u>. The obligations of Seller to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver by Seller in its sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)     the representations and warranties made by Purchaser in <u>Article IV</u> shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date, except that representations and warranties that are made as of a specified date need be true and correct only as of such date;

(b)     Purchaser shall not have breached in a manner that is material with respect to the transactions contemplated hereby, taken as a whole, the covenants required to be performed or complied with by it under this Agreement on or prior to the Closing Date (or will have cured any such breach to the extent necessary to satisfy this condition); and

(c)     Purchaser shall have delivered, or caused to be delivered, to Seller all of the items set forth in Section 2.4.

7.4     Waiver of Conditions. Upon the occurrence of the Closing, any condition set forth in this Article VII that was not satisfied as of the Closing Date will be deemed to have been waived for all purposes by the Party having the benefit of such condition as of and after the Closing. Neither Purchaser nor Seller may rely on the failure of any condition set forth in this Article VII, as applicable, to be satisfied if such failure was caused by such Party's failure to perform any of its obligations under this Agreement, including its obligation to use its reasonable best efforts to consummate the transactions contemplated hereby as required under this Agreement.

## ARTICLE VIII

## TERMINATION

8.1     Termination of Agreement. This Agreement may be terminated only in accordance with this Section 8.1. This Agreement may be terminated at any time prior to the Closing:

(a)     by the mutual written consent of Seller and Purchaser;

(b)     by written notice of Purchaser to Seller pursuant to Section 6.2;

(c)     by written notice of either Purchaser or Seller, upon the issuance of an Order by a court of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement or declaring unlawful the transactions contemplated by this Agreement, and such Order having become final, binding and non-appealable; provided that no termination may be made by a Party under this Section 8.1(c) if the issuance of such Order was caused by such Party's breach of its representations, warranties, covenants or failure to perform any of its obligations under this Agreement;

(d)     by written notice of either Purchaser or Seller, if the Closing Date shall not have occurred on or before the date which is 90 days following the day of the filing of its Bankruptcy Case, which date may be extended by mutual written agreement of the Parties (the "Outside Date") (or such later date as provided in Section 8.1(g) to the extent applicable); provided that a Party shall not be permitted to terminate this Agreement pursuant to this Section 8.1(d) if such Party is in material breach or violation of its representations, warranties, covenants or obligations under this Agreement;

(e)     by written notice of either Purchaser or Seller, if the Bankruptcy Case is dismissed or converted to a case or cases under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs or reorganization of Seller is appointed in the Bankruptcy Case;

(f)     by written notice from Seller to Purchaser, upon a material breach of any covenant or agreement on the part of Purchaser, or if any representation or warranty of Purchaser will have become untrue, in each case, such that the conditions set forth in Section 7.3(a) or 7.3(b) would not be satisfied, including a breach of Purchaser's obligation to consummate the Closing; provided that (i) if such breach is curable by Purchaser then Seller may not terminate this

Agreement under this <u>Section 8.1(f)</u> unless such breach has not been cured by the date which is the earlier of (A) two (2) Business Days prior to the Outside Date and (B) thirty (30) days after Seller notifies Purchaser of such breach and (ii) the right to terminate this Agreement pursuant to this <u>Section 8.1(f)</u> will not be available to Seller at any time that Seller is in material breach of, any covenant, representation or warranty hereunder;

(g)     by written notice from Purchaser to Seller, upon a breach of any covenant or agreement on the part of Seller, or if any representation or warranty of Seller will have become untrue in any material respect, in each case, such that the conditions set forth in <u>Section 7.2(a)</u> or <u>7.2(b)</u> would not be satisfied; <u>provided</u> that (i) if such breach is curable by Seller then Purchaser may not terminate this Agreement under this <u>Section 8.1(g)</u> unless such breach has not been cured by the date which is the earlier of (A) two (2) Business Days prior to the Outside Date and (B) thirty (30) days after Purchaser notifies Seller of such breach and (ii) the right to terminate this Agreement pursuant to this <u>Section 8.1(g)</u> will not be available to Purchaser at any time that Purchaser is in material breach of, any covenant, representation or warranty hereunder;

(h)     by written notice from Seller to Purchaser, if all of the conditions set forth in <u>Sections 7.1</u> and <u>7.2</u> have been satisfied (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) or waived and Purchaser fails to complete the Closing at the time required by <u>Section 2.2</u>;

(i)     by written notice from Seller to Purchaser, if Seller or the board of directors (or similar governing body) of Seller determines that proceeding with the transactions contemplated by this Agreement or failing to terminate this Agreement would be inconsistent with its fiduciary duties;

(j)     by written notice of either Purchaser or Seller, if (i) Seller enters into one or more Alternative Transactions with one or more Persons other than Purchaser or the Successful Bidder or the Backup Bidder at the Auction or (ii) the Bankruptcy Court approves an Alternative Transaction other than with the Successful Bidder or the Backup Bidder; or

(k)     by written notice from Seller to Purchaser if Purchaser is not the Successful Bidder or the Backup Bidder at the Auction.

8.2     <u>Effect of Termination</u>.  In the event of termination of this Agreement pursuant to <u>Section 8.1</u>, this Agreement shall forthwith become void and there shall be no Liability on the part of any Party or any of its Advisors other than the Seller's Liability for the Break-Up Fee and/or Expense Reimbursement pursuant to the terms and conditions of <u>Section 5.1(g)</u> hereof; <u>provided that</u> <u>Section 6.2(b)</u>, this <u>Section 8.2</u> and <u>Article X</u> shall survive any such termination; <u>provided further</u> that no termination will relieve Purchaser from any Liability for damages, losses, costs or expenses (which the Parties acknowledge and agree shall not be limited to reimbursement of expenses or out-of-pocket costs) resulting from any breach of this Agreement prior to the date of such termination (which, for the avoidance of doubt, will be deemed to include any failure by Purchaser to consummate the Closing if and when it is obligated to do so hereunder). Subject to <u>Section 10.12</u>, nothing in this <u>Section 8.2</u> will be deemed to impair the right of any Party to be entitled to specific performance or other equitable remedies to enforce specifically the terms and provisions of this Agreement.  If this Agreement is terminated as provided herein each Party shall

redeliver all documents, work papers (which a Party could not assert attorney-client privilege to such work paper) and other material of any other Party relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof, to the Party furnishing the same.

## ARTICLE IX

## TAXES

9.1    Transfer Taxes. Any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, use or other Taxes and recording charges payable by reason of the sale of the Acquired Assets or the assumption of the Assumed Liabilities under this Agreement or the transactions contemplated hereby (the "Transfer Taxes") shall be borne and timely paid 100% by Seller, and Seller shall timely file all Tax Returns related to any Transfer Taxes.

9.2    Allocation of Purchase Price. For U.S. federal and applicable state and local income Tax purposes, the Purchase Price (and any Assumed Liabilities or other amounts treated as part of the purchase price for U.S. federal income Tax purposes) shall be allocated among the Acquired Assets in accordance with a methodology to be mutually agreed upon (the "Allocation"), in a manner consistent with Tax Code Section 1060, the regulations promulgated thereunder, and any comparable provision of any state, local, or foreign law. As soon as commercially practicable, but no later than forty-five (45) days following the determination of the final Purchase Price, Purchaser shall deliver the Allocation to Seller. The Parties and their respective Affiliates shall file all Tax Returns, including Internal Revenue Service Form 8594, in accordance with such Allocation (as finally determined under this Section 9.2) and not take any Tax related action inconsistent with the Allocation, in each case, unless otherwise required applicable Law.

9.3    Cooperation. Purchaser and Seller shall reasonably cooperate, as and to the extent reasonably requested by the other Party, in connection with the filing of Tax Returns and any Action, audit, litigation, or other proceeding with respect to Taxes.

9.4    Preparation of Tax Returns and Payment of Taxes. Seller shall timely file all Tax Returns with respect to the Acquired Assets for any taxable period ending on or before the Closing Date and shall timely remit to the proper Governmental Body any and all Taxes due in connection with such Tax Returns.

## ARTICLE X

## MISCELLANEOUS

10.1    Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers. Each of the representations and warranties and the covenants and agreements (to the extent such covenant or agreement contemplates or requires performance by such Party prior to the Closing) of the Parties set forth in this Agreement or any other Transaction Agreements will terminate effective immediately as of the Closing such that no claim for breach of any such representation, warranty, covenant or agreement, detrimental reliance or other right or remedy (whether in contract, in tort or at law or in equity) may be brought with respect thereto after the Closing. Each covenant and agreement that explicitly contemplates performance after the Closing,

will, in each case and to such extent, expressly survive the Closing in accordance with its terms, and if no term is specified, then for five (5) years following the Closing Date, and nothing in this Section 10.1 will be deemed to limit any rights or remedies of any Person for breach of any such surviving covenant or agreement. Purchaser and Seller acknowledge and agree that the agreements contained in this Section 10.1 (a) require performance after the Closing Date to the maximum extent permitted by applicable Law and will survive the Closing for five (5) years and (b) are an integral part of the transactions contemplated hereby and that, without the agreements set forth in this Section 10.1, none of the Parties would enter into this Agreement.

10.2   Expenses. Whether or not the Closing takes place, except as otherwise provided herein (including, for the avoidance of doubt, Section 5.1(g) and Section 8.2), all fees, costs and expenses (including fees, costs and expenses of Advisors) incurred in connection with the negotiation and documentation of this Agreement and the other agreements contemplated hereby, the performance of this Agreement and the other agreements contemplated hereby and the consummation of the transactions contemplated hereby and thereby will be paid by the Party incurring such fees, costs and expenses; it being acknowledged and agreed that (a) all Transfer Taxes will be allocated pursuant to Section 9.1 and (b) all Cure Costs will be allocated pursuant to Section 5.2.

10.3   Notices. Except as otherwise expressly provided herein, all notices, demands, consents, waivers and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given (a) when personally delivered, (b) when transmitted by electronic mail if transmitted prior to 5:00 PM (local time of the recipient) on a Business Day and otherwise on the next Business Day after transmittal (c) the day following the day on which the same has been delivered prepaid to a reputable national overnight air courier service or (d) the third (3rd) Business Day following the day on which the same is sent by certified or registered mail, postage prepaid, in each case, to the respective Party at the number, electronic mail address or street address, as applicable, set forth below, or at such other number, electronic mail address or street address as such Party may specify by written notice to the other Party.

Notices to Purchaser:

**Film Services International, LLC**
[TO COME]

with a copy to (which shall not constitute notice):

**Goldstein & McClintock LLLP**
111W. Washington Street, Suite 1221
Chicago, Illinois 60602
Attention:      Matthew McClintock
                Ainsley Moloney
                Joshua Grenard
Email:          mattm@goldmclaw.com
                ainsleym@goldmclaw.com
                joshuag@goldmclaw.com

21

-- and –

**Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.**
919 Third Avenue
New York, New York 10022
Attention:       Frank J. Earley
                 Kaitlin R. Walsh
Email:           fjearley@mintz.com
                 krwalsh@mintz.com

<u>Notices to Seller</u>:

**Film Finances, Inc.**
**Rainbow Production Services, LLC**
**Rainbow Digital Services, LLC**
**EPS-Cineworks, Inc.**
9000 W Sunset Blvd Suite 1400
Los Angeles, CA 90069
Attention: Peter Coleman
Email: <u>Peter@ffi.com</u>

with a copy to (which shall not constitute notice):

**Sullivan & Triggs, LLP**
1230 Montana Avenue, Suite 201
Santa Monica, California 90403
Attention:       Cary Berger
Email:           <u>cberger@sullivantriggs.com</u>

-- and –

**Levene, Neale, Bender, Yoo & Golubchik L.L.P.**
2818 La Cienega Avenue
Los Angeles, CA  90034
Attention : David L. Neale
Email : <u>dln@lnbyg.com</u>

    10.4    <u>Binding Effect; Assignment</u>. This Agreement shall be binding upon Purchaser and, subject to the terms of the Bidding Procedures Order (with respect to the matters covered thereby) and the entry and terms of the Sale Order, Seller, and shall inure to the benefit of and be so binding on the Parties and their respective successors and permitted assigns, including any trustee or estate representative appointed in the Bankruptcy Case or any successor Chapter 7 case; <u>provided</u> that neither this Agreement or the other Transaction Agreements nor any of the rights or obligations hereunder or thereunder may be assigned or delegated without the prior written consent of Purchaser and Seller, and any attempted assignment or delegation without such prior written consent shall be null and void; <u>provided further</u> that Seller may assign some or all of its rights or

22

delegate some or all of its obligations hereunder and the other Transaction Agreements to successor entities pursuant to a plan of reorganization confirmed by the Bankruptcy Court.

10.5    Amendment and Waiver. Any provision of this Agreement or the Schedules or exhibits hereto may be (a) amended only in a writing signed by Purchaser and Seller or (b) waived only in a writing executed by the Person against which enforcement of such waiver is sought. No waiver of any provision hereunder or any breach or default thereof will extend to or affect in any way any other provision or prior or subsequent breach or default. Furthermore, neither the failure nor any delay by any Party in exercising any right, power or privilege under this Agreement or the documents referred to in this Agreement (including, without limitation, the Transaction Agreements) will operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power or privilege will preclude any other or further exercise of such right, power or privilege or the exercise of any other right, power or privilege.

10.6    Third Party Beneficiaries. Except as otherwise expressly provided herein, nothing expressed or referred to in this Agreement will be construed to give any Person other than the Parties and their permitted successors and assigns any legal or equitable right, remedy, cause of action or claim under or with respect to this Agreement or any provision of this Agreement.

10.7    Non-Recourse. This Agreement may only be enforced against, and any Action based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as parties to this Agreement. Except to the extent named as a party to this Agreement, and then only to the extent of the specific obligations of such parties set forth in this Agreement, no past, present or future Advisor or Affiliate of any Party will have any Liability (whether in contract, tort, equity or otherwise) for any of the representations, warranties, covenants, agreements or other obligations or Liabilities of any of the parties to this Agreement or for any Action based upon, arising out of or related to this Agreement.

10.8    Severability. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable Law in any jurisdiction, such provision will be ineffective only to the extent of such prohibition or invalidity in such jurisdiction, without invalidating the remainder of such provision or the remaining provisions of this Agreement or in any other jurisdiction.

10.9    Construction. The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against any Person. The headings of the sections and paragraphs of this Agreement have been inserted for convenience of reference only and will in no way restrict or otherwise modify any of the terms or provisions hereof.

10.10    Schedules. The Schedules have been arranged for purposes of convenience in separately numbered sections corresponding to the sections of this Agreement; provided that each section of the Schedules will be deemed to incorporate by reference all information disclosed in any other section of the Schedules and will be deemed a disclosure against any representation or warranty set forth in this Agreement, without the need for repetition or cross reference. No information set forth in the Schedules will be deemed to broaden in any way the scope of the

Parties' representations, warranties, obligations, covenants, conditions or agreements contained herein. Any description of any agreement, document, instrument, plan, arrangement or other item set forth on any Schedule is a summary only and is qualified in its entirety by the terms of such agreement, document, instrument, plan, arrangement, or item which terms will be deemed disclosed for all purposes of this Agreement. For the avoidance of doubt, the information contained in this Agreement, in the Schedules and exhibits hereto is disclosed solely for purposes of this Agreement, and no information contained herein or therein will be deemed to be an admission by any Party to any third party of any matter whatsoever, including any violation of Law or breach of Contract.

10.11  Complete Agreement. This Agreement, together with the other Transaction Agreements, contains the entire agreement of the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the transactions contemplated hereby and thereby and supersedes all prior agreements among the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the transactions contemplated by this Agreement and the other Transaction Agreements. In the event an ambiguity or question of intent or interpretation arises with respect to this Agreement, the terms and provisions of the execution version of this Agreement will control and prior drafts of this Agreement and the documents referenced herein will not be considered or analyzed for any purpose (including in support of parol evidence proffered by any Person in connection with this Agreement), will be deemed not to provide any evidence as to the meaning of the provisions hereof or the intent of the Parties with respect hereto and will be deemed joint work product of the Parties.

10.12  Specific Performance. The Parties agree that irreparable damage, for which monetary relief, even if available, would not be an adequate remedy, would occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached, including if any of the Parties fails to take any action required of it hereunder to consummate the transactions contemplated by this Agreement. It is accordingly agreed that (a) the Parties will be entitled to an injunction or injunctions, specific performance or other equitable relief to prevent breaches, or threatened breaches of this Agreement and to enforce specifically the terms and provisions hereof and its rights hereunder in the courts described in Section 10.13 without proof of damages or otherwise, this being in addition to any other remedy to which they are entitled under this Agreement, or other rights and remedies existing in its favor at law or in equity, and (b) the right of specific performance, injunctive relief and other equitable relief is an integral part of the transactions contemplated by this Agreement and without that right, neither Seller nor Purchaser would have entered into this Agreement. The Parties acknowledge and agree that any Party pursuing an injunction or injunctions or other Order to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this Section 10.12 will not be required to provide any bond or other security in connection with any such Order. The remedies available to Seller pursuant to this Section 10.12 will be in addition to any other remedy to which it was entitled at law or in equity, and the election to pursue an injunction or specific performance will not restrict, impair or otherwise limit Seller from seeking to collect or collecting damages. In no event will this Section 10.12 be used, alone or together with any other provision of this Agreement, to require Seller to remedy any breach of any representation or warranty of Seller made herein.

10.13    Jurisdiction and Exclusive Venue. Each of the Parties irrevocably agrees that any Action that may be based upon, arising out of, or related to this Agreement or the negotiation, execution or performance of this Agreement and the transactions contemplated hereby brought by any other Party or its successors or assigns will be brought and determined only in (a) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (b) if the Bankruptcy Court is unwilling or unable to hear such Action, in the Delaware Chancery Court and any state court sitting in the State of Delaware to which an appeal from the Delaware Chancery Court may be validly taken (or, if the Delaware Chancery Court declines to accept jurisdiction over a particular matter, any state or federal court within the state of Delaware) ((a) and (b), the "Chosen Courts"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Chosen Courts for itself and with respect to its property, generally and unconditionally, with regard to any such Action arising out of or relating to this Agreement and the transactions contemplated hereby. Each of the Parties agrees not to commence any Action relating thereto except in the Chosen Courts, other than Actions in any court of competent jurisdiction to enforce any Order, decree or award rendered by any Chosen Court, and no Party will file a motion to dismiss any Action filed in a Chosen Court on any jurisdictional or venue-related grounds, including the doctrine of *forum non-conveniens*. The Parties irrevocably agree that venue would be proper in any of the Chosen Courts, and hereby irrevocably waive any objection that any such court is an improper or inconvenient forum for the resolution of such Action. Each of the Parties further irrevocably and unconditionally consents to service of process in the manner provided for notices in Section 10.3. Nothing in this Agreement will affect the right of any Party to this Agreement to serve process in any other manner permitted by Law.

10.14    Governing Law; Waiver of Jury Trial.

(a)    Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement, and any Action that may be based upon, arising out of or related to this Agreement or the negotiation, execution or performance of this Agreement or the transactions contemplated hereby will be governed by and construed in accordance with the internal Laws of the State of New York applicable to agreements executed and performed entirely within such State without regards to conflicts of law principles of the State of New York or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of New York to apply.

(b)    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT, THE TRANSACTION AGREEMENTS AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND THEREFORE HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY ACTION BASED ON, ARISING OUT OF OR RELATED TO THIS AGREEMENT, ANY TRANSACTION AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY. EACH OF THE PARTIES AGREES AND CONSENTS THAT ANY SUCH ACTION WILL BE DECIDED BY TRIAL WITHOUT A JURY AND THAT THE PARTIES TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE IRREVOCABLE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. EACH PARTY (I) CERTIFIES THAT NO OTHER PARTY OR ADVISOR THEREOF HAS

25

REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

10.15    Counterparts and PDF. This Agreement, the Transaction Agreements and any other agreements referred to herein or therein, and any amendments hereto or thereto, may be executed in multiple counterparts, any one of which need not contain the signature of more than one party hereto or thereto, but all such counterparts taken together will constitute one and the same instrument. Any counterpart, to the extent signed and delivered by means of electronic signature (including signature via DocuSign or similar services), a photographic, photostatic, facsimile, portable document format (.pdf), or similar reproduction of such signed writing using a facsimile machine or electronic mail, will be treated in all manner and respects as an original Contract and will be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person.

10.16    Bulk Sales Laws. The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any Encumbrances in the Acquired Assets including any liens or claims arising out of the bulk transfer laws except Permitted Encumbrances, and the parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order. In furtherance of the foregoing, each Party hereby waives compliance by the Parties with the "bulk sales," "bulk transfers" or similar Laws and all other similar Laws in all applicable jurisdictions in respect of the transactions contemplated by this Agreement.

10.17    Fiduciary Obligations. Nothing in this Agreement, or any document related to the transactions contemplated hereby, will require Seller or any of its officers, directors or shareholders, in each case, in their capacity as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations.

## ARTICLE XI

## ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS

11.1    Certain Definitions.

(a)    "Action" means any action, claim (including a counterclaim, cross-claim, or defense), complaint, summons, suit, litigation, arbitration, third-party mediation, audit, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), prosecution, contest, dispute, hearing, inquiry, inquest, audit, examination or investigation, of any kind whatsoever, regardless of the legal theory under which such Liability or obligation may be sought to be imposed, whether sounding in contract or tort, or whether at law or in equity, or otherwise under any legal or equitable theory, commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Body, tribunal or arbitrator.

(b)     "Advisors" means, with respect to any Person, any directors, officers, members, shareholders, equity holders, managers, partners, employees, contractors, subcontractors, investment bankers, financial advisors, accountants, auditors, agents, attorneys, consultants, or other representatives of such Person.

(c)     "Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management, affairs and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

(d)     "Alternative Transaction" means any transaction (or series of transactions), whether direct or indirect, concerning a sale or disposition of all or substantially all of the Acquired Assets (in any form of transaction, whether by merger, sale of assets or equity, plan of reorganization or otherwise) and/or Assumed Liabilities.

(e)     "Auction" shall have the meaning ascribed to such term in the Bidding Procedures Order.

(f)     "Bidding Procedures" means those *Bidding Procedures for the Sale of the Debtors' Assets* filed in the Bankruptcy Case on [DATE] [Docket No.    ][1] and approved by the Bidding Procedures Order.

(g)     "Bidding Procedures Order" means the *Order (I) Approving the Bidding Procedures and Related Dates and Deadlines, (II) Scheduling Hearings and Objection Deadlines with Respect to the Debtor's Sale, Disclosure Statement, and Plan Confirmation, and (III) Granting Related Relief.*[2]

(h)     "Business Day" means any day other than a Saturday, Sunday or other day on which the Federal Reserve Bank located in New York City, New York is closed.

(i)     "Tax Code" means the United States Internal Revenue Code of 1986, as amended.

(j)     "Consent" means any approval, consent, ratification, permission, waiver or authorization, or an Order of the Bankruptcy Court that deems or renders unnecessary the same.

(k)     "Contract" means any contract, indenture, note, bond, lease, sublease, mortgage, agreement, guarantee, or other agreement that is legally binding upon a Person or its property, in each case, other than a purchase order, service order or sales order.

---

[1] Note: Add docket number and date once filed

[2] Note: Conform to exact title of order submitted to court

(l)     "Covered Termination" means a termination of this Agreement under (i) Sections 8.1(d), 8.1(i), 8.1(j) or 8.1(k) hereof provided Purchaser is not in material breach or violation of its representations, warranties, covenants or obligations under this Agreement or (ii) Sections 8.1(e) and 8.1(g) hereof.

(m)     "DIP Credit Agreement" means that certain Priming Superpriority Debtor-In-Possession Credit Agreement, dated as of October [__], 2024 in the aggregate principal amount of [$8,000,000].

(n)     "Encumbrance" means any lien (as defined in section 101(37) of the Bankruptcy Code), encumbrance, claim (as defined in section 101(5) of the Bankruptcy Code), charge, mortgage, deed of trust, option, pledge, security interest or similar interests, hypothecations, conditional sale or other title retention agreements.

(o)     "GAAP" means United States generally accepted accounting principles as in effect from time to time.

(p)     "Governmental Authorization" means any permit, license, certificate, approval, consent, permission, clearance, designation, qualification or authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Law.

(q)     "Governmental Body" means any government, quasi-governmental entity, or other governmental or regulatory body, agency or political subdivision thereof of any nature, whether foreign, federal, state or local, or any agency, branch, department, official, entity, instrumentality or authority thereof, or any court or arbitrator (public or private) of applicable jurisdiction.

(r)     "Hamilton Arbitration" means that certain pending arbitration titled *Dramacorp Pampas Studios AB and Film Finances, Inc. v. Hiscox Insurance Company Limited.*

(s)     "Knowledge of Seller" means, as applicable, the actual knowledge without independent verification (and in no event encompassing constructive, imputed or similar concepts of knowledge) of Mr. Peter Coleman or Mr. Billy Cheung, neither of whom, for the sake of clarity and avoidance of doubt, shall have any personal liability or obligations regarding such knowledge.

(t)     "Law" means any federal, state, provincial, local, municipal, foreign or international, multinational or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, decree, proclamation, treaty, convention, rule, regulation, ruling, directive, pronouncement, determination, decision, opinion or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Body.

(u)     "Liability" means, as to any Person, any debt, adverse claim, liability, duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued,

liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed.

(v) "Material Adverse Effect" means

(i) any change, event or effect that has had, or would reasonably be expected to have, a material adverse effect upon the Acquired Assets and Assumed Liabilities, condition of Seller (financial or otherwise), business or results of operation of the Seller; *provided, however*, that any adverse change, event or effect arising from or related to any of the following shall not be taken into account in determining whether a "Material Adverse Effect" has occurred (except, with respect to any matter described in the following clauses (S), (T), U), (V), and (W), to the extent such adverse change, event or effect has a materially disproportionate effect on Seller relative to other comparable businesses operating in the industry in which such Seller operates: (S) conditions affecting the United States economy generally; (T) any national or international political or social conditions, including the engagement by the United States in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States, or any of its territories, possessions or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States; (U) changes in financial, banking or securities markets; (V) changes in GAAP; (W) a pandemic, epidemic or disease outbreak; (X) the commencement or pendency of the Bankruptcy Case; (Y) any objections in the Bankruptcy Court to (1) the DIP Credit Agreement or any of the transactions contemplated thereby, (2) this Agreement or any of the transactions contemplated hereby or thereby, (3) the Bidding Procedures Order, (4) the Sale Order or the reorganization of Seller, or (5) the assumption, assumption and assignment or rejection of any Contract; or (Z) any Order of the Bankruptcy Court or any actions or omissions of Seller in compliance therewith; or

(ii) a material impairment or delay in the ability of the Seller to perform its obligations under this Agreement, including consummation of the transactions contemplated by this Agreement.

(w) "Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body, including any order entered by the Bankruptcy Court in the Bankruptcy Case (including the Sale Order).

(x) "Ordinary Course" means the ordinary course of operations of the business of Seller taken as a whole, consistent with past practice and taking into account the contemplation, commencement and pendency of the Bankruptcy Case.

(y) "Permitted Encumbrances" means those Encumbrances set forth on Schedule 11.1(y), including but not limited to the following: (i) agreed Encumbrances for utilities and Taxes not yet due and payable, being contested in good faith, or the nonpayment of which is permitted or required by the Bankruptcy Code, (ii) easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments against any of the Acquired Assets that do not, individually or in the aggregate, adversely affect the operation of the Acquired Assets, (iii) materialmans,' mechanics', artisans', shippers',

29

warehousemans' or other similar common law or statutory liens incurred in the Ordinary Course after the Petition Date for amounts not yet due and payable, (iv) licenses granted on a non-exclusive basis, (v) title exceptions which do not, individually or in the aggregate, materially and adversely affect the operation of the Acquired Assets, and (vi) restrictions under applicable securities Laws.

(z)    "Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, organization, estate, Governmental Body or other entity or group.

(aa)    "Pre-Petition Indebtedness" means all amounts due and owing by Seller with respect to the loan and the related obligations under the Pre-Petition Loan Agreement.

(bb)    "Pre-Petition Lenders" means, collectively, SILAC Insurance Company, in its capacity as lender under the Pre-Petition Loan Agreement, and Haymarket Insurance Company, in its capacity as lender under the Pre-Petition Loan Agreement.

(cc)    "Pre-Petition Loan Agreement" means that certain Loan and Security Agreement dated as of August 31, 2022 among Seller, Haymarket Insurance Company, in its capacity as agent and collateral agent, and Pre-Petition Lenders.

(dd)    "Purchaser Group" means Purchaser (including any predecessor thereof), any Affiliate of Purchaser (including any predecessor thereof) and each of their respective former or current Affiliates and Advisors.

(ee)    "Sale Order" means the Order or Orders (i) approving this Agreement and the terms and conditions hereof, including pursuant to, *inter alia*, sections 105, 363 and 365 of the Bankruptcy Code and (ii) approving and authorizing Seller to consummate the transactions contemplated hereby.

(ff)    "Subsidiary" or "Subsidiaries" means, with respect to any Person, any corporation of which a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person or a combination thereof or any partnership, association or other business entity of which a majority of the partnership or other similar ownership interest is at the time owned or controlled, directly or indirectly, by such Person or one or more Subsidiaries of such Person or a combination thereof.

(gg)    "Tax" or "Taxes" means any federal, state, local, foreign or other income, gross receipts, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, ad valorem/personal property, stamp, excise, occupation, sales, use, transfer, value added, import, export, alternative minimum or estimated tax, including any interest, penalty or addition thereto.

(hh)    "Tax Return" means any return, claim for refund, report, statement or information return relating to Taxes required to be filed with a Governmental Body, including any schedule or attachment thereto, and including any amendments thereof.

30

(ii)    "Transaction Agreements" means this Agreement and any other agreements, instruments or documents entered into pursuant to this Agreement, including the Assumption and Assignment Agreement.

11.2    Index of Defined Terms.[3]

| | |
|---|---|
| Acquired Assets................................. 4 | Designated Contracts...........…...........5 |
| Agreement....................................... 4 | Enforceability Exceptions............................ 9 |
| Allocation.................................... 23 | Excluded Assets.............................  5 |
| Assigned Contracts...............…............6 | Excluded Liabilities .................................. 6 |
| Assumption and Assignment Agreement.... 8 | Insurance Programs.............................5 |
| Assumed Liabilities ................................ 5 | Outside Date.............................. 21 |
| Assumed Vendor Liabilities..................5 | Parties............................................. 4 |
| Backup Bidder ......................... 14 | Party ................................................ 4 |
| Bankruptcy Case ......................... 4 | Purchase Price.............................. 7 |
| Bankruptcy Code ...................... 4 | Purchaser........................................ 4 |
| Bankruptcy Court......................... 4 | Seller ............................................ 4 |
| Closing .......................... 8 | Solvent ...................................... 13 |
| Closing Date.................................. 8 | Successful Bidder..................................... 14 |
| Closing Date Payment............................... 8 | Transfer Taxes ......................... 23 |
| Cure Costs.....................…................6 | |

11.3    Rules of Interpretation. Unless otherwise expressly provided in this Agreement, the following will apply to this Agreement, the Schedules and any other Transaction Agreement.

(a)    Accounting terms that are not otherwise defined in this Agreement have the meanings given to them under GAAP consistently applied. To the extent that the definition of an accounting term defined in this Agreement is inconsistent with the meaning of such term under GAAP, the definition set forth in this Agreement will control.

(b)    The terms "hereof," "herein" and "hereunder" and terms of similar import are references to this Agreement as a whole and not to any particular provision of this Agreement. Section, clause, schedule and exhibit references contained in this Agreement are references to sections, clauses, schedules and exhibits in or to this Agreement, unless otherwise specified. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(c)    Whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation." Where the context permits, the use of the term "or" will be equivalent to the use of the term "and/or," unless expressly indicated otherwise.

(d)    The words "to the extent" shall mean "the degree by which" and not "if."

---

[3] Note: To be updated after finalizing terms of APA.

(e)     When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded. If the last day of such period is a day other than a Business Day, the period in question will end on the next succeeding Business Day.

(f)     Words denoting any gender will include all genders, including the neutral gender. Where a word is defined herein, references to the singular will include references to the plural and vice versa.

(g)     The word "will" will be construed to have the same meaning and effect as the word "shall". The words "shall," "will," or "agree(s)" are mandatory, and "may" is permissive.

(h)     All references to "$" and dollars will be deemed to refer to United States currency unless otherwise specifically provided.

(i)     All references to a day or days will be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

(j)     Any document or item will be deemed "delivered," "provided" or "made available" by Seller, within the meaning of this Agreement if such document or item is (a) included in the data room, (b) actually delivered or provided to Purchaser or any of Purchaser's Advisors or (c) made available upon request, including at Seller's offices.

(k)     Any reference to any agreement or Contract will be a reference to such agreement or Contract, as amended, modified, supplemented or waived.

(l)     Any reference to any particular code section or any Law will be interpreted to include any amendment to, revision of or successor to that section or Law regardless of how it is numbered or classified; provided that, for the purposes of the representations and warranties set forth herein, with respect to any violation of or non-compliance with, or alleged violation of or non-compliance, with any code section or Law, the reference to such code section or Law means such code section or Law as in effect at the time of such violation or non-compliance or alleged violation or non-compliance.

(m)     A reference to any Party to this Agreement or any other agreement or document shall include such Party's successors and permitted assigns.

*[Signature page(s) follow.]*

32

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

**SELLER:**

**Film Finances, Inc.**

By: _____
Name:
Title:  Chief Executive Officer

**Rainbow Production Services, LLC**

By: _____
Name:
Title:

**Rainbow Digital Services, LLC**

By: _____
Name:
Title:

**EPS-Cineworks, Inc.**

By: _____
Name:
Title:

*Signature Page to Asset Purchase Agreement*

**PURCHASER:**


**Film Services International, LLC**


By: _____
Name:
Title:   President

*Signature Page to Asset Purchase Agreement*

## Schedule 1.1

### Scheduled Subsidiaries

| Name | Parent Company | Type of Entity | Jurisdiction |
|---|---|---|---|
| Film Finances International | FFI | Corp | California |
| FFI Acquisitions, LLC | FFI | LLC | Delaware |
| Triplet Global LLC | FFI | LLC | Delaware |
| Liquid Lights Production LLC | FFI Acquisitions LLC | LLC | Delaware |
| Pivotal Post Limited | RDS | LLC | United Kingdom |
| Post Production Pivotal Inc. | RDS | Corp. | Quebec, Canada |
| Pivotal Post Corporation | RDS | Corp. | Ontario, Canada |
| Film Finances New Mexico, LLC | FFI | LLC | New Mexico |
| Film Finances, Louisiana LLC | FFI | LLC | Louisiana |
| Film Finances Pennsylvania, LLC | FFI | LLC | Pennsylvania |
| Film Finances Alabama, LLC | FFI | LLC | Alabama |
| Film Finances GmbH | FFI | LLC | Cologne, Germany |
| Film Finances Hungary Kft. | FFI | LLC | Hungary |
| Film Finances Scandinavia AB | FFI | LLC | Sweden |
| Film Finances Canada Ltd. | FFI | LLC | Canada |
| Film Finances S.R.O | FFI | LLC | Czech Republic |
| Film Finances SA PTY LTD | FFI | LLC | South Africa |
| Film Finances Limited ("**FFL**") | FFI | LLC | England, United Kingdom |

*Schedule 1.1 - Scheduled Subsidiaries*

| Name | Parent Company | Type of Entity | Jurisdiction |
|---|---|---|---|
| Fortress Productions Limited | FFL | LLC | England, United Kingdom |
| Picture Properties Limited ("**PPL**") | FFL | LLC | England, United Kingdom |
| Switch 3 Productions LLC | PPL | LLC | Louisiana |
| Switch 3 Productions Inc. | PPL | Corp. | Canada |
| Hadley Productions LLC ("**HP**") | FFI | LLC | Louisiana |
| Hadley Productions NYC Inc. | HP | Corp. | New York |
| Lavania BC Productions Inc. | LP | Corp. | Canada |
| Lavania Productions LLC ("**LP**") | FFI | LLC | California |
| Film Finances Inc. | FFI | Corp. | Bahamas |
| FF Network Inc ("**FF Network**") | FFI | Corp. | California |
| FF Asia, LLC ("**FF Asia**") | FF Network | LLC | California |
| Film Finances China Cultural Services Ltd. | FF Asia | LLC | China |
| Great Outlook SDN BHD | FF Network | LLC | Malaysia |
| PGS Finance LLC | FF Network | LLC | California |
| Buff Dubs PTY LTD ("**Buff**") | FFI | LLC | New South Wales, Australia |
| Silver & Ballard PTY LTD ("**Silver**") | FFI | LLC | New South Wales, Australia |
| DAMsmart Asia SDN. BHD. | Silver | LC | Malaysia |
| DAMsmart NZ Limited | Silver | LLC | New Zealand |

*Schedule 1.1 - Scheduled Subsidiaries*

Docusign Envelope ID: C1CD163C-8DA4-46F1-AF89-FB1A024BCC76

| Name | Parent Company | Type of Entity | Jurisdiction |
|------|----------------|----------------|--------------|
| Buff Dubs NZ | Buff | Corp. | New Zealand |
| FFI Insurance LTD | FFI Holdings Ltd. | LLC | Bermuda |

*Schedule 1.1 - Scheduled Subsidiaries*

## Schedule 1.2

### Excluded Assets

**The following Real Property Leases:**

| Property Address | Lessor | Lessee |
|---|---|---|
| 3330 Cahuenga Blvd. Los Angeles, CA | Glenborough Cahuenga, LLC (DE)  Elat Properties, Inc. (Landlord's Representative d/b/a Cahuenga Towers 2nd Amdmt.)  Cahuenga Tower (3rd & 4th Amdmts.) | EPS-CINEWORKS, Inc. (CA) (as Assignee of EPS-CINEWORKS, LLC (CA)) |
| 25 East 21st St. New York, NY | Soundtrack Group, Inc. (NY) | Rainbow Digital Services, LLC (CA) d/b/a Pivotal Post |

**Other Excluded Assets:** N/A

## Schedule 1.3(a)

### Assumed Pre-Petition Indebtedness

N/A

*Schedule 1.3(a) – Assumed Pre-Petition Indebtedness*

## Schedule 1.3(b)

### Designated Contracts[4]

---

[4] TBD

## Schedule 3.3

### Seller Conflicts; Consents

None.

## Schedule 4.3

### Purchaser Conflicts; Consents

None.

## Schedule 6.1(a)

### Conduct of Business of Seller

*Schedule 6.1(a) – Conduct of Business of Seller*

## Schedule 11.1(y)

### Permitted Encumbrances